# EXHIBIT B

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 2 of 238

1

CITY COUNCIL
CITY OF NEW YORK

------------------------ X

TRANSCRIPT OF THE MINUTES

Of the

COMMITTEE ON ENVIRONMENTAL
PROTECTION, RESILIENCY AND
        WATERFRONTS

------------------------ X

                    October 16, 2023
                    Start:    1:24 p.m.
                    Recess:   6:08 p.m.


HELD AT:          COUNCIL CHAMBERS, CITY HALL

B E F O R E:      James F.   Gennaro, Chairperson

COUNCILMEMBERS:
                  Jennifer Gutiérrez
                  Kamillah Hanks
                  Robert F.  Holden
                  Julie Menin
                  Sandy Nurse
                  Lincoln Restler
                  Keith Powers

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 3 of 238

2

A P P E A R A N C E S (CONTINUED)

John Castelli
Deputy Commissioner
Legislative Affairs
Office of Administrative Trials
and Hearings

Amy Slifka
Deputy Commissioner
Hearings and Adjudications Division
Office of Administrative Trials
and Hearings

Angela Licata
Deputy Commissioner
Department of Environmental Protection

Mark Page
Executive Director
Bureau Environmental Compliance
Department of Environmental Protection

Alyssa Preston
Director
Air and Noise Policy and Enforcement
Department of Environmental Protection

Andrew Rigie
Executive Director
NYC Hospitality Alliance

Max Bookman
Counsel
NYC Hospitality Alliance

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 4 of 238

3

Robert Bookman
Counsel
NYC Hospitality Alliance

David Sheldon
South Street Seaport Coalition

Kathleen Reilly Irwin
New York State Restaurant Association

Katelyn Mooney
General Manager
The Independent

Michael Jacobs
Corner Table Restaurants

Vanessa Oré
General Manager
Romantic Depot Queens

Brittney Mayorga
Supervisor
Romantic Depot

Joel Kupferman
Environmental Justice Initiative

John Conroy
Mustang Harrys

Theresa Sigler
Manager
Pig N Whistle

4

Liam Malanachy
Junior's Cheesecake

Clint Smeltzer
Manhattan Community Board 3

Mark Fox
Fox Lifestyle Hospitality

Lesa Rozmarek
Nederlander Organization

Robert Camacho
Bushwick Allience

Yoav Erez
Citizen of New York

Sandra Telendrana
Flowers by Giorgie

Nikolay Gergov
Pando 39

Frank McCawley
Tito Murphys

A.M. Riccielli, Co-op
East 17th Street Loft Corporation Co Op

Gregory Guarino
Acoustilog Incorporated

Norma Cote
Citizen of New York

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 6 of 238

Peter Gibson
Citizen of New York

Murphy Fitzpatrick
Manager
BarDough Restaurant

Robin Warren
Citizen of New York

Sharon Trennor
Representative
Eight restaurants

Cormac Flynn
Community Board 2

Jonathan Rinaldi
Citizen of New York

Raul Rivera
Citizen of New York

Eric Eisenberg
Citizen of New York

Jeanine Bata
Citizen of East Flatbush

Dietmar Detering
Citizen of New York

Leslie Clark
Citizen of New York

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 7 of 238

6

Alfred Fuente
Attorney

Deborah Farley
Citizen of Sunnyside

Ernest Welde
Citizen of New York

Hayden Brockett
Citizen of Manhattan

Michael Streeter
Citizen of New York

Michele Campo
Representative
Little Italy and Bowery Block Association

Laura Sewell
Director
East Village Community Coalition

Lisa Ann Chapman
Citizen of New York

Micki McGee
Citizen of New York

Mitchell Grubler
Bowery Alliance of Neighbors

Susan Ginsburg
Citizen of the West Village

7

Victoria Hillstom
Citizen of New York

Zach Winestine
St. Gansevoort

Alex Stein
Citizen of New York

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 9 of 238

```
                 COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1    RESILIENCY AND WATERFRONTS                         8

  2         SERGEANT AT ARMS:  At this time, please silence

  3    your electronics, and if you wish to submit a

  4    testimony you may do so at testimony@counsel.nyc.gov.

  5    Just a friendly reminder:  Please do not approach the

  6    dais at any moment.  If you need assistance, you may

  7    ask one of the Sergeant at Arms.  And at this time we

  8    are ready to begin, Chair.

  9         CHAIRPERSON GENNARO:  Sergeant, we're ready to go

 10    right?  Did he say yes?  Oh, yes.

 11         [GAVEL]

 12         Good afternoon, I am Jim Gennaro, Chair of the

 13    Committee on Environmental Protection, Resiliency,

 14    and Waterfronts.  Today we're here to examine the

 15    Department of Environmental Protection's response and

 16    management to noise complaints.  The Committee will

 17    also hear a few pieces of legislation including Intro

 18    No. 160, sponsored by Councilmember Holden, in

 19    relation to the noise standard for commercial

 20    businesses, Intro No. 1194 sponsored by me in

 21    relation to citizen noise complaints, and a package

 22    of bills sponsored by Councilmember Powers (that

 23    should be Majority Leader Powers) in relation to

 24    construction noise, noise inspection results, and

 25    creating a photo noise violation monitoring device
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                   9

1

2    program for motor vehicles.  New York City must

3    balance the vibrancy of being a world class city with

4    the needs of everyday New Yorkers.  However, DEP

5    cannot always respond quickly to every noise code

6    violation in the city.

7         To that end-- Sip of tea.  To that end, the

8    city's noise code allows New Yorkers to file their

9    own noise complaints against violators of some quote

10   "some" noise code-- noise code provisions.  These

11   civilian enforcers must first serve a complaint upon

12   DEP.  Then if DEP fails to act within 30 days, the

13   enforcer may file a complaint directly on the alleged

14   violator and the Environmental Control Board in the

15   Office of Administrative Trials and Hearings, known

16   as OATH.  Civilian enforcers are awarded a percentage

17   of any penalty assessed from a complaint they pursue,

18   that is if it's upheld, typically between $110 and

19   then $660 per complaint staff informs me.

20        Engaged New Yorkers play an important role in

21   enforcement of our city's noise code.  However,

22   recent news reports have highlighted a small number

23   of civilian enforcers who filed large numbers of

24   complaints under one particular noise code provision,

25   often repeatedly against the same businesses to

FILED: NEW YORK COUNTY CLERK 05/03/2024 12:34 PM   INDEX NO. 159847/2023
NYSCEF DOC. NO. 126                                RECEIVED NYSCEF: 05/03/2024

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                               10

1

2    collect the reward money.  The result is local

3    businesses being unfairly burdened by overzealous

4    enforcers who are more motivated by profit than

5    quality of life.  There I said it.  This hearing will

6    examine DEP's and OATH's roles and enforcing the

7    noise code to balance the needs of all New Yorkers.

8        In addition, we'll hear several bills that will--

9    that make will make civilian enforcement of the noise

10   code less financially lucrative and more objective,

11   make it easier for New Yorkers to request and obtain

12   the results of certain noise inspections, and reduce

13   the overall level of unnecessary noise in the city.

14   These bills include Intro 1194, which I sponsored, or

15   am sponsoring that would cap the compensation

16   civilian enforcers can receive when their complaint

17   prompts proceedings under Subdivision B of Section

18   24-244 of the noise code at $5 for proceedings

19   brought by DEP, and $10 for proceedings and

20   enforcement and enforcer brings themselves.

21       This would reduce the financial incentive for--

22   well let me just kind of edit this sentence as I read

23   it.  This would reduce the financial incentive for

24   individuals who file multiple harassing complaints

25   against businesses for the purposes of collecting the

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                                 11

2    reward money and will allow DEP inspectors to focus

3    on legitimate noise complaints and on improving the

4    quality of life for all New Yorkers.

5        We're also here-- we will also hear Intro 160

6    sponsored by Councilmember Holden, who would amend

7    the definition for quote "unreasonable noise" close

8    quote, as applies to commercial establishment, to be

9    sound that exceeds specified prohibited noise levels.

10   Unreasonable noise would include impulsive sound

11   above 15 decibels measured at any point within the

12   property in question, or 15-- or 15 feet or more from

13   the source of the sound on the public right away.

14       I just have a sidebar on that:  Twenty years ago

15   when the Mayor did his revamp on the noise code, and

16   it came before this committee, and I was Chair at the

17   time, and it was my understanding that we had put

18   that all to rest, and that there was a big-- this is

19   a little history.  There was a big fight at the time

20   about the Bloomberg administration's desire to have

21   an unreasonable noise standard for-- for business

22   establishments, for people having backyard parties,

23   for people doing loud noise in their apartments or

24   whatever.  And I and the Council, the-- the Council

25   at the time-- the Committee at the time, thought it

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 13 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    12

1

2   was unfair for businesses to not have an objective

3   standard that they had to meet.  Just like one drives

4   a car, and the speed limit is 30, you know, the speed

5   limit is 30.

6       And so, we felt it was important to have an

7   objective standard that that business establishments

8   could be apprised of, and they would have to stay

9   within that standard.  That would be measured by a

10  decibel meter.  Because if the Bloomberg

11  administration had had its way, and it was an

12  unreasonable noise standard that that applied to

13  business establishments, any business would be--

14  would be subject to a violation for noise for

15  anything, you know, depending upon the individual

16  writing the summons.  And so how can a business

17  reasonably prepare?  And how can they operate if they

18  have no idea when they're going to be violated?  And

19  so it'd be-- you know, served with a violation.

20      So that was when we came up with the-- with the

21  noise meter for establishments.  That was going to be

22  their standard.  They'd be apprised of what the

23  decimal standard is, and then they would have to meet

24  that, they would know it.  They can get an engineer.

25  They can look at it.  They can measure it, and then

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 14 of 238

```
            COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1          RESILIENCY AND WATERFRONTS                        13

 2          they'd be in compliance.  And if someone caught them

 3          being out of compliance, as measured by a noise

 4          meter, they would get a violation.

 5              And the unreasonable noise standard (this is back

 6          20 years ago when we thought we put all this to

 7          rest)-- the-- the unreasonable noise standard was

 8          still going to apply for things that were not

 9          establishments: For someone having a loud back

10          backyard party, someone playing a loud noise in their

11          apartment at, you know, three in the morning.  So

12          there was certainly as a road for an unreasonable--

13          for an unreasonable noise standard.

14              And so-- but it seems-- not a lawyer-- but it

15          seems that there is still ambiguity as to what that

16          what we actually did 20 years ago, and I think the

17          Holden bill speaks to that.  And so we will hear more

18          about that.  But I just thought that history lesson

19          was in order.  We fought like anything to get the

20          noise standard, measured by decibel meter, to be

21          fair.  There was blood shed over that provision.  But

22          we prevailed, and now it seems that, you know,

23          unreasonable noise standard for businesses that-- I

24          understand the difference between noise emanating

25          from the operation of a business, and people pointing
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                14

1

2    speakers out to say, you know, "Come and shop here,

3    by a necktie here."  I think that's a little bit of a

4    different story.  But certainly, you know, so the

5    plot thickens, over the last 20 years, to where we

6    are now.  And so--  Where was I?  Where were we?

7    774?  Is that where we are?

8        Okay, well hear a package of bills sponsored by

9    Councilmember Powers that includes-- look at this

10   package.  Jeez.  Look at this whole thing he's got

11   here.  Intro 774, which would require DEP to measure

12   the volume of certain types of construction noise

13   from within dwelling units upon request of the owner,

14   lessor, or occupant; Intro 775 which would mandate

15   that DEP publish the results of their noise

16   inspection online within 24 hours after they had been

17   completed; Intro 776, which would require a DEP and

18   NYPD to give a copy of a noise report pursuant to a

19   311 noise complaint to anyone who requests the report

20   and provides the 311 tracking number within 14 days

21   of the request.

22       And you know-- and I know the Majority Leader is

23   going to speak on these bills in a minute. I just

24   kind of want to set them up.  Intro 777, which would

25   require any person engaging in a construction project

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              15

1

2    to obtain an after-hours variance before removing

3    construction debris, before or after certain hours

4    and on the weekend; and Intro 778-- he's the majority

5    leader so I noticed that all of his bills are in

6    consecutive order; 774, 775-- you've got to be the

7    majority leader to pull that off-- Intro 778, which

8    would establish a noise camera program to detect

9    motor vehicles in violation of the noise code.

10   Vehicles found to be in violation are subject to the

11   civil penalty as prescribed by existing law.  The

12   bill would require a DEP to report on noise camera--

13   on the noise camera program annually.

14       Finally, I would like to thank the really

15   terrific committee staff who have done such great

16   work over the years, particularly on this hearing.

17   Committee Council Samara Swanson, and Clara

18   McLaughlin, Policy Analyst Ricky Chawla, and Andrew

19   Boren, and Financial Analyst Andrew Lane Lawless.

20   And finally my great legislative director Navi Corr

21   for all of their hard work.  Before I turn it over to

22   members who have bills for statements, I want to

23   recognize that we're joined by Councilmember Holden,

24   whom I made reference to, Councilmember Nurse,

25   Councilmember Menin, Committee-- Uh, Majority Leader

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 17 of 238

```
              COMMITTEE ON ENVIRONMENTAL PROTECTION,
   1          RESILIENCY AND WATERFRONTS                        16

   2     Powers.  We have Councilmember Hanks on Zoom.  Is

   3     that correct?  And is Lincoln here?  Okay.  And

   4     Lincoln.  And Lincoln Restler, who, when he asks

   5     questions will no doubt go over time, but I always

   6     indulge him.  And I think I got it.

   7          And with that.  Bob, you're a member of the

   8     Committee and-- but if you wouldn't mind, we do have

   9     the Majority Leader with us, if you would defer and

  10     have me call upon the Majority Leader to speak about

  11     his package of bills first.  Is that okay, Bob?

  12          COUNCILMEMBER HOLDEN:  Okay.

  13          CHAIRPERSON GENNARO:  Okay.  Councilmember Holden

  14     is being most gracious.  And now I recognize the

  15     Majority Leader to speak on his good bills.

  16          MAJORITY LEADER POWERS:  Thank you.  Thank you,

  17     Chair.  Thank you to Councilmember Holden, who I know

  18     has a bill that we're hearing here today.  I also

  19     want to congratulate Lincoln on achieving the Donna

  20     and Cher status as one name for people in this world.

  21     But I really want to thank the Chair and the staff

  22     here for giving me the opportunity to hear these

  23     bills today and being great partners on a number of

  24     issues that we're working on together around

  25     environment and quality of life.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              17

2        We introduced a package a few months back we call

3    the Stop Spreading The Noise Act.  Yes, it's a bad

4    pun, but you're going to have to deal with it, my

5    friends.  It's to help to reduce excessive noise

6    across the five boroughs.  This is directly from

7    constituent calls that we get every single day, and

8    whether you are in Manhattan or anywhere else in the

9    city, I can tell you without question your neighbors

10   and your constituents are-- are dealing with noisy

11   issues every single day.

12       We all know New York is a city that never sleeps.

13   But between noisy helicopters, constant construction,

14   and loud cars, I think we all can agree it's time for

15   some quiet.  I've introduced these five bills to help

16   tackle some of the most common and frequent issues

17   that we hear in my office.  First, Introduction 778

18   establishes a noise camera program to help us detect

19   noisy vehicles and issue violations to any drivers

20   found to be violating city noise limits.  This bill

21   would require annual reporting on the locations of

22   the cameras, the number of violations detected, and--

23   and any revenue raised by the program.  And I want to

24   note that the DEP, as I understand it, is rolling out

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                              18

2    a program right now, to evaluate this and to

3    understand how it could work here in the city.

4        We also know that construction is another major

5    source of noise.  Intro 774 will allow New Yorkers

6    who live near construction sites to request an

7    inspection of sound levels within their home through

8    DEP, and to cut down on construction-related noise

9    overnight on weekends.

10       Intro 777 would require an after-hours variants

11   for the removal of construction debris, two things

12   that we've gotten calls about in my office.

13       Introductions 775 and 776 will help our 311 noise

14   complaint system to be more transparent and effective

15   by ensuring the results of those noise inspections

16   are published online with 24--  within 24 hours, and

17   made available to anyone with a 311 tracking number.

18       Like a lot of issues of 311, it's a fantastic

19   system, but we often hear New Yorkers complain about

20   what happened to that actual call I made?  And we

21   think that on this particular issue, they deserve a

22   right to have the outcome of that call in their hands

23   to admit-- to understand better how that city and

24   that system is working for them.

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 20 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    19

1

2       And to be clear noise is not only a nuisance,

3    it's a public health issue.  The Department of Health

4    has reported that one in six New Yorkers already

5    experience ringing in their ears or hearing loss, and

6    20% are frequently disturbed by noise at home.  Long-

7    term exposure can not only lead to hearing loss, or

8    stress, and sleep disruption, disruption but also

9    high blood pressure and heart disease.  It's also--

10   we're obviously coming off a period of time where

11   many New Yorkers are staying at home and working, or

12   working increasingly at home, and we have seen

13   citywide the amount of complaints go up, enforcement

14   go down, or the ability to respond to those perhaps

15   stay even while we try to tackle many more complaints

16   coming in.  And certainly for the New Yorkers who are

17   experiencing a new way of life, they deserve an

18   opportunity to have a greater, a greater opportunity

19   for peace and quiet.

20       I am confident this package of legislation will

21   help greatly improve New Yorkers' quality of life.  I

22   want again, to thank Chair Gennaro for holding this

23   hearing and the Committee staff for their work.  I

24   want to thank my staff for helping to put this

25   package together.  I look forward to hearing the

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 21 of 238

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
     1          RESILIENCY AND WATERFRONTS                    20

     2          testimony today moving forward this package

     3          legislation to make New York just a little bit of

     4          quieter.  Thanks so much.

     5              CHAIRPERSON GENNARO:  Thank you very much Mr.

     6          Majority Leader.  It's my privilege to recognize my

     7          colleague and great member of this committee,

     8          Councilman Bob Holden to speak on his bill.

     9              COUNCILMEMBER HOLDEN:  Thank you Chair Gennaro.

    10          And-- And just follow up on Majority Leader Keith

    11          Powers's comments:  The noise problem in New York

    12          City has been forever.  We all know this.  And

    13          particularly if you live in a mixed-use area,

    14          commercial along with residential.  And so there's

    15          got to be a balance there.  And so the introduction

    16          of my bill, Intro 160, is a big step in addressing a

    17          significant problem we face in New York City, of

    18          course, the noise.  I'm not a big fan of noise and

    19          some of my legislation in the past has shown that.

    20          And I know many others feel the same way.  Noise

    21          pollution can really impact our daily lives and our

    22          quality of life.

    23              With my bill, we're looking to take action to

    24          deal with this issue seriously.  We're setting clear

    25          noise standards that don't leave room for any
```

FILED: NEW YORK COUNTY CLERK 05/03/2024 12:34 PM          INDEX NO. 159847/2023
NYSCEF DOC. NO. 126                                       RECEIVED NYSCEF: 05/03/2024

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    21

1

2    compromise.  Many times, it's very subjective.  You

3    get a police officer.  And if you call it into 311,

4    it takes-- it tells you on 311, it'll take eight

5    hours, many times to address it within eight hours.

6    The problem we have, and my district is certainly one

7    of them, we have a problem where the officer goes

8    there and says, "Oh, it's not that noisy."  And then

9    the homeowner calls and says, "Listen to this

10   councilman.  Look at how noisy this is.  I have this

11   for eight hours a day."  So we need some kind of

12   standards.  So I'm hopeful that these measures will

13   make our city a quieter and more comfortable place to

14   live.  Again, particularly in mixed-use areas.  So,

15   I'm looking forward to hearing from both the

16   administration and the public on this matter.  I'm

17   open to suggestions on the bill.  If people feel that

18   it's-- it's too strict, we could-- we could change

19   it.  We can modify it.

20       So your feedback and support are crucial.  As we

21   work together to create a more peaceful and enjoy--

22   enjoyable urban environment in New York City.  I want

23   to thank the Chair again.

24       But I also want to bring up a little history, if

25   you if you don't mind, Chair Gennaro that--

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 23 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              22

1

2    CHAIRPERSON GENNARO:  Please, please do so.

3    COUNCILMEMBER HOLDEN:  Mayor Bloomberg tried

4    this.  Mayor Bloomberg had Operation Silent Night.

5    Does anybody remember operation Silent Night?  One

6    person in the room.  And where did it go?  It went

7    nowhere.  Nothing really came of it.  It's a noisier

8    city.  So, I thank the Chair for this, these series

9    of bills, and the Majority Leader because these are

10   important bills to make-- to improve our quality of

11   life.  Again, thank you, Chair.

12   CHAIRPERSON GENNARO: Thank you.  And

13   notwithstanding the fact that Silent Night didn't

14   turn out the way a lot of people thought, when the

15   mayor put forward his comprehensive overhaul of the

16   noise code which took-- he put it forward, I think,

17   in 2003.  But by the time we got through with all the

18   yelling and screaming, it was like 2005 when we

19   actually got it done.  So it was-- you know, it

20   affected the carting industry.  It affected building

21   managers that had air circulation devices.  It

22   affected construction, carting.  It was-- We-- It was

23   a comprehensive package that I thought did a good

24   job.  But you know, not everything is-- is a big hit.

25   So Silent Night wasn't a big hit.  But to the Mayor's

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 24 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    23

1

2   credit, he really tried to take noise, you know,

3   seriously.  We got a lot done, but we're back.

4       And-- and with that, I think we're ready to call

5   the first panel, the Office of Administrative Hearing

6   and Tribunals.  I'd ask the Committee Counsel to

7   swear in the witnesses, and I'll just-- as a matter

8   of, you know, just a statement I-- I want to thank

9   DEP for, you know, kind of working with us to

10  structure the hearing this way.  Ordinarily this is--

11  When we call The Administration this hearing

12  ordinarily would be-- DEP would be the first entity

13  to testify.  But as always, we work well with DEP.

14  We work well with The Administration.  And I worked

15  well with OATH before.  I was the one that gave you

16  folks the ECB.  I don't know if you enjoy that or

17  not, but it used to be in DEP.  We took it out of DEP

18  and gave it to you.  And I hope that worked out for

19  you.  And so, with that said, let me make sure I have

20  my copy of your testimony in front of me.  And the

21  witnesses are sworn, right?  Or have they been sworn,

22  or just called forward?  Have they been sworn yet?

23      COMMITTEE COUNSEL:  Would you please raise your

24  right hand?  Do you swear or affirm to tell the

25

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 25 of 238

```
                 COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1              RESILIENCY AND WATERFRONTS                        24

  2              truth, the whole truth and nothing but the truth

  3              today?

  4                  PANEL:  I do.

  5                  CHAIRPERSON GENNARO:  Thank you very much.  I

  6              have your statement.  You may proceed with your

  7              testimony.

  8                  DEPUTY COMMISSIONER CASTELLI:  Thank you,

  9              Councilmember-- Chair Gennaro.  Thank you.  Good

 10              afternoon Councilmembers.  My name is John Castelli,

 11              and I am the Deputy Commissioner for Legislative

 12              Affairs at the New York City Office of Administrative

 13              Trials and Hearings.

 14                  I would like to start by thanking Chair Gennaro,

 15              and the members of the Committee here today, taking

 16              the time that-- you're-- I know you have extensive

 17              responsibilities and it's appreciated.  I'm joined by

 18              my colleague, Amy Slifka, who is the Deputy

 19              Commissioner of our Hearings Division.

 20                  By way of background OATH is New York City's

 21              central independent administrative law tribunal, and

 22              our mission is to ensure that everyone who appears

 23              before us receives a fair opportunity to be heard and

 24              a timely resolution of their case.  We are a high-

 25              volume court, and in fiscal 2023 alone in our
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                              25

2    hearings division, we processed almost 765,000

3    summonses, and held over 238,000 hearings, and issued

4    close to 2000 appeals decisions. We also closed

5    after trial or by settlement conference approximately

6    4200 cases at our trials division. In each of these

7    cases, we take great care to ensure that every party

8    who appears before us is treated impartially and is

9    accorded due process. In order to fulfill our

10   mission, ensure impartiality, and protect due

11   process, OATH must remain independent from the many

12   city agencies that appear before us.

13       New Yorkers, including individuals, homeowners,

14   and small businesses, need to know that when they

15   come before OATH, they are coming to a place that is

16   unaffiliated with the agency that issued them a

17   summons or notice of violation. And that they will

18   be given a fair hearing. I have had the opportunity

19   to do outreach events in a number of council

20   districts, including some of your own (and if I

21   haven't done it with you yet, believe me, I'm going

22   to be there at some point, and looking forward to

23   it), and through that work, I've come to learn that

24   your constituents rely on OATH being independent.

25   And for these reasons, we take our independence very

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                26

1

2    seriously.  One way that OATH maintains its

3    independence is by not getting involved in

4    enforcement matters.  OATH does not opine on

5    potential enforcement legislation, enforcement

6    policy, or enforcement penalties.  Those decisions

7    are for the policymakers.  We are the tribunal.  Once

8    a law is passed, we apply that law to the facts of

9    each case brought before us.  Consistent with this

10   OATH takes no position on the package of proposed

11   legislation that is under consideration at today's

12   hearing.  We are here today because we understand

13   that the Committee has questions about OATH,

14   processes and data, and we are happy to assist the

15   Committee and understanding how OATH works.  And we

16   will do our best to respond to your questions.  Thank

17   you Chair Gennaro.

18       CHAIRPERSON GENNARO:  Thank you very much for

19   appearing here today.  We appreciate all that OATH

20   does.  And, oh, we're also joined by Councilmember

21   Gutiérrez.  She has joined us, and we are grateful to

22   have her.

23       And-- And you came out to my district recently,

24   and we have to-- we have to coordinate that.

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                          27

2       DEPUTY COMMISSIONER CASTELLI:  Yes, Chair.  We

3    had a tremendously successful event out in your Kew

4    Gardens branch--

5       CHAIRPERSON GENNARO:  Right.

6       DEPUTY COMMISSIONER CASTELLI:  --library and

7    we're looking forward to coming out again.

8       DEPUTY COMMISSIONER CASTELLI:  Yeah, there was a

9    little disconnect with my office.  But, yeah-- but we

10   certainly appreciate you know, getting out to--

11   getting out to Queens, particularly my district.

12      Okay, I have some prepared questions, but I--

13   just help me out here a little bit.  So, on August

14   17, there was a resolution put forward by OATH

15   regarding the exercise of authority to remit a civil

16   penalty in code Section 24-244 B matters.  This has

17   become a big deal.  And-- And so if you could just--

18   For those that are not familiar-- Because this is

19   seems like kind of an extraordinary thing for--

20   Because-- For OATH to put forward because it wasn't

21   in relation to one specific appeal or whatever.  It

22   was just OATH putting this out.  And--  And if you

23   could just walk us through the reason why OATH felt

24   compelled to-- to put out this resolution.  This is a

25   real resolution with whereas clauses and a resolved

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 29 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1   RESILIENCY AND WATERFRONTS                              28

2   clause and all the trimmings, you know.  You know,

3   what compelled OATH to do that, and for the laypeople

4   here what are you trying to get across to folks?

5        DEPUTY COMMISSIONER CASTELLI:  Mr. Chair, the

6   decisions made by the Environmental Control Board are

7   something I can't comment too as a representative of

8   the administrative law tribunal.  It those decisions

9   are-- they speak for themselves, just like the

10  decisions that are made by a-- quasi-judicial

11  decisions that are made by our hearing officers and

12  our ALJs.  So I can't speak to--

13       CHAIRPERSON GENNARO:  Okay.

14       DEPUTY COMMISSIONER CASTELLI:  --that decision.

15       CHAIRPERSON GENNARO:  All right.  I am officially

16  oh-for-one now.  Let's see if I can get my batting

17  average up.  Lincoln's-- one of his jobs is to

18  chuckle at things that I say, nothing else.

19       You're supposed to do it all the time.

20       Okay, thank you.

21       Now, in light of what you said, let me ask

22  questions that would be appropriate for OATH,

23  according to how you just couched that.

24

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 30 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              29

2       This could be-- I just want to get this on the

3   record.  You probably have to get back to me with

4   this:  What is the total monetary value of the civil

5   penalties that OATH has sustained for citizen-

6   initiated summonses alleging a violation of Section

7   24-244 B?

8       DEPUTY COMMISSIONER CASTELLI:  That I'd have to

9   get back to you on now.

10      CHAIRPERSON GENNARO:  So I-- Again, this is--

11  this is the things that we want, and we appreciate

12  that.

13      And what percentage of-- This-- You may have

14  some sense of this, you may not, or you may-- may

15  want to get back with a reassessment.  What

16  percentage of citizen-initiated summonses alleging a

17  violation of Section 24-244 B have been defaulted on?

18      DEPUTY COMMISSIONER CASTELLI:  The percentage is

19  59%.

20      CHAIRPERSON GENNARO:  So 59% default?  Okay.  All

21  right.  Now the citizens-- citizen enforcers have

22  been using Section 24-244 B to-- which I believe is

23  really meant for those that have speakers facing out

24  from an establishment trying to generate business.

25  And-- And are you in a position to tell us whether or

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          30

1

2   not that-- that section of the code is being applied

3   correctly when it comes to businesses that are-- not

4   have outward facing speakers, but they have ambient

5   noise within the establishment that spills out into

6   the street?  That is my undrestanding.  It was

7   supposed to be like a decibel noise measure standard,

8   and not subject to the unreasonable noise standard.

9       DEPUTY COMMISSIONER CASTELLI:  Mr. Chair, we

10  wouldn't be able to comment on whether or not the

11  enforcement--  This is more of an enforcement type

12  question.  We can comment on the processes where we

13  have a citizen-prosecuted summons filed with OATH,

14  and we can tell you what happens once that summons is

15  filed.  And I do want to stress that I have

16  tremendous respect for this Committee and the

17  council, and I don't like to tell you, "Hey, I can't

18  answer."

19      CHAIRPERSON GENNARO:  No, no.  It's fine.

20      DEPUTY COMMISSIONER CASTELLI:  So I just want you

21  to be aware of that.

22      CHAIRPERSON GENNARO:  John, don't worry about it.

23  We're-- We feel you.  We got it, you know?  And-- But

24  I will for the sake of the public, you know,

25  indicate, just-- just to put on the record, that

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 32 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                          31

1    this, you know, August 17-- this August 17 resolution

2    talks a lot about 24-244 B, and what it really gets

3    at is that-- I'll just read it.

4

5        Resolved that the board exercises-- meaning the

6    Environmental Control Board-- exercises the authority

7    granted under 24-25 Section B-- which is-- that's the

8    whole-- it's the enforcing thing.  To remit in whole

9    the civil penalty in all matters, wherein summonses,

10   charges, a violation of 24-244 B, upon finding at the

11   hearing that the respondent is no longer in violation

12   accordingly upon a hearing officer, so finding a zero

13   penalty shall be imposed.

14       And I just want to let that sink in a little bit.

15       So this is from the Board, saying that if someone

16   brings something forward, under 24-244 B, if the

17   respondent is no longer in violation, and that can be

18   substantiated, a zero penalty shall be imposed.  It

19   seems to me-- this is my own editorializing-- I'll

20   own it-- that OATH has kind of had it with these

21   violations, and they are-- this is their own way-- my

22   interpretation, you know-- that this is their way of,

23   like, putting forward that the-- what's been going on

24   since this fairly recent phenomenon of the, you know,

25   citizen enforcers going out and-- and using 24-244 B,

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 33 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    32

1

2    you know, in a way that differs from what it was

3    intended.  You know, to me, this is OATH doing, kind

4    of, all it can to indicate that, as long as the, you

5    know, condition is now corrected, no penalty will be

6    imposed.

7        And so I know that OATH is kind of in a little

8    box here, and-- and has limited ability to opine on

9    this and that.  But, you know, to me, this was a

10   striking resolution.  I think, kind of an act of

11   courage on the on the part of OATH, and I salute you

12   for that.  That's not a question.  It's a statement.

13       And-- But getting back to that 59% number.  So,

14   someone gets a violation under 24-244 B, and maybe

15   the section-- maybe that maybe that section of the

16   code is being applied in the right way, maybe it is

17   being applied in the in the wrong way, but if they

18   default, they lose, judgment against them, they have

19   to pay the-- the citizen enforcers, you know, get

20   their bounty or whatever you want to call it.  And

21   then the businesses have to pay.  So this a 59%

22   default rate.  And, so that I think is-- are there--

23   Just to turn this into a question.  I mean, is it--

24   is it ordinary for a lot of different violations for

25   there to be like this level of default?  Or is 24-244

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 34 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              33

1

2    B, you know, unique in its, you know, percentage of

3    defaults?

4        DEPUTY COMMISSIONER CASTELLI:  I couldn't answer

5    that question.  Regarding--

6        CHAIRPERSON GENNARO:  It was a good question,

7    though, I think.

8        DEPUTY COMMISSIONER CASTELLI:  That says, I mean,

9    as the administrative law tribunal our-- our role is

10   to ensure that the hearings happen, I can't speak to,

11   or can't--

12       CHAIRPERSON GENNARO:  Okay.

13       DEPUTY COMMISSIONER CASTELLI:  --can't opine on

14   why someone defaults, fails to answer a summons.  And

15   I can't...

16       CHAIRPERSON GENNARO:  Well, I tell you what.  Why

17   don't we have someone from OATH, if you wouldn't

18   mind, you know, put some numbers together on default

19   rates if that's-- obviously it's-- it's public

20   information.  I'm just I just want to kind of zero in

21   on that 59% default number.

22       DEPUTY COMMISSIONER CASTELLI:  So I can-- I can

23   look into that and we'll get back to you.

24       CHAIRPERSON GENNARO:  Okay.  Sure.

25

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1      RESILIENCY AND WATERFRONTS                      34

 2         And-- And regarding the OATH appeals unit, if

 3      you-- if you're able, can you describe the role of

 4      the OATH appeals unit?  And are the decisions of the

 5      appeals unit binding on all hearing officers?

 6         DEPUTY COMMISSIONER CASTELLI:  The decisions by

 7      the-- depending on-- obviously, there could be

 8      factual distinctions between cases, but where the

 9      where the facts are basically the same, a decision is

10      made when it's-- those-- those facts are applied to

11      the law in question.  If the appeals decision is made

12      based on those facts, and there are similar cases

13      those--

14         CHAIRPERSON GENNARO:  Right.

15         DEPUTY COMMISSIONER CASTELLI:  --those similar

16      cases could follow that-- that decision.  Again-- But

17      it each case is taken on its own.

18         CHAIRPERSON GENNARO:  Right.

19         DEPUTY COMMISSIONER CASTELLI:  so it-- there are

20      so many nuances involved, as you know.

21         CHAIRPERSON GENNARO:  Yeah.

22         DEPUTY COMMISSIONER CASTELLI:  So regarding this:

23      Yes, and my answer is:  It depends, basically.

24         CHAIRPERSON GENNARO:  Right.  But-- So the-- When

25      something is appealed, and, you know, you-- and-- and
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 36 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1     RESILIENCY AND WATERFRONTS                           35

 2     the appeals unit comes forward with the decision that

 3     is-- that is-- that's what lawyers might call

 4     precedent or something.  Is that-- Is that a proper

 5     use of that term, Counsel?  And, but it is-- so it--

 6     so these appeals would be disseminated to the hearing

 7     officers, and they'd be aware of various appeals,

 8     that when they're in the midst of adjudicating, you

 9     know, whatever, they're adjudicating, they would-- it

10     would be, it would be fair to say that that would be

11     guidance for them, right?

12          DEPUTY COMMISSIONER CASTELLI:  Pursuant--

13     Pursuant to the charter requirement, yes.

14          CHAIRPERSON GENNARO:  Right.  Okay.

15          And has OATH-- has OATH seen an increase in

16     citizen-initiated summonses under 24-261 alleging a

17     violation of Section 24-244 B in the last year?  Do

18     you have any sense of that?

19          DEPUTY COMMISSIONER CASTELLI:  I can't.  I

20     couldn't tell you.  I'd have to get back to you on

21     that.

22          CHAIRPERSON GENNARO:  All right.

23          There's so many questions here.  I want to be--

24     And ordinarily when-- I normally bring in my other

25     members fairly early to ask questions, because I like
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          36

1

2    to get them involved and engage them.  I'm being a

3    little bit of a ball hog here, and it's not my way to

4    do this.  But this is kind of a special case.

5        Pardon me while I shuffle through papers.

6        While I kind of get my head together for my next

7    question, we have Councilmember Nurse who has asked

8    for the opportunity to ask questions.  I recognize

9    Councilmember Nurse.

10       COUNCILMEMBER NURSE:  Chair, I think my question

11   is going to be for DEP.

12       CHAIRPERSON GENNARO:  Oh, no.  These would just

13   be for OATH.  Okay.  And so...

14       COUNCILMEMBER NURSE:  Actually, mine will be for

15   later.

16       CHAIRPERSON GENNARO:  What's that?

17       COUNCILMEMBER NURSE:  I have a question for

18   later.

19       CHAIRPERSON GENNARO:  Okay, fine.  Sure.

20       CONSERVATIVE MEASURES NURSE:  Thank you.  Thank

21   you.

22       CHAIRPERSON GENNARO:  Yeah.  So yeah, when-- when

23   DEP is on what, we'll do that.

24       Okay.  I recognize Councilmember Holden for

25   questions.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 38 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1   RESILIENCY AND WATERFRONTS                          37

2        COUNCILMEMBER HOLDEN:  Thank you, Chair.  Just a

3   few questions on the types of complaints and some of

4   the defense that we hear from, let's say some

5   establishments.  I'm more interested in hearing from

6   commercial establishments, like-- do some of these

7   commercial establishments say-- or do most of their

8   defense would say, "I didn't know about the law," or

9   "I didn't know the standards of the law."

10       DEPUTY COMMISSIONER CASTELLI:  I mean, in that

11  scenario, the answer would be yes.

12       COUNCILMEMBER HOLDEN:  That would be the majority

13  of the time--

14       DEPUTY COMMISSIONER CASTELLI:  I couldn't tell

15  you--

16       COUNCILMEMBER HOLDEN:  --they didn't know they

17  were violating-- violating the law?

18       DEPUTY COMMISSIONER CASTELLI:  I can't--

19       COUNCILMEMBER HOLDEN:  It was essentially noise

20  complaints.  I would-- I would think that would be

21  probably the defense.

22       DEPUTY COMMISSIONER CASTELLI:  That could be a

23  defense, yeah.

24

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 39 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              38

2       COUNCILMEMBER HOLDEN:  And-- And so when you say

3   that there was a default, that means they didn't

4   answer the complaint?

5       DEPUTY COMMISSIONER CASTELLI:  They failed to

6   answer the summons.

7       COUNCILMEMBER HOLDEN:  They failed--

8       DEPUTY COMMISSIONER CASTELLI:  Which means-- Yes,

9   I'm sorry, Councilmember.

10      COUNCILMEMBER HOLDEN:  And then-- So tell us what

11  happens.

12      DEPUTY COMMISSIONER CASTELLI:  So if they fail to

13  answer a summons, what happens is OATH will notify

14  the respondent, business establishment, and let them-

15  - immediately notify them and let them know that

16  you're-- you've missed your hearing, please contact

17  us ASAP regarding this.  And they get 75 days from

18  the date of the hearing that they missed where they

19  can file a motion to vacate that default.  So that's

20  75 days without any questions asked they will be

21  given.  Once they file their motion to vacate (you

22  can do it online, you can do it in writing), they

23  will be granted a new hearing date.

24      COUNCILMEMBER HOLDEN:  So you give them--

25  automatically give them a second chance?

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 40 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1    RESILIENCY AND WATERFRONTS                        39

  2        DEPUTY COMMISSIONER CASTELLI:  A second chance.

  3    Yes.  Yes.

  4        COUNCILMEMBER HOLDEN:  Then what happens after

  5    that if they don't?

  6        DEPUTY COMMISSIONER CASTELLI:  Well, if they

  7    don't, then from between-- if it's more than 75 days

  8    and less than one year, they need a reasonable excuse

  9    to-- for-- to get a motion to vacate that default.

 10    They have to provide a reasonable excuse.  And if

 11    it's more than a year, they are going to need a-- an

 12    extra-- extraordinary circumstance to succeed in

 13    getting that motion to vacate.

 14        COUNCILMEMBER HOLDEN:  All right.  At what point-

 15    - what point do you generate a summons?

 16        DEPUTY COMMISSIONER CASTELLI:  Well, we don't

 17    generate the summons--

 18        COUNCILMEMBER HOLDEN:  You don't generate, but

 19    the agency will.

 20        DEPUTY COMMISSIONER CASTELLI:  The summons-- The

 21    summons is filed with us by the enforcement agency.

 22    That's when it comes into our universe.  That's when

 23    it exists in our world.

 24        COUNCILMEMBER HOLDEN:  Right.

 25
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 41 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1     RESILIENCY AND WATERFRONTS                        40

  2         DEPUTY COMMISSIONER CASTELLI:  So it depends when

  3     the agencies file it with us.

  4         COUNCILMEMBER HOLDEN:  So it's up to them if they

  5     file it.

  6         DEPUTY COMMISSIONER CASTELLI:  Yes.  And they set

  7     the hearing dates.

  8         COUNCILMEMBER HOLDEN:  All right.  Thank you,

  9     Chair.

 10         CHAIRPERSON GENNARO:  Thank you.  Thank you,

 11     Councilmember Holden.

 12         Now, most times, the entities that bring

 13     summonses forward to OATH would be agencies, yeah?

 14     You know?

 15         DEPUTY COMMISSIONER CASTELLI:  Yes.

 16         CHAIRPERSON GENNARO:  And are there any special

 17     accommodations or changes to OATH-- to OATH's

 18     practices that must be made for citizen-initiated

 19     summonses, as opposed to when the petitioner is an

 20     agency?  How does that-- how does that work?

 21         DEPUTY COMMISSIONER CASTELLI:  Well, when--

 22     Obviously when-- when the agency files a summons with

 23     OATH, then the-- it comes into-- again, as I said,

 24     we-- then the adjudicatory process begins.  And then

 25     there is a hearing.  And until we get to that
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 42 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    41

1

2   hearing, there are no ex parte communications between

3   OATH and any of the parties.  The only time we have

4   any communications is on the record at the hearing.

5       Now, when a-- when a citizen-prosecuted summons

6   is filed with OATH, then it's treated-- the hearing

7   date is set similarly to the-- similarly to the what

8   the-- the enforcement agency sets the hearing date,

9   and also the-- the citizen complainant, the citizen

10  prosecutor who-- who becomes-- who prosecutes the

11  case.  They have to appear at the hearing.  Now,

12  sometimes the enforcement agency is not-- does not

13  appear-- they don't always appear at the hearing.

14  They usually do.  But in the case of the citizen--

15      CHAIRPERSON GENNARO:  Okay.  If you could just--

16  just hold on that point again.  So-- So you've got a

17  citizen-initiated adjudication that's going on.

18      DEPUTY COMMISSIONER CASTELLI:  Rirhgt.

19      CHAIRPERSON GENNARO:  So the entities that would

20  be there would be the adjudicatory entity, which is

21  you folks.

22      DEPUTY COMMISSIONER CASTELLI:  Yes.

23      CHAIRPERSON GENNARO:  And then you have the

24  person making the complaint?

25      DEPUTY COMMISSIONER CASTELLI:  Yes.

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 43 of 238

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1              RESILIENCY AND WATERFRONTS                       42

 2                  CHAIRPERSON GENNARO:  And the person that the

 3              complaint is being made against?

 4                  DEPUTY COMMISSIONER CASTELLI:  Yes.

 5                  CHAIRPERSON GENNARO:  And then you would have the

 6              agency that's involved?

 7                  DEPUTY COMMISSIONER CASTELLI:  No.  No.  What I'm

 8              talking about is where the-- where it's a citizen-

 9              prosecuted summons, where-- that's filed with OATH,

10              it's the citizen complainant who has to appear at the

11              hearing to prosecute the case against the responding-

12              - the respondent-- before the OATH hearing officer.

13                  CHAIRPERSON GENNARO:  Right.  And let's just say

14              this citizen enforcer was-- makes an allegation of a

15              violation, and OATH makes a determination that the

16              section of the code cited by the complainant is not

17              the right section of the code, or that section of the

18              code doesn't apply to the complaint that they're

19              bringing forward.  What happens then?

20                  DEPUTY COMMISSIONER CASTELLI:  I'm going to defer

21              to Deputy Commissioner Amy Slifka, who is the head of

22              our Hearings Division.

23                  CHAIRPERSON GENNARO:  All right.

24                  DEPUTY COMMISSIONER CASTELLI:  She can give a

25              better answer than me.
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 44 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                           43

2      DEPUTY COMMISSIONER SLIFKA:  So basically, from

3  one--

4      CHAIRPERSON GENNARO:  Please state your name for

5  the record.

6      DEPUTY COMMISSIONER SLIFKA:  I'm sorry.  Amy

7  Slifka, Deputy Commissioner of Adjudications at OATH.

8      So basically, from what I'm hearing, you're

9  saying is:  If a summons is issued, and for example,

10  they don't-- the facts don't make out the charge for

11  the section of law, if both parties are present, then

12  the hearing officer would hear the case, the

13  petitioner would present their case, in this case the

14  citizen complainant, the respondent would present

15  their case, and the hearing officer would decide the-

16  - make the decision on the case.  If the facts don't

17  make out a case for the section of law charged, then

18  obviously, it's not making a prima facie case, and it

19  would more than likely be dismissed.  But this is not

20  done ex parte.  This is not done by the hearing

21  officer without both sides being given an opportunity

22  to present their side of the case.

23      CHAIRPERSON GENNARO:  Right.  But the-- But the--

24  Any individual who will be-- who would be doing the--

25  who would actually be doing the-- doing the

```
    COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1 RESILIENCY AND WATERFRONTS                         44

  2 adjudication would be a hearing officer and-- and ALJ

  3 or...?

  4     DEPUTY COMMISSIONER SLIFKA:  Right.  It's a

  5 judicial hearing officer.  Right.

  6     CHAIRPERSON GENNARO:  And so that person is-- is

  7 obliged to make sure that the code is--

  8     DEPUTY COMMISSIONER SLIFKA:  Applied correctly.

  9     CHAIRPERSON GENNARO:  --that section is being is

 10 being applied correctly?

 11     DEPUTY COMMISSIONER SLIFKA:  Correct.

 12     CHAIRPERSON GENNARO:  Okay, and that-- and that's

 13 that, right?

 14     DEPUTY COMMISSIONER SLIFKA:  And that's that.

 15     CHAIRPERSON GENNARO:  Okay.  All right.

 16     Okay.  I recognize Councilmember Nurse who has a

 17 question for OATH.

 18     COUNCILMEMBER NURSE:  Just one question.  I'm

 19 just trying to understand what-- what data you can

 20 share.  I had a question about how many of the

 21 complaints that have been initiated by the two

 22 people, who I'm reading, make about 90% of the noise

 23 complaints, how many of those are successful?

 24     DEPUTY COMMISSIONER CASTELLI:  Thank you,

 25 Councilmember for the question.  First thing I just
```

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 46 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                        45

2  want to clarify for-- so I answer the best I can to

3  your question is:  When we at OATH-- We look at

4  Citizen-prosecuted summonses and not they're not

5  citizen complaints.  So they're filed with us, the

6  citizen-prosecuted summonses.  That's when-- uh, so

7  in terms of--

8     COUNCILMEMBER NURSE:  So of those that are-- of

9  those that are filed with you...?

10    DEPUTY COMMISSIONER CASTELLI:  I-- I couldn't

11 tell you what the-- what the what the numbers are.  I

12 cannot tell you.  I can check to see if we can find

13 out.

14    COUNCILMEMBER NURSE:  What kind of data are you

15 able to provide today, I mean, related to this

16 hearing?  I'm just kind of struggling to understand

17 what we're what we're getting here.

18    DEPUTY COMMISSIONER CASTELLI:  Sorry?

19    COUNCILMEMBER NURSE:  I'm asking what kind of

20 data are you able to provide today around this

21 hearing topic?

22    DEPUTY COMMISSIONER CASTELLI:  Well, the data

23 that I provided-- that was provided from the

24 questions--

25

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 47 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                        46

2      COUNCILMEMBER NURSE:  The 59%?  That's really--

3   That's the only data point I heard, but I might-- I

4   might have mis-- misheard.

5      DEPUTY COMMISSIONER CASTELLI:  No, I can't-- I

6   mean, the questions that were previously provided to

7   us, we had given information regarding the summonses

8   that were issued by the enforcement agency, DEP, and

9   by the citizen-prosecuted, citizen complainants who

10  prosecute summonses with us.

11     COUNCILMEMBER NURSE:  Okay.  So even if you've

12  said it or not, just to restate it, because I'm

13  trying to keep on top of what's being said across

14  here.

15     DEPUTY COMMISSIONER CASTELLI:  And Councilmember,

16  please, it's-- We want to make sure we--

17     COUNCILMEMBER NURSE:  Yeah.  I know.  I'm trying

18  to understand the scale of it.

19     DEPUTY COMMISSIONER CASTELLI:  we explain.  As

20  the administrative law tribunal, it's-- it's our job

21  to make sure that you know-- the more you know, the

22  better it is for your constituents, the better is for

23  all of us, and we can make sure that people get fair

24  and impartial hearings.

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 48 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1  RESILIENCY AND WATERFRONTS                          47

2      COUNCILMEMBER NURSE:  I believe you.  I believe

3  you 100%.

4      DEPUTY COMMISSIONER CASTELLI:  I sound like a

5  broken record when I say it, because that's all I

6  say, and people get annoyed because all they hear

7  about from-- from us is "fair and impartial hearings"

8  and "due process", because that's what we focus on.

9      COUNCILMEMBER NURSE:  It's just been hard for me

10  to follow exactly the numbers in this conversation.

11  So, I'm trying to get a sense of-- how many cases

12  that are complaints, that move into your jurisdiction

13  where you are taking action around noise complaints,

14  have been successful?

15      DEPUTY COMMISSIONER CASTELLI:  Well, the--  If

16  look--

17      COUNCILMEMBER NURSE:  How many of those cases are

18  you getting a year?  Because you testified a lot of

19  numbers, just in terms of all of the cases, but I

20  don't know if that was...

21      DEPUTY COMMISSIONER CASTELLI:  If-- If I'm if I'm

22  correctly interpreting the question, and forgive me

23  If I'm not, please, we have-- the numbers that were

24  provided have the cases that are dismissed and the

25  percentage.  If you look at citizen-issued summonses

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 49 of 238

```
      COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1    RESILIENCY AND WATERFRONTS                          48

 2    by percentage for noise, you will see the percentage

 3    of summonses that are dismissed.  That would be on

 4    page three, if we have the same type of--

 5        COUNCILMEMBER NURSE:  I think maybe mine has a

 6    missing page.  I have a paragraph where you have, you

 7    know, 765,000 summonses, 2000 appeals.  I just don't

 8    if that's-- just that's like your whole casework.

 9        DEPUTY COMMISSIONER CASTELLI:  Right.  We

10    provided numbers and have numbers.

11        COUNCILMEMBER NURSE:  Okay.

12        DEPUTY COMMISSIONER CASTELLI:  We provided the

13    answers to questions that counsel-- that the

14    committee has submitted to us.

15        COUNCILMEMBER NURSE:  I will follow up and get

16    those then, because this was not-- I was like, I'm

17    not 100%.

18        DEPUTY COMMISSIONER CASTELLI:  Yeah.  Please feel

19    free.  We're always available.  You can-- Feel free.

20    I'm able to give you our-- I'll give you my card

21    after that-- when we're done here so you have access,

22    and please contact us any time.

23        COUNCILMEMBER NURSE:  Okay, that sounds great.

24    Thank you, Chair.

25        DEPUTY COMMISSIONER CASTELLI:  Thank you.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                          49

2       CHAIRPERSON GENNARO:  Thank you, Councilmember

3   Nurse.  Here's just one, a sort of final question.

4   Getting back to the resolution.  I'm kind of still

5   stuck on that.  And Counsel of the Committee thinks

6   it's good idea to get this question in full on the

7   record.  Again, going back to the resolution.  On

8   August 17th, the ECB adopted a resolution to exercise

9   the authority-- to exercise the authority-- the noise

10  code grants them, ECB, to remit a civil penalty upon

11  a finding and a hearing that the respondent is no

12  longer in violation of Section 24-244 B, which

13  concerns the use of a noise reproduction device by a

14  commercial enterprise for advertising purposes.  What

15  factors will the ECB rely on to make a determination

16  and each matter that there is no longer a violation?

17      DEPUTY COMMISSIONER CASTELLI:  Again, Chair, I

18  can't speak to-- I cannot opine on the decision, a

19  quasi-judicial decision that the Board made.

20      CHAIRPERSON GENNARO:  Okay.  But I think the

21  resolution, you know, does kind of speak for itself

22  somewhat on that.  And does anybody have any more

23  questions for-- for OATH?  No?  Okay.

24

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 51 of 238

```
    COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1  RESILIENCY AND WATERFRONTS                        50

 2     With that, I would like to thank you both for

 3  coming before us.  Do you have another statement you

 4  want to make?

 5     DEPUTY COMMISSIONER CASTELLI:  I just want to

 6  thank you, Chair Gennaro.  OATH wouldn't be where it

 7  is today without the work that you did 20 years ago.

 8  You've helped us.  You've expanded and provided

 9  accessibility, greater access to justice for people

10  throughout our city for the work that you've done.

11     CHAIRPERSON GENNARO:  Well, I was getting a lot

12  of complaints back in the day, from vendors, from

13  this, from that.  And also, you know, we've got--

14  we've got, you know, DEP, who is-- you have an entity

15  within DEP that is hearing like fire violations and

16  noise violations, and all kinds of different-- and

17  sanitation violations.  And, you know, the ECB of

18  that era didn't have, like, such a great reputation.

19  I thought it's a good idea to, you know, to put it

20  into OATH where, you know, OATH has got some game.

21  So I thought that would be a better place, there

22  would be more, there would just be better justice

23  meted out.  And people would go to ECB, and then

24  they'd have to come back another day.  And, you know,

25  I used to get a lot of complaints.  And I was, again,
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 52 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                           51

 2   Chair of the Committee at that time.  And then I--

 3   You know, overseeing DEP, and I'm like, we should--

 4   we should move this to OATH.  So, um, I'm glad for

 5   all the work that you've done.  And vendors and other

 6   people that used to get jammed up at you know, ECB--

 7   Let's just say I don't get complaints anymore.  And

 8   so that is a testament to your good, you know,

 9   stewardship of the-- of the ECB and, you know,

10   adjudicating all stuff is not really what DEP is all

11   about.  That's what you're about.  So that's where

12   that came from.  And so, thank you for coming before

13   us.

14       And now we have the face of OATH at our

15   committee, and this is your first time before this

16   committee, so pick up your door prize before-- as

17   you're-- as, you know--  We don't really have door

18   prizes here.

19       DEPUTY COMMISSIONER CASTELLI:  Thank you, Chair.

20   Thank you members of the Committee.  Thank you

21   members of the Committee.

22       CHAIRPERSON GENNARO:  Lincoln is just going like

23   this, just going like this.

24       DEPUTY COMMISSIONER CASTELLI:  I'm going to give

25   you my card, Councilmember.
```

```
          COMMITTEE ON ENVIRONMENTAL PROTECTION,
     1    RESILIENCY AND WATERFRONTS                        52

     2        CHAIRPERSON GENNARO:  Okay, thank you very much.

     3    We want to call, you know, DEP forward.  I'd ask DEP

     4    to get themselves situated and sworn.  I'll be back

     5    in two minutes to hear their statement.

     6        [TO MINUTES SILENCE]

     7        Okay it is always a pleasure to have DEP with us,

     8    and you know, they are folks I go back with a long

     9    way, Deputy Commissioner Licata, Mr. Page-- Well, you

    10    have your-- I just want to call everybody by the

    11    right title.  But hello.  Hello.  Great to have you

    12    here.  I look forward to hearing your good testimony.

    13    Everyone's all duly sworn and everything?  Okay.  All

    14    right with that, we'd be-- Oh, they haven't been

    15    sworn in?  Okay.  Now if Counsel could swear in the

    16    witnesses.

    17        COUNSEL:  Please raise your right hand.  Do you

    18    affirm to tell the truth, the whole truth and nothing

    19    but the truth before this committee and to respond

    20    honestly to Councilmember questions?

    21        PANEL:  I do.

    22        CHAIRPERSON GENNARO:  Thank you very much.

    23    Again, a pleasure.  Please-- Please commence with

    24    your good testimony.

    25
```

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1             RESILIENCY AND WATERFRONTS                        53

  2                 DEPUTY COMMISSIONER LICATA:  Good afternoon,

  3             Chairman Gennaro, and members of the Environmental

  4             Protection Committee on-- We would like to begin just

  5             by introducing my colleagues.  As you noted, this is

  6             Mark Page.  He's the Executive Director of the Bureau

  7             Environmental Compliance.  And sitting to his left is

  8             Alyssa Preston.  And yes, I knew you would recognize

  9             that name.

 10                 CHAIRPERSON GENNARO:  Oh, Alyssa.  Have you been

 11             in DEP all these years?  Oh, well, it's been a long

 12             time.  So good to see you.  So good to see you.

 13                 DEPUTY COMMISSIONER LICATA:  She's the Director

 14             of Air and Noise Policy and Enforcement.

 15                 So, I am Angela Licata, and I'm the Deputy

 16             Commissioner for the Department of Environmental

 17             Protection.  And I'm--  Thank you for the opportunity

 18             to testify today.

 19                 I'd like to begin with a brief overview of DEP's

 20             noise enforcement work, including the citizen

 21             complaint program, and then we'll speak to each of

 22             the bills being considered today.

 23                 To begin, DEP and my colleagues were very proud

 24             of the work that we had done to improve the quality

 25             of life for all New Yorkers by enforcing the city's
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              54

2   noise code.  The code does ensure that the city that

3   never sleeps remains vibrant and active while meeting

4   the needs of those who live in, work in, and visit

5   the city by reducing noise pollution and protecting

6   public health.

7       DEP and the New York City Police Department share

8   responsibility for enforcing the noise code.  DEP's

9   responsibilities focus on commercial music,

10  construction noise, noise from buildings' heating and

11  ventilation equipment, and DEP's noise inspectors

12  proactively approve and inspect noise mitigation

13  plans and respond to approximately 50,000 noise

14  complaints each year.

15      The noise code has been updated twice in recent

16  years.  First, as Chairman Gennaro explained, was in

17  2005.  And then we had some updates and improvements

18  that were made with Local Law 53 of 2018.  And we're

19  very grateful for the leadership and the support of

20  the New York City Council, and especially of the now

21  Chair and then Chair Gennaros for making these

22  improvements.  We are forever looking to-- continue

23  to make these improvements.  So we don't want to rest

24  on our laurels.  But we do want to appreciate how far

25  that we've come since the 1970s.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                55

1

2    CHAIRPERSON GENNARO:  Although I will indicate--

3    just indicate that Local Law 53 of 2018 was when I

4    wasn't here.

5    DEPUTY COMMISSIONER LICATA:  Yes.

6    CHAIRPERSON GENNARO:  So anyone who has got a

7    problem with that law, it's not-- that ain't me, you

8    know?  And so-- but it's always-- it's great to be

9    partners with DEP.  We've done a lot of great things

10   together over the years, the Council and DEP.  Please

11   continue.  Forgive my interruption.

12   DEPUTY COMMISSIONER LICATA:  These critical

13   updates standardized commercial music regulations,

14   require that these noise mitigation measures for

15   construction activities, created a section that

16   prohibits excessive noise for motor vehicles.  Since

17   the 2018 changes, DEP has been required to respond to

18   after-hours noise complaints in specific timeframes,

19   and requires that all noise mitigation plans be filed

20   electronically and be available for public

21   inspection.  These changes have significant--

22   significantly strengthened DEP's enforcement.

23   In addition to the proactive enforcement DEP

24   inspectors focus on the areas of known complaints,

25   and they also have very specific training, and can

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                    56

1

2    use their discretion to determine if there is a

3    violation or not.  If a inspector determines a

4    complaint is justified under the noise code, the

5    inspector informs the business of the alleged

6    violation and what can be done to correct it, and

7    that is generally before a violation is issued.

8    Depending on the severity of the alleged violation

9    and whether or not it is purposely and egregiously

10   performed, these are the levels of discretion that

11   our inspectors are trained to provide.

12       And our goal again, we need to be really clear,

13   is to bring businesses into compliance with the noise

14   code and to reduce noise pollution for the benefit of

15   the public and its public health.  The goal is not to

16   be punitive.  The goal is not to make profits,

17   although as we stated, we do not hesitate to issuing

18   summonses to bad actors.

19       CHAIRPERSON GENNARO:  Angela, I'm going to

20   confess that I've lost my place.

21       DEPUTY COMMISSIONER LICATA:  We're going to start

22   with a paragraph.

23       Of course DEP's inspectors will never be able to

24   address all of the city's noise issues as they are

25   happening.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                          57

2      CHAIRPERSON GENNARO:  Page 2?  Is this page 2?

3      DEPUTY COMMISSIONER LICATA:  Mm-hmm.

4      CHAIRPERSON GENNARO:  Where is-- say that again?

5      DEPUTY COMMISSIONER LICATA:  Of course, DEP's

6  inspectors will never be able to address all of the

7  city's noise issues as they are happening.

8      CHAIRPERSON GENNARO:  Keith, you got this?  Not

9  the one with--

10     Oh, my testimony is missing a page.  I'm

11 vindicated.

12     We should have music in the background as we kind

13 of figure this out.

14     DEPUTY COMMISSIONER LICATA:  Okay, beginning with

15 the paragraph--

16     CHAIRPERSON GENNARO:  I don't have anything in

17 front of me now.  I will soon.

18     MAJORITY LEADER POWERS:  The testimony that was

19 given to us, I think, was missing some pages.  So--

20 at least on some of the legislation, it was missing

21 several bills.

22     CHAIRPERSON GENNARO:  Yes.  There was a missing

23 page.  Now I have the page.  It is a partial

24 paragraph, and the first whole paragraph begins, "Of

25 course, DEP's inspectors..." right?

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 59 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                          58

2       DEPUTY COMMISSIONER LICATA:  Correct.

3       CHAIRPERSON GENNARO:  Okay, sorry about that.

4   Sorry for the hubbub.

5       DEPUTY COMMISSIONER LICATA:  Okay.  So it says...

6       Of course, DEP's inspectors will never be able to

7   address all of the city's noise issues as they are

8   happening.  We simply cannot be everywhere all the

9   time.  This is why citizen enforcement can be a

10  useful complement to DEP's work.  Local laws allow

11  us-- allows anyone to provide evidence of potential

12  violations of certain sections of the noise code to

13  DEP.  DEP or the reporter can then bring this

14  evidence to the Office of Administrative Trials and

15  Hearings for a hearing to determine whether a

16  violation has taken place.  We believe citizen

17  enforcement is valuable, but it needs to be fair.

18  Citizen enforcement of the noise code should pursue

19  the same goal as DEP lead enforcement, encouraging

20  compliance and reducing noise pollution.

21      Unfortunately, that has not been the norm.

22      CHAIRPERSON GENNARO:  If I could just jump in--

23  Again, sometimes, if I don't do it now.  And-- I'll--

24  Please pardon the back and forth.  And so with regard

25  to the citizen enforcement, you talks about-- here's

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 60 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              59

1

2   how it works.  Local law allows anyone to provide

3   evidence of a potential violation.  And so-- the

4   DEP's or the reporter can then bring this evidence

5   to-- to OATH for a hearing, but don't they have to

6   bring it to DEP first?

7       DEPUTY COMMISSIONER LICATA:  They come to DEP

8   first.  DEP has 30 days to either seek enforcement on

9   its own, in conjunction with the citizen or--

10      CHAIRPERSON GENNARO:  So-- So somebody comes to

11  DEP and they-- they have a complaint.  And so DEP can

12  send their own enforcement people out there to

13  monitor it, do what needs to be done, assess it,

14  issue violations, or whatever.  So DEP gets that.

15  And-- And, failing that, like, what happens?  So DEP

16  decides for whatever reason-- So if somebody brings a

17  complaint, and DEP wouldn't go out there, if it's

18  just like something that-- that that that already

19  happened, and somebody comes forward and they have

20  evidence or whatever, right?  Then DEP like takes a

21  look at that.  And then DEP can use that evidence to

22  issue its own violation?

23      DEPUTY COMMISSIONER LICATA:  Yes. DEP can issue

24  its own violation if it witnesses.  It can go out

25  there as you stated, and look--

Case 1:25-cv-02100-KPF        Document 16-2        Filed 07/01/25        Page 61 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          60

2        CHAIRPERSON GENNARO:  No, but I'm asking-- but

3    can they do it based on--

4        DEPUTY COMMISSIONER LICATA:  The citizen's--

5        CHAIRPERSON GENNARO:  --based on the citizen's

6    information that's been brought forward?

7        DEPUTY COMMISSIONER LICATA:  Yes.

8        CHAIRPERSON GENNARO:  It can be a videotape.  It

9    can be an audio tape.  It could be a decibel level

10   reading.

11       DEPUTY COMMISSIONER LICATA:  Yes.

12       CHAIRPERSON GENNARO:  It could be what-- whatever

13   the heck it is, right?

14       DEPUTY COMMISSIONER LICATA:  Yes.

15       CHAIRPERSON GENNARO:  And so based on that, DEP

16   can issue a violation.  And then DEP is the

17   complainant, and then it has to go and deal with

18   OATH?

19       DEPUTY COMMISSIONER LICATA:  Yes.  DEP would co-

20   sponsor that complaint.  The citizen would get a

21   portion of that penalty if the penalty is upheld at

22   OATH.  So they would receive some of that penalty

23   money.

24       CHAIRPERSON GENNARO:  Right.  Okay.  And-- All

25   right.  This is-- I don't want to get too much into

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                61

1

2    the questions, but just-- just know that coming out

3    of this, Alyssa, there's going to be a question about

4    this section, whatever it-- wherever it is, you know,

5    whether or not Section 24-244 B-- people are using

6    that section for sound reproduction devices, which I

7    believe, and you can correct me if I'm wrong, is

8    really meant for people that are using that for

9    advertising purposes.  But yet, these violations are

10   being brought to DEP for ambient noise that is

11   spilling out into the street, and therefore not.

12       So I just think that's, you know, the wrong

13   section of the code.  So just get ready for a

14   question on that, and why the DEP is even

15   entertaining these, and not just-- not just

16   indicating, like, "You've got the wrong section of

17   the code.  Go home."  And so-- So that that question

18   is coming.  Okay?  Make sure I do that.  Okay?

19       Please continue.  I'll try to limit my jumping

20   in.

21       DEPUTY COMMISSIONER LICATA:  Unfortunately, that

22   has not been the case recently.  Citizen noise

23   enforcement has been a significant problem for many

24   businesses this year, with businesses receiving

25   multiple violations by citizen enforcers all at once

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 63 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              62

1

2    without a warning, and racking up thousands of

3    dollars in fines for minor infractions.  We do not

4    think this has been fair and we thank the Chair for

5    his attention to this real issue and to protecting

6    the livelihood of businesses unfairly targeted by a

7    select few citizen enforcers.

8        Citizen enforcement is supposed to be a tool to

9    reduce genuine noise pollution in circumstances where

10   DEP inspectors cannot respond in real time.  The

11   program is also used for our vehicle idling program,

12   a program that has been largely successful and that

13   is playing an important role in improving air quality

14   in the city and helping communities protect

15   themselves from pollution.  The idling program allows

16   citizens to film a vehicle idling and submit the

17   video with a description of the incident through the

18   DEP website.  DEP inspectors then review the evidence

19   and issue a summons if warranted.

20       If the vehicle owner is found in violation at the

21   subsequent OATH hearing the citizen who submitted

22   this evidence is entitled to receive 25% of the

23   collected fine.  If DEP does not issue a summons, and

24   the citizen decides to self-pursue the case with

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          63

1

2  OATH, then the citizen is entitled to receive 50% of

3  the collected fine.

4      Some citizens have realized that the money-making

5  potential of the idling enforcement program and begun

6  to patrol neighborhoods looking for idling vehicles.

7  Overall, the diligence of idling enforcement has been

8  a positive thing for communities and our air quality.

9  However, there are some over-zealous, opportunistic,

10  citizen idling enforcers who have abused the program.

11  Some participants have been egregiously aggressive

12  towards our staff and some have tried to defraud the

13  system by doing things like filing fake videos or

14  resubmitting the same video repeatedly.

15      Our staff has thwarted their attempts to submit

16  falsified evidence, and they are also successful in

17  fact that a few participants started looking for new

18  ways to profit from the citizen enforcement programs.

19  About a year ago, these few participants realized

20  they could file noise complaints against businesses

21  who are playing music outdoors.  Because noise videos

22  do not have time minimums, they could make money more

23  easily.

24      A small number of people abused this enforcement

25  option and have been targeting and harassing several

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 65 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    64

1

2    businesses.  In fact, about 90% of the approximately

3    6000 noise complaints filed in 2023 by citizens were

4    filed by only two people.  As you can see on the map

5    that we provided in testimony, these citizens have

6    been targeting specific areas of Queens and

7    Manhattan.  They are mostly commercial areas where

8    they can walk down the street and record sound from

9    multiple businesses in just a few minutes.  Locations

10   have citizen enforcement of Section 24-244 B which

11   relates to businesses playing music outside for

12   commercial purposes.

13      CHAIRPERSON GENNARO:  Oh, I just lost my place.

14   So you have, "As you can see from this map, they can

15   do sound from multiple business in a few minutes."

16   Then you have the map.  And then what happened after

17   that?  Did you skip something?

18      DEPUTY COMMISSIONER LICATA:  "Locations of

19   citizen enforcement of Section 24-244 B", you should

20   see, which relates to businesses playing music

21   outside for commercial purposes.

22      CHAIRPERSON GENNARO:  I don't have that on mine.

23   Do you have that?  Oh.  Okay, that's the fine print

24   on top of the-- the graphic I'm sorry.  Okay.  Please

25   continue.

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 66 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    65

1

2       DEPUTY COMMISSIONER LICATA:  The enforcement

3   being done through citizen enforcement is hurting

4   businesses and is not helping communities.  Citizen

5   enforcement is happening in areas where we do not

6   receive 311 noise complaints.  No one is complaining

7   about noise from Times Square in the middle of the

8   day, but more than 1000 Citizen complaint reports

9   have been focused there.  The participants are not

10  using enforcement to achieve compliance and reduce

11  noise pollution they are using it for personal

12  profit.

13      And now we're turning into the legislation.

14      Overall the legislation being considered today

15  complements DEP's work and we generally support these

16  bills.  We do want to recommend a few specific

17  changes to the introduced legislation, and would like

18  to postpone consideration of Intro 1194.  Intro 1194

19  current--

20      CHAIRPERSON GENNARO:  Postpone consideration?

21  This is the hearing

22      DEPUTY COMMISSIONER LICATA:  Not postpone the

23  hearing.

24      CHAIRPERSON GENNARO:  No, I'm just saying that--

25  but this is the--

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 67 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                        66

 2       DEPUTY COMMISSIONER LICATA:  Well, I'm going to

 3   testify about our concerns on that right now.  So--

 4       CHAIRPERSON GENNARO:  Oh fine, fine, fine.  Okay.

 5       DEPUTY COMMISSIONER LICATA:  It's completely--

 6   Yeah.

 7       CHAIRPERSON GENNARO:  I thought you meant like

 8   you didn't want to address it at all.  Okay, and I'm

 9   saying, "This is the hearing.  You have to."

10       DEPUTY COMMISSIONER LICATA:  Yup.

11       So currently if a business pays a fine from a

12   noise summons by a citizen enforcer, the citizen

13   enforcer can receive as much as $660.  Subsequent

14   violations have heavier fines than the first one.  So

15   enforcers are incentivized to stack a series of

16   complaints against one business and deliver many at

17   once.  Before a business has received one summons,

18   they already have racked up several more.  Intro 1194

19   would reduce the payout collected by citizen noise

20   enforcers from a percentage of that penalty to a flat

21   rate of $5 or $10.  This reduction would make it

22   harder for bad actors to use these violations as a

23   source of significant income.  This reduced incentive

24   could reduce the volume of summons-- summonses that

25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                               67

1

2    businesses receive, addressing one of the challenges

3    small businesses are facing.

4        We share the goal of reducing this undue burden

5    on small business.  But we would like to work with

6    council to enact broader reforms to the citizen

7    complaint program.  DEP has been working with other

8    agencies, including small business services on

9    comprehensive reforms to improve the citizen

10   enforcement program.  These reforms will make the

11   program a more effective tool to combat noise

12   pollution and protect businesses from program abuse.

13       Using penalty reduction to achieve the volume of

14   complaints that a business receives only resolves one

15   of the challenges that businesses are facing.  Even

16   if this bill were enacted as it is currently drafted,

17   businesses could still receive many summonses, and

18   many summonses long after the alleged violation date.

19       So, we would like to take the time to defend--

20   Oh, I'm sorry--  Summonses at once, having to take

21   the time to defend themselves at an adjudication

22   hearing and having to pay a significant fine.

23       In addition to these changes to protect

24   businesses, we want to reform the program to protect

25   city staff from repeated harassment and abuse that

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 69 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1     RESILIENCY AND WATERFRONTS                          68

 2     they have experienced.  As I alluded to earlier, a

 3     small number of citizen enforcers have harassed staff

 4     at multiple agencies and the companies they provide

 5     evidence against.  Some specific issues we have dealt

 6     with included several instances of aggressive citizen

 7     complaints attempting to access secure government

 8     office spaces, looking for specific individuals,

 9     including an instance of a complainant attempting to

10     assault a staff member, aggressive verbal harassment

11     targeted at specific employees, and instances of the

12     same piece of evidence being submitted with different

13     allegations with the intent to generate multiple

14     summons based on intentionally fraudulent evidence.

15         I understand that some of your colleagues' staffs

16     have received similar aggressive communications.  If

17     any Councilmember has further questions regarding

18     abusive behavior, please feel free to reach out to

19     the Administration for more details.  We welcome

20     continuing this conversation.

21         The Administration therefore wants to enact

22     holistic reform legislation that would establish a

23     fixed monetary payment for citizen enforcers as this

24     bill does, but would also ensure the businesses

25     receive a summons in a timely manner and do not
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              69

2    receive too many at once; limit citizen noise

3    enforcement to overnight hours when these noise

4    violations have a greater negative impact; create a

5    cure mechanism so that businesses can work with DEP

6    to resolve an issue, avoiding the need to appear at a

7    hearing and eliminating any potential fine;

8    authorizing DEP to establish clear rules for evidence

9    required with reports; authorize The City to

10   disqualify citizens from participating in the program

11   if they are found to submit fraudulent evidence or

12   exhibit abusive behavior.  Further, we would like to

13   update the type of violations that can be-- be

14   reported by citizens.  Noise complaints through 311

15   about ice cream trucks playing music is one of the

16   top five 311 noise complaint categories.  Ice cream

17   trucks are not supposed to play music continuously

18   while they are parked.  DEP inspectors cannot

19   regularly respond to these calls, so we want to

20   expand citizen enforcement to include this noise.

21       Intro 160 would amend the noise code relating to

22   interior noise at commercial establishments so that

23   noise that is generated inside but cannot be heard

24   from the sidewalk is no longer treated the same as

25   noise that is generated outside.  This would include

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          70

2    removing interior noise from citizen enforcement

3    eligibility.  We think this is a clear delineation to

4    the citizen enforcement program, and it makes sense,

5    and makes the code more understandable for businesses

6    so we support this bill.

7        Intro--

8        CHAIRPERSON GENNARO:  Okay.  So I just want to

9    jump in for a second.  And so--  You know what?  Let

10   me-- Let me let me just kind of save that.  Mark that

11   and save that for-- for a question.  And that's an

12   alarm going off saying I have to take some

13   medication.  So as soon as you finish your statement,

14   I'm going to do that.  It's going to go off again in

15   a minute to remind me.  But, yeah, it's a thing.

16       Okay, again, forgive the interruption.  Please

17   continue.  Intro 774.

18       DEPUTY COMMISSIONER LICATA:  Intro 774 would

19   require DEP to measure construction related sound

20   levels inside homes whenever asked to.  DEP falls

21   this practice currently, so we support this

22   requirement, and is already codified in 24-223 D for

23   after hours work.  DEP recommends amending sections

24   228 and 229 to allow for readings to be taken from a

25   dwelling during the day with limits warranting a

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 72 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          71

1

2    summon set to an increment of 10 decibels above the

3    ambient during the day, instead of a limit of 85

4    decibels at the weighted scale, and retain the 7 DbA

5    standard or decibels at the weighted scale for after-

6    hours work.

7         Intro 775 would require DEP to post the results

8    of all noise inspections online within 24 hours of

9    the inspection being completed.  We request that this

10   bill be amended to extend the time window.  Each

11   inspection report must be reviewed and approved by a

12   supervisor, and there are extra considerations when

13   we expect a summons to be issued.  We prefer to delay

14   posting information to ensure that the information is

15   accurate.  So, we would like to work with the sponsor

16   to determine a more workable timeline.

17        Intro 776 would require DEP to provide any noise

18   inspection report that was generated in response to a

19   311 call to be provided to anyone who requests the

20   report, and has the 311 tracking number.  Currently,

21   FOIL requests are required to obtain these reports.

22   We support the goal of this bill but we'd like to

23   discuss it in more detail with the sponsor and our

24   colleagues at the police department.

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1   RESILIENCY AND WATERFRONTS                        72

2       Intro 777 would add debris removal to the

3   definition of construction work that requires a

4   variance for after-hours noise generation.  DEP

5   currently considers debris removal in noise permit

6   requirements as removal of material as part of the

7   construction process.  DEP does include-- supports

8   the inclusion of debris removal in the definition of

9   construction work.

10      Intro 778 would require DEP to establish the

11  noise camera program for motor vehicles, and lays out

12  the specifications for how a program should work and

13  how OATH should process violations.  DEP began

14  piloting a vehicle noise camera program in 2021.

15  After a successful pilot period, we launched the

16  program officially in March of 2022.  The program has

17  led to more than 300 violations being issued.  The

18  use of the cameras as an effective and efficient

19  complement to boots on the ground or field patrol

20  enforcement efforts.  We continue to learn and evolve

21  the program, including adopting new technologies and

22  increasing the number of camera locations.

23      If a noise program is required by local law, we

24  support many of the proposed requirements including

25  the reporting and certification requirements.

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 74 of 238

```
   COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1 RESILIENCY AND WATERFRONTS                              73
 2 However, we would like it to complement the program
 3 that we have developed over the last few years and be
 4 flexible enough to allow the program to evolve as new
 5 technologies emerge.  We're happy to work with the
 6 sponsor on this legislation as well.
 7     Thank you for consideration of these matters.  We
 8 look forward to engaging in thoughtful discussion
 9 with the Chair and bill sponsors to work towards our
10 shared goal of reducing noise pollution to protect
11 the health of all New Yorkers, and we are happy to
12 answer any questions you may have.
13     CHAIRPERSON GENNARO:  Thank you very much, Deputy
14 Commissioner Licata.  Yeah.  So we've got, like, a
15 bunch of bills by the Majority Leader.  And then Bob
16 Holden and I are fighting the war on civilian
17 enforcement.  And so, I'm going to yield to the
18 Majority Leader.  He has questions on his bills.
19     Sergeant, I'm not putting the Majority Leader on
20 a clock.  And so I recognize Councilmember Powers for
21 questions on his bills.
22     MAJORITY LEADER POWERS:  Thank you.  I'll try to
23 be quick anyway out of respect for everyone here.  I
24 just want to ask you-- first of all, thank you for
25 your testimony.  Without question, I'm happy to work
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 75 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                             74

1

2    with DEP to make sure that legislation we're working

3    on is efficient and effective.  I think your

4    recommendations make some sense and appreciate the

5    constructive feedback on the various different

6    programs we're talking about here.  And I'll have ask

7    some questions.  I want to start just taking a--

8    taking a step back.

9        We were looking at some of the data around new

10   lays enforcement in the city, which-- which helped

11   inform us on the legislation and going into the

12   hearing.  It feels like it's a shared responsibility

13   between DEP and NYPD right now, when you call 311,

14   and-- and file a-- or reach out to-- call the city

15   and-- and file a complaint.  I don't-- I'm trying to

16   understand what is the actual separation of duties

17   there?  How does the NYPD respond to calls?  How does

18   the DEP respond to calls?  What is the current

19   resource allocation for the DEP to noise complaints?

20       And it seems like a tremendously high amount of

21   them are going to the PD, and they're going out and

22   responding.  Various levels of enforcement are

23   happening.  But I guess just to understand this

24   conversation, you have to kind of understand how

25   we're doing enforcement in the first place.  So can

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          75

1

2    you share with us how DEP's role is shaped in this

3    conversation, and where handoff happens between DEP

4    NYPD?  Or how the NYPD or DEP might share

5    responsibilities here?

6        DEPUTY COMMISSIONER SLIFKA:  Yeah, thank you very

7    much for the question.  So, um, first and foremost,

8    we have air and noise inspectors that cross-trained

9    individuals.  We have about 65 of them on board at

10   DEP.  And we are generally enforcing the sections of

11   the code that I mentioned in my testimony:  The

12   commercial music, the HVAC systems.  And we are

13   looking at joint operations with NYPD as well.

14       So that is something that has really been sparked

15   by the Adams Administration.  We're very grateful for

16   the support that we're getting from NYPD.  And I

17   think they're grateful for the support that they get

18   from us.  And we do conduct a lot of shared, what we

19   call, operations whereby we're balancing the best of

20   both features of the departments.  So we have

21   training on the noise meters.  We can actually take

22   those measurements.  A lot of our violations are

23   actually at a higher cost.  So it's also a benefit to

24   NYPD to be supported by DEP.  And we have had many of

25   these shared operations, especially during the

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1    RESILIENCY AND WATERFRONTS                         76

  2    weekends, and especially in areas where we're having

  3    very high complaints.

  4        MAJORITY LEADER POWERS:  So let me just follow up

  5    to that.  If I have a noisy construction site, let's

  6    say, an after hours variance, or even just a noisy

  7    construction site that feels like it's exceeding the

  8    decibel limit.  I call 311.  Is it DEP or NYPD who is

  9    showing up?

 10        DEPUTY COMMISSIONER SLIFKA:  It would be DEP.

 11        MAJORITY LEADER POWERS:  DEP?

 12        DEPUTY COMMISSIONER SLIFKA:  For construction

 13    noise, yes.

 14        MAJORITY LEADER POWERS:  Okay, because that's in

 15    the bucket that you select from.  So, if I call 311,

 16    they are farming it out to the agency where they

 17    believe the jurisdiction lies?

 18        DEPUTY COMMISSIONER SLIFKA:  Yes.

 19        MAJORITY LEADER POWERS:  So anything outside of

 20    the ones that you named would be going to the NYPD

 21    for them to respond to: If it was a noisy neighbor, a

 22    noisy party, or something like that, which I do see

 23    they respond to a lot.

 24        DEPUTY COMMISSIONER SLIFKA:  Yes.

 25        MAJORITY LEADER POWERS:  Okay.
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 78 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                77

1

2    DEPUTY COMMISSIONER SLIFKA:  Generally, the 311

3    scripts are very precise about who is getting routed

4    which violation.  I don't have those scripts here

5    with me, but we could provide them.

6    MAJORITY LEADER POWERS:  Okay.  What is the

7    average response time for your 65 inspectors?

8    DEPUTY COMMISSIONER SLIFKA:  We are generally

9    going within a one-week timeframe.  So if we have a

10   call, let's say there's a dislodged construction

11   plate, right?  Let's say it's roadwork.  And we could

12   respond to that within a day or two.  But let's say

13   we're responding under our Section 24-231, where a

14   resident would like us to take a reading within their

15   premise.  That we would schedule an appointment for.

16   So they may have called us about an activity that's

17   happening on a Friday night, and they know that they

18   need to schedule that appointment with us for the

19   next Friday night.  And that's why we have those

20   timeframes that's reserved for those types of events.

21   MAJORITY LEADER POWERS:  I mean, unfortunately,

22   for the person who's staying up all night, pulling

23   their hair out, because they have a noisy thing going

24   on outside their premises, it's-- the next Friday

25   won't be-- will be far too long to respond to that,

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 79 of 238

```
      COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1    RESILIENCY AND WATERFRONTS                           78

 2    which I think we're trying to get into that,

 3    including providing people more information, you

 4    know, whether it's 24 hours, 48 hours, whatever it is

 5    of that extra report.  I think we are sometimes

 6    lacking the ability to enforce in real time, which is

 7    really when the noise issues tend to happen, and they

 8    need enforcement right now.

 9        I don't disagree with the NYPD being part of it,

10    because they-- we have precincts in all of our

11    neighborhoods, and they responded to it quickly.  But

12    of course, we're pulling them off one assignment to

13    do another when we do that.

14        How many decibel meter machines do you have that

15    are dedicated to construction?

16        DEPUTY COMMISSIONER SLIFKA:  Let me just go back

17    to your earlier comment.  I think that was an

18    excellent point.  We do have rapid response units in

19    place, and the way that we can work around making the

20    appointment, let's say, for a citizen to issue under

21    that section of the code, that is the benefit of

22    having various sections of the code.

23        MAJORITY LEADER POWERS:  Right.  About the

24    civilian-- you're talking about the benefit of having

25
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 80 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              79

2    the civilian complaint program, if you reform it in

3    the way you desire to?

4        DEPUTY COMMISSIONER SLIFKA:  Yeah.  It's the

5    benefit of having that unreasonable noise.  So, if we

6    wanted to respond to that complaint in real time, we

7    could get out there and we could respond to that

8    complaint, we could respond to various sections used

9    to get at the same purpose.

10       MAJORITY LEADER POWERS:  Okay.

11       DEPUTY COMMISSIONER SLIFKA:  So just wanted to

12   make that--  [TO DEPUTY COMMISSIONER CASTELLI:]  How

13   many noise meters do we have?

14       DEPUTY COMMISSIONER CASTELLI:  All of the 65

15   inspectors have noise meters.

16       MAJORITY LEADER POWERS:  And those can read any

17   level of noise, whether it's construction noise, or--

18       DEPUTY COMMISSIONER SLIFKA:  Yes.

19       MAJORITY LEADER POWERS:  So basically it just

20   records the sound-- the decibel, like, level?

21       DEPUTY COMMISSIONER SLIFKA:  They are very

22   sophisticated machines.  They are calibrated

23   regularly, and the inspectors are trained on them.

24   They're able to evaluate decibel levels on the A

25   scale, which is what the human ear can detect.  And

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 81 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1      RESILIENCY AND WATERFRONTS                        80

 2      they also kind of valuate on other octave bands,

 3      which is very important to get to some of the bass or

 4      C scales.

 5          MAJORITY LEADER POWERS:  Okay.  And for--  You

 6      mentioned--  We'll just go into the civilian

 7      complaint program.  You mentioned something around

 8      there being no time minimums related when they record

 9      video.  Can you just explain what you mean by that

10      when--  I can read you back your part of that.  But

11      there was a point when you were making, I think,

12      recommendations about it, that with some of the

13      videos, I believe, there were not timed minimums

14      required-- involved in them.  So, it becomes a costly

15      endeavor.  I can find my underline of that, but if

16      you-- if you recall, I can-- I'm happy to read.  Uh,

17      here it is.  It's uh-- I will find actually-- I'll

18      find that section and I'll come back to it.

19          But it did want to ask another thing.  You said

20      90% of the approximately 6,000 noise complaints filed

21      in 2023, so this year, by citizens were filed by only

22      two people.  How many total people participate in

23      that program?

24          DEPUTY COMMISSIONER SLIFKA:  I think we have six.

25
```

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 82 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          81

2         MAJORITY LEADER POWERS:  Like what is the other

3    10%?

4         DEPUTY COMMISSIONER SLIFKA:  I think we have six.

5         MAJORITY LEADER POWERS:  Six civilians in New

6    York City are filing that, two are responsible for

7    90%.

8         DEPUTY COMMISSIONER SLIFKA:  The majority are

9    filed by six.

10        MAJORITY LEADER POWERS:  And 1000 in the area

11   around Times Square?  It's my district.

12        DEPUTY COMMISSIONER SLIFKA:  Mm-hmm.  Yes.

13        MAJORITY LEADER POWERS:  Okay.  And the-- Just to

14   understand the violations once more:  A citizen of

15   course can receive as much as $660.  So it's capped

16   at $660?  Or that's just how the percentage would

17   play out if you add them up.

18        DEPUTY COMMISSIONER SLIFKA:  That's the first

19   violation.

20        MAJORITY LEADER POWERS:  The first violation?

21   Okay.

22        DEPUTY COMMISSIONER SLIFKA:  Yeah.  And then

23   there would be a higher penalty for the second

24   violation.  And then an even higher penalty for the

25   third violation.

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                         82

 2       MAJORITY LEADER POWERS:  So what are those

 3   violations?  First, second, third, amount wise?  Not

 4   the citizen complaint part of it.  But to the-- We

 5   have--  We presumably have some business owners here,

 6   who are here to talk about this.

 7       DEPUTY COMMISSIONER SLIFKA:  Yeah.

 8       MAJORITY LEADER POWERS:  What-- What is the fine

 9   on them?

10       DEPUTY COMMISSIONER SLIFKA:  So the first

11   violation is, generally speaking, on the citizen

12   issued is $440.  And then the second violation is

13   $880.  And the third violation is $1320.

14       MAJORITY LEADER POWERS:  That's what the business

15   pays.  And then the civilian is taking--  I think

16   right now, 25% of that?

17       DEPUTY COMMISSIONER SLIFKA:  25% of the

18   department participates, and 50% of the department

19   does not participate.  And then there's also even

20   higher penalties for the first, second, and third for

21   default penalties.  So they're very steep.

22       MAJORITY LEADER POWERS:  Okay.  Got it.  So we

23   have-- I am familiar with Time Square businesses and

24   non-Time-Square businesses who have been-- have been

25   raising concerns about the program.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          83

1

2       There was a-- I can't find my other.  I will find

3    it.  But the question I had after that, I wanted to

4    also talk about the noise cameras, which we have a

5    legislation to codify that program, to expand it,

6    maybe perhaps to distribute it in an effective way.

7    Can you just talk to us about how that program is

8    going right now?  I understand you're through going

9    through a pilot program.  I've seen, I think, some

10   feedback on how it's working so far.  I think you're

11   rolling it out more.  Are you able to share with us

12   how many noise cameras are on the city right now?  I

13   have your violation number, I think your testimony.

14   But just-- Any feedback on what-- what the department

15   is learning about that program as you're rolling it

16   out?

17       DEPUTY COMMISSIONER SLIFKA:  Yeah, so we're very,

18   very pleased with the program now.  We had one camera

19   where we were piloting.  We moved it several times.

20   So, we practiced at different locations.  We have

21   learned that we need to have a certain configuration

22   or roadway geometry for the camera that is part of

23   the microphone system to be very deliberate in terms

24   of discerning which vehicle generated the noise.  But

25   we are doing so now quite successfully.  We currently

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 85 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                84

1

2    have nine cameras that we've purchased, and we have

3    seven that are and have been installed.

4        MAJORITY LEADER POWERS:  Say those numbers one

5    more?  You have nine purchased and seven installed?

6    Okay.

7        DEPUTY COMMISSIONER SLIFKA:  And seven installed.

8        We've been generally issuing or violations off

9    the one camera.  So this should expand quite rapidly,

10   very quickly as these other nine cameras come online.

11       MAJORITY LEADER POWERS:  And location wise, I

12   think I read something-- Long Island Expressway,

13   difficult to differentiate between vehicles because

14   of the fine, but what are you learning in terms of

15   geographic location?

16       DEPUTY COMMISSIONER SLIFKA:  We're looking

17   throughout the five boroughs.  And in fact, we've had

18   a lot of recommendations from Councilmembers for

19   where they're experiencing a lot of complaints.  And

20   really, you know, your constituents are the eyes and

21   ears on the ground.  So we do take their

22   recommendations very seriously.  In fact, I believe

23   that based on the camera experiences that we've had

24   so far, that they have been proven very right,

25   because we're issuing a lot of violations, not just

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 86 of 238

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1              RESILIENCY AND WATERFRONTS                       85

 2              for the loud muffler noise, but also for unnecessary

 3              horn honking that is not related to emergency

 4              situations.

 5                  MAJORITY LEADER POWERS:  Okay, just to be

 6              respectful of the other sponsors here and the Chair,

 7              when to stop there.  We'd be happy to continue to

 8              talk with the department about my legislation, the

 9              five bills we have.  We think there's more to do

10              here, and expanding this enforcement around this

11              issue is an easy way to deliver some wins for New

12              Yorkers who are pulling their hair out.  And we get--

13              These are all I think informed by real life

14              experiences.  So, I look forward to working with you

15              guys on that.  I appreciate it.

16                  DEPUTY COMMISSIONER SLIFKA:  Okay.  Thank you.

17                  CHAIRPERSON GENNARO:  Thank you, Mr. Majority

18              Leader.  One more great package of bills that you're

19              bringing forward.  I really appreciate you doing

20              this.  And very happy to give you the allotment to

21              them to ask questions as long as you want.  And so

22              thank you for that.

23                  I just saw Councilmember Holden now.  I was going

24              to ask a question before I go to him, but I just had

25              a-- the thing that I was going to read from, I want
```

```
         COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1      RESILIENCY AND WATERFRONTS                      86

  2      some copies made of it, because I'm going to give

  3      them to DEP.  And so while that's going on, I'm going

  4      to recognize Councilmember Holden for questions.

  5         COUNCILMEMBER HOLDEN:  Thank you Chair.  And I

  6      just want to just follow through on Majority Leader's

  7      questions on noise cameras, because they can't happen

  8      fast enough.  We-- You know, you have the-- the

  9      mufflers that backfire, sound like gunshots.  I have

 10      them every single night within earshot of my home.

 11      And the guy comes by every-- you know, almost the

 12      same time.  So, these noise cameras.  Are they very

 13      expensive, first of all?  There's probably different

 14      stock-- different makes and models and so forth.  And

 15      how-- how expensive are they?  Because that'll

 16      dictate how many we put up, I guess.

 17         DEPUTY COMMISSIONER SLIFKA:  Yeah, they're

 18      running about $50,000.

 19         DEPUTY COMMISSIONER CASTELLI:  35.

 20         DEPUTY COMMISSIONER SLIFKA:  35?  Yeah, $35,000.

 21      They will improve.

 22         COUNCILMEMBER HOLDEN:  $35,000 each?

 23         DEPUTY COMMISSIONER SLIFKA:  Each.

 24

 25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          87

1

2      COUNCILMEMBER HOLDEN:  Okay.  And you have nine

3   cameras.  Seven were installed.  But how come the

4   other two weren't installed yet?

5      DEPUTY COMMISSIONER SLIFKA:  They're just going

6   up now, as we speak.  We have staff that are

7   employing them.

8      COUNCILMEMBER HOLDEN:  Now, so these--  And I'm

9   worried because when I hear, "We don't have that

10  many," I'm just worried that they're going to be in

11  Manhattan, and not in Queens.  Only because-- you

12  know, there's-- there's a bunch of bills that we

13  have, but I think we also have to sleep in Queens

14  too.  And we chose to live in residential areas

15  mostly.  Yet we have things that we've never seen

16  before.  We have-- First of all, why would somebody

17  modify their muffler to make it sound like gunshots?

18  We've never had that before.  We had some people that

19  just soup up their cars.  And obviously that happens.

20  It's always happened.  But now there's a strange

21  phenomenon.  People just like to make noise.

22      And if the cameras are that successful, and can

23  generate-- Again, I just wanted to ask about the

24  fines.  Let's say you do get a guy with a muffler and

25  you caught them.  What's the fine?

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 89 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          88

1

2      DEPUTY COMMISSIONER SLIFKA:  $800.

3      COUNCILMEMBER HOLDEN:  $800.  This is why I like

4  DEP, when they're involved.  Because when NYPD is

5  involved, and I just want to ask a couple of

6  questions.  I guess-- I'm on the clock, right?  Yeah,

7  I see.

8      CHAIRPERSON GENNARO:  We're-- We're partners on

9  this whole civilian thing.

10      COUNCILMEMBER HOLDEN:  Okay.  So-- So--

11      CHAIRPERSON GENNARO:  Sometimes they get off the-

12  - plus I'm looking at my stuff, so knock yourself

13  out.

14      COUNCILMEMBER HOLDEN:  No, I think I-- Okay.

15      CHAIRPERSON GENNARO:  It's good.

16      COUNCILMEMBER HOLDEN:  Just-- Just the

17  coordination between NYPD and DEP, because I've had

18  chronic locations where NYPD cannot handle.  They

19  just-- The local precinct, and I listen to the

20  scanner-- They're busy with 911 calls.  The-- the

21  noise complaints are when they get around to it.  And

22  it's rarely now with the new police department, is it

23  within eight hours like they promise on 311.  It's

24  sometimes the next day, 24 hours, and of course the

25  noise has probably gone.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 90 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          89

1

2      And so when does-- when does NYPD-- are they

3  mandated to contact the DEP at one point because they

4  can't address is this?  It's a chronic location?

5      DEPUTY COMMISSIONER SLIFKA:  So that's an

6  excellent question.  And thank you for it.  When we

7  do have those chronic locations (and again, I just

8  want to recognize Mayor Adams and Commissioner

9  Agarwal at DEP, because this has really improved

10  under their tenure), the agencies, or the police

11  department, or the DEP are working together with

12  these joint operations, and again blending the skill

13  sets of both departments really well, where we can go

14  out and do the technical work, we can do the

15  measurements, we can issue to the offending parties

16  at the higher rate of penalty.  Whereas the police

17  department is helping us safely access some of these

18  locations.  We do not have armed personnel, so it is

19  very important that they stay safe.

20      So it has really been a wonderful blend.  If you

21  have locations, you should please provide them to us.

22  Because we are constantly on the move with these

23  joint ops.

24      COUNCILMEMBER HOLDEN:  Yeah, normally it's-- it's

25  neighbor and neighbor who say, "Well, they're playing

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 91 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                      90

1

2      the radio too loud," that kind of thing.  And-- But

3      the police increasingly now cannot handle this.

4      That's why-- But I'm also wondering, with all these

5      packages of bills that we have, are 65 inspectors

6      enough to handle this-- this load here now?  Because

7      I-- I don't know how you promote the awareness of the

8      citizen noise complaint program.  Because a lot of

9      people don't know about it.  And maybe we would get

10     more people participating, rather than the bad actors

11     that you say they're doing it for profit.

12         But it's not-- it's not under the-- you know, if

13     we did promote this more, we might get, really, to

14     the point where enforcement is, and we do have--

15     enforcement is good-- and we do have a livable city.

16         But right now, again, I can't get the police to

17     handle parking summonses anymore in my district.

18     It's so bad because they're handling increased 911

19     calls.

20         DEPUTY COMMISSIONER SLIFKA:  Yeah.  That's a very

21     sensible recommendation.  And we agree that we could

22     do a better job of marketing this.  I think we've

23     been a little reluctant, holding off, because we'd

24     like to make these reforms first so that we can

25     ensure that we have a successful program to promote.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 92 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                            91

2   So we would greatly appreciate working with you for

3   it.

4       COUNCILMEMBER HOLDEN:  So-- and I like the

5   strategy:  "Let's get the program to where we it'll

6   function properly.  And we can get, you know, get

7   some of these issues solved, whether through

8   legislation or regulations."  But I do like the idea.

9       But I would like to see the program operate.

10  And-- Because I'm dealing with the same locations

11  over and over again.  And I did speak to the

12  Commissioner about this.  But I do-- On chronic

13  locations, I recommend DEP because that will put an

14  end to it.  You get a you know, a few $1,000 fine,

15  you're not going to be playing, you know, music very

16  loud, constantly, every night, or just on weekends.

17  So I like that idea.

18      So-- But do you need more inspectors?  That's

19  what I'm, you know-- Because 65 for the entire city

20  of New York, and noise seems to be one of the biggest

21  complaints on 311.

22      DEPUTY COMMISSIONER SLIFKA:  Yeah.  Um, it's a

23  tough question to answer during these budget

24  constraints.  We do feel like we have enough to

25  respond to the complaints that we're getting within

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                    92

2    the mandated timeframes through the mayor's

3    management report.  We're always meeting our targets.

4    However, additional staff would always be welcome.

5    Clearly, you know, we would put them to good use.  I

6    will say that in recent history, we've been working

7    much more efficiently.  We're working smarter.  We

8    have utilized technology to our advantage.  We have

9    heat maps.  We call them the heat maps.  They're--

10   Generally when we can see complaints coming in, our

11   supervisors can see that in real time, and they can

12   deploy people to those areas.  So, yes, we feel

13   somewhat constrained, as all agencies are now.  But

14   we do feel like we are working as efficiently as we

15   possibly can.  And, through the use of technology,

16   there's probably room for additional improvement.

17       COUNCILMEMBER HOLDEN:  Right. Let me just go

18   back.  And last question, I promise you.

19       The biggest-- One of the biggest complaints we

20   get, and probably the most frustrating because the

21   police can't catch these guys, the guys that play

22   their music very loud in the car, and they ride

23   around, and they wake the whole neighborhood up.  And

24   they set-- they even set up-- there's-- it's so loud,

25   not only with their mufflers, but they're setting off

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                        93

1

2   car alarms as they drive down the street.  A camera

3   program that would catch these guys, you know, again,

4   as long as it we don't identify where these cameras

5   are, you know?  Like if people know that-- where the

6   speed cameras are, so they don't, they'll drive down

7   every other street, but they'll avoid those streets,

8   or at least slow up.  Are these cameras hidden?  Are

9   they noticeable?

10      DEPUTY COMMISSIONER SLIFKA:  They're hidden in

11  plain sight.

12      COUNCILMEMBER HOLDEN:  Okay.

13      DEPUTY COMMISSIONER SLIFKA:  We have had a

14  circumstance where one was detected, and absolutely

15  it was avoided.  There's a lot of clubs, these

16  automobile clubs.  They got the word out really

17  quickly.  And we were able to get there.  We moved

18  the camera as quickly as they were able to identify

19  it.  So, we do try to disguise them.  And we do keep

20  the location secret.

21      COUNCILMEMBER HOLDEN:  Okay, but I'm just

22  offering my-- my budget-- a portion of my budget that

23  I get in my council office for these cameras, because

24  I think they'd be a godsend for peace and quiet, and

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                              94

2  we need to sleep at night in New York City.  Thanks

3  so much.

4      DEPUTY COMMISSIONER SLIFKA:  You're welcome.

5      CHAIRPERSON GENNARO:  Thank you, Councilmember

6  Holden.  Pardon me.  I'm going to take some water.

7      Okay, folks, I'm having a sidebar with Alyssa

8  Preston about-- about an appeal from a citizen

9  enforcer, or-- versus Jackson Hole Restaurant.  And

10  the appeal was dated July 27, 2023.  And by my

11  reading of it (and it is pretty plain language), it

12  seems to indicate quite clearly that, you know, with

13  regard to-- with regard to sound that is emanating

14  from the interior of an establishment, and that--

15  that 24-244 B is the wrong section of the code for

16  that.  It's really meant more for outward facing

17  speakers, if you're trying to draw people in for you

18  know, as I said, before "come on in and buy neckties

19  here" or whatever.

20      And so, with this having been put forward by

21  OATH, in July 27, 2023, the question would be-- It

22  seems to me that OATH has established that 24-244 B

23  is the wrong section of code for the for-- for the

24  citizen enforcers that are coming forward with these

25  with-- with these violations.  Now with-- with this

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 96 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                              95

2    in place-- And this also seems to clash a little bit

3    with the-- with the August, whatever it was,

4    resolution of the board that says, "Okay, if we can

5    establish that-- that the that the infraction, or the

6    problem, or the violation has been fixed, then you

7    know, we're not going to levy a penalty."

8        And so, in July, it says it's the wrong section

9    of the code for this kind of violation.  In August

10   OATH is saying, "Well, as long as you can show that

11   it's fixed, then we're not--"  They-- they don't seem

12   to agree with one another.  But I'm going with the

13   July one, because it just plain old says that it's,

14   you know, the wrong section of the code.

15       Now, if I'm DEP, and I get the ability to dismiss

16   violations as frivolous, or whatever the term is, if

17   you're using the wrong section of the code, then why

18   not just quash it there rather than just not act and

19   have the civilian enforce who go to OATH, have the

20   person default (59% default), and then the city gets

21   its money, and then the bounty hunters get their

22   money.  It just seems that this provides some clarity

23   as to that section of the code being in the wrong

24   section of the code, that-- that is being used by the

25   civilian enforcers.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 97 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                            96

2        And so that's kind of my statement.  And so the

3    question would be that, since this has happened, and

4    there's been some clarity made, that this is the

5    wrong section of the code, has DEP changed the number

6    of violations that it is dismissing from the civilian

7    enforcers, when they're presented to DEP, based on

8    this, you know, appeal by OATH, saying it's the wrong

9    section of the code?  And what is DEP's sense of

10   this-- of this whole thing, being like the wrong

11   section of the code?  And why-- I don't want make a

12   characterization, but why is DEP sitting back and let

13   he's letting these things go through to-- and tying

14   up OATH, and getting the business owners to come

15   down?  They're most likely not; 59% don't.  And so

16   it's-- You know, forgive the cynic in me-- that you

17   know, it's money for city.  Okay.  And then, you

18   know, money for the-- for the for the bounty hunters.

19   I don't get it.

20       And so I would just like, you know, someone to

21   opine on what's going on here, when we have a

22   document in hand, by my interpretation, showing that

23   that section is the wrong section of the code for all

24   of these violations that are being put forward by the

25   civilian, or by the what I call the-- hang on, yeah,

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 98 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                          97

2    by the civilian enforcers.  Some of you call them

3    citizen enforcers.  I prefer civilian enforcers.  So

4    that's my statement-question-statement-question.  So

5    there you have it.  I don't want to be you right now.

6    But sorry.

7        DEPUTY COMMISSIONER SLIFKA:  So thank you for

8    that.  We are aware of the appeals decision that

9    you're referencing.  I think it's important to draw

10   the distinction that--

11       CHAIRPERSON GENNARO:  I need you to speak right

12   into the mic like this, you know?

13       DEPUTY COMMISSIONER SLIFKA:  Sorry.  Is that

14   better?

15       CHAIRPERSON GENNARO:  Yes.

16       DEPUTY COMMISSIONER SLIFKA:  So yes.  We are

17   aware of that appeals decision.  I think it's

18   important to point out in that particular appeals

19   decision, the court focused on the fact that they

20   were using it for the entertainment of the dining

21   population, and they also pointed out that that

22   particular location referenced in the appeal was near

23   the Grand Central Parkway.  So it was very hard for

24   the citizen to prove it was for commercial or

25   business advertising purpose.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          98

2         CHAIRPERSON GENNARO:  No, just stop right there.

3    I'm not-- I'm not following that line of--

4         DEPUTY COMMISSIONER SLIFKA:  I'm going to explain

5    it to your point.

6         CHAIRPERSON GENNARO:  Yeah.

7         DEPUTY COMMISSIONER SLIFKA:  So I think it's

8    helpful that appeals decision, because there's no

9    longer presumption that just because it's audible,

10   that they're innately in violation of 244.  So what

11   DEP is doing is we're reviewing as we have been--

12        CHAIRPERSON GENNARO:  But-- But I'm going to take

13   issue with that.  Because just-- "plainly audible" or

14   whatever, you know, gets into the whole, you know--

15   That's something that we put the bid 20 years ago

16   with-- with the noise meters and all that.  And so

17   like, that's what we're supposed to be doing.  And so

18   the whole plainly audible standard, which is like the

19   unreasonable noise standard, is, you know, harkens

20   back to a day before we did the noise meters and all

21   that, and we put that to bed 20 years ago, and so I

22   can't get-- I can't get past that.

23        DEPUTY COMMISSIONER SLIFKA:  So I understand your

24   consternation.  So 244 B is in the code, and that

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 100 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              99

2   does have a statement that it basically must be for

3   commercial or business advertising purpose.  DEP--

4        CHAIRPERSON GENNARO:  Advertising purposes.

5        DEPUTY COMMISSIONER SLIFKA:  Right.

6        CHAIRPERSON GENNARO:  So 244 B--

7        DEPUTY COMMISSIONER SLIFKA:  For commercial.

8        CHAIRPERSON GENNARO:  --is for advertising

9   purposes.  But yet all the bounty hunters are going

10  there and putting their cell phone, or whatever the

11  hell it is, you know, like, you know, right up

12  against the glass.  And, you know, DEP could have

13  been dismissing these things from-- from the get go.

14       DEPUTY COMMISSIONER SLIFKA:  So we can't--

15       CHAIRPERSON GENNARO:  So why aren't they-- So why

16  weren't they before?  And certainly, why are they not

17  doing that now?

18       DEPUTY COMMISSIONER SLIFKA:  So we are just

19  dismissing a great portion of the citizen complaints

20  that come to us, based on lack of appropriate

21  evidence.  But we have not been--

22       CHAIRPERSON GENNARO:  Well--

23       DEPUTY COMMISSIONER SLIFKA:  --opining and

24  adjudicating whether or not, you know, what the case

25  specifically is.

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
     1          RESILIENCY AND WATERFRONTS                        100

     2              CHAIRPERSON GENNARO:  Yeah, but certainly DEP is

     3          in a position to know whether or not the wrong

     4          section of code is being-- is even being applied.

     5          Doesn't that give--  If someone comes forward to DEP,

     6          you know, a complainant, and then they have this, oh,

     7          but-- So do they come to you with a ticket, or do

     8          they just come to you?  Or they--  they come to you

     9          with their-- with their homemade ticket--

    10              DEPUTY COMMISSIONER SLIFKA:  They come to us

    11          first.  We have 30 days in which to review the

    12          citizen complaint.  Um, for a portion of them, we

    13          determine that we don't believe that the evidence is

    14          sufficient for anybody to pursue that complaint.  So

    15          just based on--

    16              CHAIRPERSON GENNARO:  Do you have any kind of--

    17          any kind of statistic on-- for the civilian

    18          enforcers--

    19              DEPUTY COMMISSIONER SLIFKA:  What is the number?

    20              CHAIRPERSON GENNARO:  How many come to you that

    21          have been dismissed by-- or whatever the word is, you

    22          know...

    23              DEPUTY COMMISSIONER SLIFKA:  Yes.  We have that

    24          number.  So...  If you want to report that.  But

    25          ultimately, I agree that since we have these
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          101

1

2   decisions now, I think that we do (and you're making

3   that point) that we probably have the basis of more

4   dismissals.  And we-- we can do that.  That takes

5   staff away from DEP's other business.  But we

6   certainly -- based on what we're trying to do to

7   support our local economy and our small businesses,

8   now that we have these rulings and decisions -- we

9   can probably dismiss a great deal more.  But also the

10  reforms that we are proposing, I believe, will

11  eliminate this problem in the future.  So these--

12      CHAIRPERSON GENNARO:  Right.  And certainly

13  that's a good conversation.  But, you know, right

14  now, we have a situation where, you know, 59% of the

15  businesses get these things.  They don't show up.

16  They get whacked.  And then, you know, the bounty

17  hunters get all their money, $660, whatever.  And--

18      And this is, you know, by your own testimony, and

19  the strong language in your testimony it's a real--

20  it's a real blight and a real problem, and a real,

21  you know, imposition on businesses in the city.  And,

22  you know, we in government just-- just don't really

23  have the, you know-- don't have the luxury of just

24  putting, you know, harsh language, in testimony, when

25  DEP comes before the Council.  The whole idea is to,

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 103 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                               102

1

2   once these decisions come forward, and they're, you

3   know, moving the needle on what is and what is not,

4   you know, a valid violation, you know?

5       DEPUTY COMMISSIONER SLIFKA:  Mm-hmm.

6       CHAIRPERSON GENNARO:  Then, you know, then DEP

7   not only has the right, but-- but the obligation to

8   make sure that it steps up and says, "Okay, we can

9   do--  We can come down harder on these."  And then--

10  And then that has done that has a chilling effect on

11  the people who are writing the violations in the

12  first place.

13      DEPUTY COMMISSIONER SLIFKA:  Yes.  We can

14  dismiss--

15      CHAIRPERSON GENNARO:  Because they are-- they are

16  like starting to get shut down and shut out, because

17  they're using the wrong damn section of the code,

18      DEPUTY COMMISSIONER SLIFKA:  We can dismiss based

19  on meritless and frivolous-- I believe that's the

20  language of the section.  And if we determine--  It's

21  just very, very difficult, sometimes by viewing those

22  videos to determine what the intended purpose is, of

23  those speakers.  It is just difficult for us.  And

24  we--  There's that blurry line that we don't like to

25  cross, which is that we are not the adjudicating

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 104 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              103

1

2   body.  That would be OATH.  So that's the fine line

3   that we're walking.

4       CHAIRPERSON GENNARO:  I'll put that under the

5   category of what I call "nice try", you know what I

6   mean?  And--  And I would have said the same thing,

7   if I were you.  But you know, the fact remains that,

8   you know, with-- with--

9       And again, OATH too.  They got this thing in

10  July, and then they got this thing in August that

11  don't appear to me to, sort of, agree.  But both are

12  kind of, in different ways, sending the message that

13  we're sick of this nonsense.  We don't want to do

14  this anymore.  We got businesses getting jammed up.

15  We got people walking away with like, pockets full

16  of-- hundreds of thousands dollars a year from this,

17  and we're helping them essentially, you know,

18  perpetuate a scam.  And this-- this can't be.  And--

19  And, you know, I wouldn't want to be part of DEP top

20  management that has got to shift resources in order

21  to, you know, make this thing go away.  But, you

22  know, it sort of is what it is, and the people who

23  are paying the price is not-- it's not DEP.  It's

24  these businesses that are getting these violations.

25  They don't know what they are.  They don't want to

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 105 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    104

1

2    hire a lawyer, or they don't know, or whatever.

3    They're trying to run their business.  They've got to

4    take a whole day off and go down there.  They don't

5    know what they're going to face.  "And if I hire

6    lawyer and do this, I'm just going to break even

7    anyway.  So why don't I just pay the vig, so to

8    speak?"  Vig is a slang term.  Most people-- Most

9    people might know what that is.  But, you know,

10   those, my age and older would probably know that.

11       But-- So this is my-- You know, this is- this is

12   what I get from-- people know I'm Chair of the

13   Committee.  I get-- I get businesses from all over

14   the city like yelling and screaming at me.  And then

15   I get the bounty hunters yelling and screaming at me

16   with their, you know, very aggressive tactics and--

17   and, you know, being aimed at my staff, and I'm like,

18   "What the heck are we doing here?"  And so:  Happy to

19   work, you know, going forward with, you know, things

20   that we could and should do.  But I think there needs

21   to be a change, and there really needs to be a change

22   now.

23       And so, you know, whatever you need to do in

24   order-- well, you tell me what-- what you think is

25   going to happen now, after, you know-- you're going

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              105

1

2    to go back to Lefrak and say, "Gennaro did his whole

3    thing."  And so...?  So...?

4        DEPUTY COMMISSIONER SLIFKA:  We're riled up too

5    about this.  I mean, there have been, again, a lot of

6    conversations with Small Business Services.  Our

7    colleagues over there are very frustrated with this

8    program.  And again, I think the best thing that we

9    can all do is move quickly on this package of

10   reforms, additional--

11       CHAIRPERSON GENNARO:  I know, but right now-- but

12   right now there-- there are people-- you know,

13   they're people interacting with DEP today, on behalf

14   of bus--  The number of summonses is like off the

15   charts.  And so, I'm all for the reforms, but I'm--

16   What we have in hand right now, you know-- appeals of

17   OATH, the resolution of OATH.  And it would appear

18   that, since these resolutions have-- and this appeal

19   and this resolution came forward, I don't think DEP

20   has really changed the number of-- of violations that

21   they themselves are taking the opportunity to dismiss

22   as frivolous, or whatever the word is, or not

23   consistent with the code, or whatever.  Or has there

24   been a difference?  If there has been a-- if there

25   has been a difference, now's the time to say it, and

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           106

1

2    I'll be the first one to applaud, you know?  But has

3    that been the case?

4        DEPUTY COMMISSIONER SLIFKA:  Well, as I said, I

5    think now we have a greater opportunity to dismiss

6    some of these cases.

7        CHAIRPERSON GENNARO:  But the time is now.  Like

8    this is July.

9        DEPUTY COMMISSIONER SLIFKA:  And the time is now.

10   There's nothing I can do about pending cases with

11   OATH.  So that's a clear distinction.

12       CHAIRPERSON GENNARO:  Well, I think, you know,

13   once we do something those that have not been

14   adjudicated, you know, we could-- we could tie all

15   those up in a bow and just get rid of them.  But,

16   again--  I don't play lawyer here, but you know, to

17   the extent there is this kind of, you know, mis--

18   this kind of, you know, injustice in the name of

19   justice playing out in the city, where-- where, you

20   know, business owners are getting fleeced, and you

21   know, DEP has, you know, decisions in hand, and can--

22   and can just, you know, be kind of, you know, nip

23   these at the bud, and not drag in OATH, which is

24   clearly sick of this.  I think that's-- I think

25   that's the obligation.  I think.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 108 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1    RESILIENCY AND WATERFRONTS                            107

  2        And in the meantime, we work through, like, what

  3    we're going to do in terms of, you know, reforms,

  4    both, you know, to the civilian enforcement for

  5    noise, as well as idling, which we're not really

  6    talking about today (you did in your statement, and I

  7    thought it was important for you to do that, and so I

  8    gave you a little latitude on that), but I'm kind of

  9    like decoupling, you know, officially decoupling, at

 10    least for now.  Because, you know, this is the fire

 11    that is raging, the one right now with the bounty

 12    hunters and-- and with the business, with the

 13    businesses that are being impacted by it, and, you

 14    know, government kind of throwing up his hands a

 15    little bit saying, "Yeah, we could do more but we're

 16    busy."  You know, that just--  You know, in the case

 17    of this kind of wildfire, that doesn't-- that doesn't

 18    sort of carry the day.  It's just not good enough.

 19        I still like you all.  It's not about that, you

 20    know?  But, just, I think we need to do better.

 21        Let me see what other-- Hang on.  Oh.  My very

 22    patient partner in government here and partner in the

 23    Council Lincoln Restler.

 24        COUNCILMEMBER RESTLER:  I thought you were going

 25    to call me loquacious.
```

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 109 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          108

2       CHAIRPERSON GENNARO:  What's that?

3       COUNCILMEMBER RESTLER:  I thought you were going

4    to call me loquacious.

5       CHAIRPERSON GENNARO:  Oh, yeah.  You're-- You're

6    that and more, my friend.

7       COUNCILMEMBER RESTLER:  I'll be brief today.

8       CHAIRPERSON GENNARO:  So you thought I was-- You

9    thought I was that I was a tough customer.  Okay.

10   You're going to get it now.  Okay.  So I recognize my

11   friend and colleague, Lincoln Restler, for questions.

12      COUNCILMEMBER RESTLER:  Thank you very much.  I'm

13   not giving anybody an overly hard time today.  But I-

14   - I do really appreciate Chair Gennaro's leadership

15   on this topic, and comments of my colleagues.

16      You know, there is a noise complaint to 311 every

17   minute of every hour of every day for the year,

18   across the year, for the city of New York.  We get--

19   I think there were 523,000 complaints last year.

20      And, you know, we get it.  We live in a loud

21   city, and we're accustomed and acclimated to a

22   certain extent of it-- to a-- to a certain extent.

23   But in many areas, it is just inexcusable.  And it's

24   very challenging to get any kind of meaningful

25   enforcement from DEP or from the NYPD.  I recognize

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 110 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                  109

1

2      that I think of those 520,000 complaints, only 60-

3      something-thousand of them get sent to DEP.  The vast

4      majority of them go to the police department.  So we

5      should bring them in next time, Chair Gennaro, and

6      give them a hard time about their failure to enforce

7      on any of the noise complaints that we have across

8      our district.

9          The stuff that drives me the craziest are the

10     extremely loud mufflers, the extremely loud

11     motorcycles that ride through our communities and

12     have no regard whatsoever for our neighborhoods.  And

13     I'm interested in just understanding where we are on

14     the camera pilot study and the status of your plans

15     to expand it.  My recollection is that you've had it

16     at five different locations over the past year and

17     change, year and a half.  We had at some point been

18     approached about identifying locations in our

19     district that we thought would be viable.  We

20     suggested a number of locations.  None had been

21     selected, as far as I know, much to my chagrin, and

22     we want you to have a presence in our community and

23     to be utilizing this technology to impose fines for

24     people who are incredibly disrespectful of our

25     neighborhoods.

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 111 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              110

2        And so how are we doing on this pilot?  Are we

3    finally ready to-- to acknowledge its success?  Its

4    efficacy or lack thereof?  And what are the plans for

5    expansion?

6        DEPUTY COMMISSIONER SLIFKA:  Thank you very much

7    for the question.  We really are pleased with the

8    noise camera pilot program.  This all began during

9    the pandemic, or at least we saw our roads being

10   overtaken by a lot of drag racing, loud-- loud

11   mufflers, and it was very difficult to be able to

12   deploy personnel in all of these locations

13   simultaneously.  It was frustrating to us.  It was

14   frustrating to NYPD.

15       And we read about a program that was successful

16   in London.  So what we did is we sent over for one of

17   their pieces of equipment so that we could pilot it

18   here in New York City.  We are extremely pleased with

19   the level of precision of the microphones that are

20   associated with the cameras.  They're directionally

21   oriented so that you can really pinpoint and discern

22   which is the vehicle that's creating the noise.

23   That's not in all cases.  In some cases, it is not

24   easily discernible.  We don't feel like that would

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 112 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                          111

 2   hold up in court.  But we are pursuing quite a large

 3   volume of these associated just with the one camera.

 4       So, we had about 250 summons that were issued so

 5   far.  We have about another 100 that are pending.

 6   And I was reporting earlier that we have nine cameras

 7   in total that were purchased.  And we just finished

 8   installing seven of them.  So the other two will

 9   happen in the next couple of weeks.

10       COUNCILMEMBER RESTLER:  But none in District 33?

11       DEPUTY COMMISSIONER SLIFKA:  I have to check.  We

12   have not excluded you purposefully.  I honestly would

13   have to check, but we are taking--

14       COUNCILMEMBER RESTLER:  I'm glad that you haven't

15   purposefully excluded me.  But I hope that you

16   prioritize our district because downtown Brooklyn has

17   a phenomenal amount of noise.  And we could use some

18   attention, especially by the entrances to the

19   Brooklyn and Manhattan bridges, the levels of

20   honking, the noise of the cars.  It's extraordinary.

21   And there should be more attention there.  And I

22   don't think-- I would love to see more PD enforcement

23   on this, but I don't think that that's the right

24   solution.  I think that the cameras are a better

25   approach.  I appreciate that you have nine cameras.
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 113 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              112

1    
2    Could we-- Are we in a position where we could

3    allocate capital dollars in this year's budget for

4    additional cameras in our district?

5        DEPUTY COMMISSIONER SLIFKA:  It's hard for us--

6        COUNCILMEMBER RESTLER:  How do we get you to say

7    yes?

8        DEPUTY COMMISSIONER SLIFKA:  --to mix capital

9    money with our expense budgets, so that--

10       COUNCILMEMBER RESTLER:  We purchase cameras with

11   the NYPD, Argus cameras, to-- in high crime areas in

12   our districts to try and make sure that our police

13   departments have the tools they need to be

14   successful.  Why couldn't we do the same here?

15       DEPUTY COMMISSIONER SLIFKA:  I'm very welcoming

16   of the idea.  And if we could figure out a way to do

17   that, I would definitely support it.

18       COUNCILMEMBER RESTLER:  I don't know that DEP

19   takes capital money from the Council.  But if we

20   could identify an alternative agency that could be a

21   partner--

22       DEPUTY COMMISSIONER SLIFKA:  Mm-hmm.

23       COUNCILMEMBER RESTLER:  --so that we could

24   purchase cameras and place them in locations that we

25   jointly determine are most helpful, then we could

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              113

1

2    help expedite that.  Do you have any sense of what

3    the cost would be per camera?

4        DEPUTY COMMISSIONER SLIFKA:  Yes.  We were just

5    talking about that earlier, too.  It's about $35,000

6    per camera.  And I will say that it-- they are paying

7    for themselves.  So, they are a wonderful use of

8    technology.  Again, we are not a profit driven

9    enterprise.  We don't run on quotas or anything like

10   that.  But given the quality of life disturbances

11   that this creates, I believe it is a very effective

12   enforcement tool.

13       COUNCILMEMBER RESTLER:  Okay.  I would really

14   like to follow up you, Deputy Commissioner, about how

15   we can be ready in this upcoming budget to allocate

16   additional capital money to bring additional cameras

17   to our district.  So, we'd like to start those

18   conversations quickly.  And then just lastly, as

19   Chair Gennaro gives me the hook:  In light of the

20   passage of the SLEEP Act, the New York SLEEP Act up

21   in Albany this year, that went into effect-- or last

22   year, that went into effect in April, enforcing

23   decibel limits and raising funds for illegal muffler

24   modifications, has there been any additional DEP

25   enforcement or any ways that we can demonstrate that

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 115 of 238

```
         COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1       RESILIENCY AND WATERFRONTS                              114

 2       we've been able to execute on the efficacy of this

 3       law?

 4          DEPUTY COMMISSIONER SLIFKA:  I'll let Alyssa

 5       handle that because we want to differentiate between

 6       the vehicle traffic law and the enforcement of the

 7       DEP's noise code.

 8          DEPUTY COMMISSIONER CASTELLI:  I'll just add that

 9       the penalty is $800 now, which we were able to do as

10       a result of the SLEEP Act in March of 2022.  Before

11       that, it was around $250.  So that did give us the

12       authority to be able to increase that penalty.  We

13       referred to the VTL to set the sound limit that we

14       use for the camera.  But the authority for us to

15       implement the program is purely within the New York

16       City noise code.

17          COUNCILMEMBER RESTLER:  Great.

18          And so I look forward to working with you on

19       capital allocations this year.  We will figure out

20       however we can make that happen.  We would very much

21       like to see an increased presence of these cameras

22       around our district.  And I imagine many of my

23       colleagues would want to do the same.  Thank you.

24          CHAIRPERSON GENNARO:  Thank you, Councilmember

25       Restler.  And we have no more questions for the
```

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 116 of 238

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
    1           RESILIENCY AND WATERFRONTS                        115

    2           panel.  We really appreciate your, you know, being

    3           here.  And it seems like the message kind of sunk in.

    4           And we are appreciative of that.  We look forward to

    5           the work, you know, coming ahead, that we can, you

    6           know, work on this with the noise, and also the

    7           civilian with the idling, which we're not talking

    8           about today, but we do very much look forward to

    9           that.  Always a pleasure to see you and thanks very

   10           much for your good testimony, and-- yeah.  Thank you.

   11           And with that we have our first panel.  If the

   12           Counsel could call them the first panel?

   13               Just one second.

   14               Okay, we have a first panel of Andrew Rigie, Max

   15           Bookman, and Robert Bookman, all testifying on behalf

   16           of the New York Hospitality Alliance.   where you can

   17           work with

   18               Okay, am I going to call upon Counsel to swear in

   19           this-- swear in the panel.

   20               Thank you.

   21               Okay, Sergeant, normally we set it a two-- this

   22           is, like, a juicy topic.  We're going to go to three

   23           minutes to give people a chance to say what they have

   24           to say.  Even though it's-- that means I don't have

   25           dinner tonight.  No loss there.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                116

1

2      MR. RIGIE:  I can't say my name in two minutes.

3      CHAIRPERSON GENNARO:  Now that said, people don't

4  have to take up three minutes if they... you know.

5      Okay.  Yeah, we just swear in the administration,

6  those folks.  So please proceed with your good

7  testimony.  And we appreciate you being here.

8      MR. RIGIE:  Excellent.  Thank you, Mr. Chair,

9  Councilmembers, committee staff.  My name is Andrew

10  Rigie.  I am the Executive Director of the New York

11  City Hospitality Alliance.  We are a not-for-profit

12  association that represents thousands of bars and

13  restaurants across the five boroughs.  So first, I

14  want to thank you, both Chair, Councilmember, for

15  introducing legislation that will put an end to the

16  unacceptable abuse that far too many bars and

17  restaurants have been subjected to by a tiny group of

18  self-interested, private bounty hunters.

19      These bounty hunters are not your average

20  citizens.  They have turned profiting into the-- off

21  the backs of small business owners into an

22  opportunity.  They wake up.  They go across the city

23  to different neighborhoods, and they target small

24  businesses.  Worse, they're relying on an incorrect

25  reading of the law to do it, as was recently

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                           117

2    recognized by OATH's appeal unit, which was

3    referenced earlier.  They repeat this process over

4    and over again enriching themselves in significant

5    sums.

6        This is not how New York City should do sound

7    enforcement.  In a moment you're going to hear from

8    the alliance's counsel, both Robert and Max Bookman.

9    They'll speak a bit about the history of sound

10   enforcement, and the correct law that governs here,

11   as well as some comments on these specific bills.

12       But first, I'd like to say Councilmember Holden's

13   bill will clarify that the correct statute for

14   policing commercial sound violations is the one that

15   has been on the book for nearly two decades, and

16   which you're very familiar with, the one that

17   provides objective criteria based on a decibel

18   reading.  It would send a stark message to the bounty

19   hunters victimizing bars and restaurants that the

20   section of the law they are currently using to go

21   after small businesses is off limits.

22       Second, for those who may not get the message,

23   Councilmember Gennaro's bill would cap the amount of

24   money bounty hunters could collect from initiating

25   these summonses.  But after listening to DEP's very

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                            118

 2   thoughtful commentary on this matter, it seems that

 3   the best idea may just get rid of the section

 4   entirely of the noise code that permits civilian

 5   complaints, and these bounty hunters to go around and

 6   exploit small businesses, because of the degree to

 7   which they're doing it, and some of the really

 8   incredibly horrible techniques they are using.

 9       There were some comments we had about limiting

10   the ability of a citizen to live within 200 feet of a

11   business, to be permitted to issue these violations.

12   But perhaps the idea is just get rid of that section

13   in its entirety.

14       But also, we want to make sure that the thousands

15   and thousands of these summonses that are currently

16   pending are tossed out as well.  So, we'd love to see

17   a provision that not only applies moving forward in

18   the future once a law is enacted, but also to ensure

19   that all the summonses that are pending are tossed

20   out.

21       So, for these reasons, the Hospitality Alliance

22   strongly supports these efforts.  And you'll hear

23   from my colleagues at the Hospitality Alliance in

24   more specificity.  But I want to thank you for your

25   time and your effort to address these issues.  If
```

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 120 of 238

```
         COMMITTEE ON ENVIRONMENTAL PROTECTION,
1        RESILIENCY AND WATERFRONTS                        119

2        anything, you both know that we need to support our

3        small businesses.  And what's happening here just

4        send absolutely the wrong message to not only our

5        small business owners, workers--

6            CHAIRPERSON GENNARO:  Thank you Anthony.  I've

7        got to move forward.  The way I want to do this is--

8        I do-- I just want to pose a question.  You made

9        reference in your statement to Mr. Bookman, that was-

10       - who was going to give us some legal commentary.

11       Let me put that in the form of a question:  Mr.

12       Bookman, if you would opine with your-- with your

13       very substantial, you know, legal background going

14       back-- you were part of this 20 years ago.

15           MR. R. BOOKMAN:  Yes, I was.

16           CHAIRPERSON GENNARO:  And so if you just take us

17       from 20 years to now, give us some legal commentary

18       on what you saw play out before us today.

19           MR. R. BOOKMAN:  Sure.  My name is Robert

20       Bookman.  I'm counsel to the New York City

21       Hospitality Alliance, but I'm also a partner in the

22       small Manhattan law firm, Pesetsky & Bookman, and we

23       specialize in representing small businesses and have

24       been doing so for 35 years now.

25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          120

2        So you're correct.  About 20-some-odd years ago,

3    you and I were both involved with the once-in-a-

4    generation change of the noise code.  And you did an

5    excellent job as Chair of the Committee at that

6    point, bringing in all the stakeholders that were

7    going to be impacted by this new noise code.  As you

8    said before, there was construction, there was

9    garbage collection, cars.  One of the last sections--

10   Actually one of the last things that remained was the

11   hospitality industry commercial noise.  There had

12   been on the books for a long time what was called an

13   unreasonable noise standard.  It meant, as Councilman

14   Holden said, anything anybody wanted it to mean.  So

15   it meant everything and it meant nothing.  And

16   businesses were complaining that the default

17   violation from the NYPD when they went to a place was

18   to issue an unreasonable noise summons.  It

19   invariably required you to hire a lawyer, they all

20   got dismissed, but that would be used against you

21   when your liquor license was up for renewal that you

22   had these violations.  And we brought that to your

23   attention.  And we had one specific request, and that

24   is that there be an objective standard for the

25   measurement of sound emanating from a commercial

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 122 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                               121

1

2   establishment.  It didn't seem complicated noise is

3   one of the things that in fact can be measured.

4       And thanks to you, you told the Administration,

5   Mayor Bloomberg, and the Chairman Emily Lloyd--

6       CHAIRPERSON GENNARO:  Lloyd.  Yeah.

7       MR. R. BOOKMAN:  --at the time that unless that

8   issue was resolved, you're not passing a noise code.

9   And if you recall, it was the end of a session, and

10  if they didn't pass it in December, they would have

11  to start all over again.  She went to-- Emily Lloyd,

12  the Commissioner, went to the Mayor, and explained

13  the problem.  And as it is now well known in

14  folklore, Mayor Bloomberg, who was a techie kind of

15  person in his in his day said, "So what's the

16  problem?"  And she said, "Well, if there's an

17  objective standard, every police department and DEP

18  will have to have a handheld noise meter."  And he's

19  said, "So go buy them."  And that resolved it.  And

20  the-- We passed a specific criteria that, as you

21  recall, which requires a certain amount of decibels

22  above ambient during the day, a different one, you

23  know, a lesser standard at night when people are

24  entitled to more quiet.

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          122

1

2      And we've lived happily ever after, for the last

3   20 years, where we have not had these unreasonable

4   noise violations.  But businesses know with a couple

5   hundred dollars, they can-- they can buy these

6   handheld meters, and they measure themselves pursuant

7   to the law when their sound is leaking from inside,

8   which it often does when you're playing background

9   music for patrons, you have windows and doors open,

10  but they can measure it for themselves.  That's the

11  standard-- [bell rings]

12     CHAIRPERSON GENNARO:  I was going to say that

13  because I'm the Chairman, I'm not-- I'm not subject

14  to the clock in terms of the answers.

15     MR. R. BOOKMAN:  And that's been the standard

16  objective criteria (not subjectivity) for 20 years

17  now until these bounty hunters found a 1972 section

18  of the noise code that I am embarrassed to admit I

19  did not know existed.  I'm not sure you did, either,

20  which--

21     CHAIRPERSON GENNARO:  Nor did the Bloomberg

22  administration in 2003 either.

23     MR. R. BOOKMAN:  No.  Nor did the Bloomberg

24  Administration, nor did the Commissioner, Emily

25  Lloyd, which apparently was put in before there was a

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 124 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1      RESILIENCY AND WATERFRONTS                          123

 2      311, before Community Boards were even really being

 3      established, where people didn't have a way to

 4      complain about noise.  So this sec-- this was put in

 5      there that if you had an-- if you were a true citizen

 6      and wanted to complain about, you know, somebody's

 7      downstairs from, you know, or around the corner on,

 8      you know, on a commercial strip, you know, in Queens,

 9      or in a building underneath, there was a mechanism to

10      do it.

11          No one knew it existed because it was virtually

12      never used, until these bounty hunters decided to

13      abuse the system.

14          And to answer the second part of your legal

15      question, they were abusing it in an improper way,

16      because they are citing the section of the law, which

17      we clarified-- or at least we thought we clarified.

18      But I think we need Councilman Holden's bill to make

19      it crystal clear and black and white, that what we

20      meant, and what has been happening for the last 20

21      years, be the law for the next 20 years.  And that is

22      a specific objective-- a specific objective criteria.

23          So that solves that problem.  But it doesn't

24      solve the bounty hunter problem, which is new to me.

25      As matter of fact, the first time we started hearing
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 125 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                              124

2  about this last November, we quite frankly, thought

3  it was a scam that somebody was trying to collect

4  money from a restaurant, because it had no name on it

5  had DEP crossed out.  It had some POBox.  So we told

6  people to ignore it.  Then when we started to get a

7  lot of them, we went to DEP, and they said, "Yeah.

8  No.  It's a subsection of law that nobody knew about.

9  And there are these guys issuing tons of them."

10     So that's the-- you know, that's the-- the noise

11  code issue.  And the citizen complaint history, legal

12  history, how we got to where we are today.

13     CHAIRPERSON GENNARO:  Okay.  Let me get to my

14  next question.

15     MR. R. BOOKMAN:  Sure.

16     CHAIRPERSON GENNARO:  And, you know, thank you

17  for your indulgence in keeping you up here, but we've

18  worked on this stuff a long time.

19     And now, with regard to the OATH appeal of July

20  27th, the--  you know, I, as a non-lawyer, and the

21  Counsel to the Committee, you know, seems convinced

22  that this kind of rules out, you know, 24-244 B as--

23  as an applicable section of the code to be used as a

24  bounty hunters are using it.

25

```
COMMITTEE ON ENVIRONMENTAL PROTECTION,
```
1   RESILIENCY AND WATERFRONTS                 125

2     Do you believe that this-- that this appeal is,

3   you know, very dispositive of that of that legal

4   fact?

5     MR. R. BOOKMAN:  I do.  And I do want to say that

6   I was very impressed with DEP's testimony here today,

7   how they are in complete support of Councilman

8   Holden's bill.  They provide-- provided plenty of

9   support, you know, for your bill.  I'm frankly

10   shocked that the situation is even as bad-- it's

11   worse than I thought it was, where only six people

12   have filed these citizens' complaints and two of them

13   have 90% of them, and only six have filed more than

14   one.  It's really, really a bad situation.

15     So if they felt that they were constrained by

16   this 1972 law, which allowed for bounty hunter

17   complaints before this appellate decision, and I

18   disagree with them about to what extent they are an

19   adjudicator under this law.  It's true when DEP

20   issues that summons, or consumer affairs, or any

21   other agency, they are-- they are the plaintiff, but

22   this law provides for-- is something different.  And

23   so this law did not allow for, quote, "citizens," and

24   I put it in quotes, because I don't even know if

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                               126

1

2    these two people are citizens of the city of New

3    York.

4        CHAIRPERSON GENNARO:  That's why I call them

5    "civilian."  That's why I preferred-- That is why I

6    prefer the term "civilian."

7        MR. R. BOOKMAN:  I don't even know where they

8    live.  They could live in Long Island as far as I

9    know, and just, you know, making a living here in New

10   York.  But it gives the agency three options.  They

11   can't just go right to OATH, you know, and submit a

12   violation.  It created a different process.  And that

13   process is:  DEP has three options.  They could say,

14   "Hey, this is a really good violation based on the

15   amount of evidence we see.  We're going to take it

16   over as-- as the as the petitioner in the normal

17   course of a violation."  Or, "You know, we think it's

18   a little bit weak, but you-- you citizen bounty

19   hunter could proceed with it on your own, if-- you

20   know, if you want."  But the third option, which they

21   kind of ignored until you asked them, the question

22   was:  They could dismiss it right out by finding that

23   it's frivolous or duplicitous.

24       So the law does require them to have a judicial

25   role here, basically.  You know, because it's

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 128 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          127

1

2    different.  It's-- it's somebody sending in a

3    violation.  And they should use that judicial role

4    judiciously.  And they certainly, before July, were

5    not, because we now hear that 6000 of these went to--

6    went to OATH, which is an outrageous number.  Now

7    comes this decision of-- of July 30, whatever.

8        CHAIRPERSON GENNARO:  Yeah.

9        MR. R. BOOKMAN:  I'm kind of disappointed that

10   DEP-- that OATH felt constrained not to be able to

11   answer any of your questions today.  But if you read

12   that appellate decision, they are basically reaching

13   out to DEP and to the Council to do something about

14   these thousands of violations.  It's their Supreme

15   Court, and it is binding upon their other ALJ's and--

16   and Max will speak to whether the ALJ's are-- are

17   informed about this--

18       CHAIRPERSON GENNARO:  If I asked him.  If I ask

19   him to, he will.

20       MR. R. BOOKMAN:  --decision, because he has

21   appeared on these violations since then.  But this

22   appellate decision is very clear cut, it gives DEP

23   all the ammunition that it possibly needs.  And let

24   me read the-- what we call the holding in the law,

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              128

1

2     you know, where the court says, "Okay, here's the

3     facts, and here's our legal decision."

4         It says, quote, "Where music contributes to the

5     atmosphere of a dining establishment or store, and is

6     directed to the patrons or shoppers therein, even

7     though it may also be incidentally heard by

8     passersby, an advertising purpose is not established.

9         And that section of the law that these bounty

10    hunters are writing in under is a section that talks

11    about commercial advertising--

12        CHAIRPERSON GENNARO:  Right.

13        MR. R. BOOKMAN:  --the old Canal Street, you

14    know, hawkers where they're standing out there with a

15    microphone or a megaphone.  That's commercial

16    advertising.  OATH is saying here that restaurants,

17    stores, bars that are playing music for the enjoyment

18    of their patrons, even outdoor patrons (because that-

19    - this appeals case, by the way, the speakers were

20    out to outside, but they were facing their out--

21    licensed outdoor dining area.  Even in that case,

22    OATH is saying, "Wrong section of the law."

23        So DEP can tomorrow, and should tomorrow, review

24    all the violations that have not been fully

25    adjudicated yet (and there may be thousands of them),

```
           COMMITTEE ON ENVIRONMENTAL PROTECTION,
    1      RESILIENCY AND WATERFRONTS                        129

    2      all the ones where there were defaults, because they

    3      could all be reopened as we heard today, and apply

    4      this new standard, where the court has made clear

    5      that that's not a commercial advertising purpose, and

    6      therefore get rid of a whole bunch of these before

    7      you guys even pass a law to limit, you know, the

    8      bounty hunters.

    9          CHAIRPERSON GENNARO:  Now, in order to do that,

   10      if there are indeed thousands, you know, DEP--

   11      although I did bring up the resource question.  It's

   12      just like, okay, we have to suddenly pour through

   13      thousands of them.  And, you know, how are we

   14      supposed to do that, like, on...?  And I, you know,

   15      you heard what I said.  But I--

   16          MR. R. BOOKMAN:  You said, "Nice try."

   17          MR. R. BOOKMAN:  Yeah, but there-- you know,

   18      there are resources that-- that you know, in all

   19      candor, there-- there are resources that would have

   20      to be applied to do that.  But as I also said that

   21      they have not only the right, but they have the

   22      obligation.  That's because the workload is-- is a

   23      lot is not an excuse for not doing it.

   24          MR. R. BOOKMAN:  Correct.  And once they start

   25      dismissing all these as-- as Councilman Holden, I
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           130

1

2      think said, the volume is going to go way down,

3      because these guys are only in it for the money.  And

4      if they're not going to get the money, then-- then,

5      you know, yes, initially there may be thousands.  But

6      in two months from now, there may be hundreds and two

7      months after that they may only be dozens.

8          CHAIRPERSON GENNARO:  Right.

9          MR. R. BOOKMAN:  But they'll do something else to

10     make a living.

11         Also, you know, DEP is not completely an innocent

12     bystander here.  They got to put in the work, but

13     they're also getting a cut of the action here by not

14     doing the work.  And you know, they don't have clean

15     hands.

16         CHAIRPERSON GENNARO:  Or the City-- the City is

17     getting money.

18         MR. R. BOOKMAN:  Well, it goes into their monthly

19     report or annual report about fines that have been

20     collected.  And this is a-- this is an easy, cheap

21     way for them to collect fines, because they don't

22     have to do any work.  They just say, "Okay, you

23     bounty hunter, you prosecute the case."  They don't

24     have to put in any-- any of their inspector time, any

25     of their attorney time.  You know, maybe OATH will,

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 132 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                              131

 2   will lend them a couple of ALJ's to go through some

 3   of these.

 4       Also understand that DEP has a citizen complaint

 5   noise form that goes with the citizen complaints, and

 6   it is wholly lacking in requiring the citizens to put

 7   in sufficient information for the DEP's to make a

 8   determination.  It doesn't ask what is-- a simple

 9   question:  "What is the commercial advertising

10   purpose that you are-- that this noise was

11   complaining about?"

12       CHAIRPERSON GENNARO:  Oh.  You're saying that the

13   form should properly reflect the section of the code

14   that people are...?

15       MR. R. BOOKMAN:  And this appellate decision.

16   And there were other court cases going back 20 some-

17   odd years ago, which talked about this.  If this is

18   all they're-- they're looking at, of course, they're

19   passing all these along, because they're not asking

20   enough questions from the-- from the bounty hunter.

21       CHAIRPERSON GENNARO:  [TO COUNSEL:] Do we have

22   that?  Do we have that form?  Okay.  [TO PANEL:] I

23   mean-- the Sergeant will-- you don't mind giving us

24   that.  So, Sergeant, when they when they leave the

25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           132

1

2    dais, I want that for the record of the-- of the

3    Committee.

4        And if I could, just to move things along-- just

5    you just move things along, I'd like to ask Mr. Max

6    Bookman, if you have anything to add what Robert had

7    to say.

8        MR. M. BOOKMAN:  Yes.  Thank you.

9        CHAIRPERSON GENNARO:  You want to speak right

10   into the microphone--

11       MR. M. BOOKMAN:  Of course.

12       CHAIRPERSON GENNARO:  --with the red line on.

13       MR. M. BOOKMAN:  Thank you, Chair.  And thank

14   you, Councilmember Holden and committee staff.  My

15   name is Max Bookman.  I'm a partner at the law firm,

16   Pesetsky & Bookman.  And for the past eight years,

17   I've been representing small businesses before OATH.

18       No small business should have to go through the

19   time and expense of hiring me to defend them at OATH

20   for this type of violation.  The abuse of these

21   summonses:  It's not delivering justice, it's

22   creating injustice, along with wasted time and money.

23       Chair, you said to DEP you wanted to decouple the

24   idling violations and the citizen complaints for

25   those from the noise violations.  You said we have a

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          133

2    fire, we have an emergency going on with the noise

3    violations.  So what I'd like to do is I'd like to

4    give you a report from the trenches in OATH, where I

5    practice, and give you three of the aggressive

6    tactics that these incredibly small number of

7    individuals are using to misuse our city's summons

8    apparatus.

9        One is that they're ignoring OATH precedent.  The

10   appeals unit case that we've been talking about today

11   was issued on July 27.  These citizens are still

12   prosecuting these cases.  And when you go into the

13   hearing, the virtual hearing room with them, they're

14   not bringing up this appeals decision with the OATH

15   ALJs.  You asked, Chair, whether the appeals unit

16   decisions are disseminated-- disseminated to the OATH

17   hearing officers to the ALJ as well.  They're

18   supposed to be, but we've had many hearings where the

19   OATH hearing officers are unaware of this decision.

20   So, our clients are fortunate to have us.  We're

21   aware of it.  We bring it to their attention.  But

22   not everybody has us, and not everybody is-- is

23   hiring a lawyer, or a lawyer who knows all this

24   background.  And so if the hearing officer doesn't

25   know about the appeals decision, and if the citizen

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              134

2   complainant is not bringing up the decision, it's

3   just going unmentioned.

4       So that's a major problem.

5       You know, in state court, there's a duty of

6   candor with the court.  You have to be forthright

7   with the court about the legal arguments that you

8   make.  There's the same expectation in OATH and it's

9   not happening there.  So that's problem number one.

10      Number two:  Not only are they ignoring the OATH

11  precedent, but they're issuing multiples of these

12  frivolous violations one day after the next.  And I'm

13  glad to hear DEP talking about it, because it's

14  really a problem.  So just to give a little more

15  color on that:  These folks are coming unannounced.

16  They're not-- they have no badge to show, but they're

17  not-- once they do come unannounced, they're not

18  making themselves known.  So they come day after day

19  in secret, recording businesses day after day,

20  issuing summonses day after day.  We have one client

21  in OATH who got sent--

22      CHAIRPERSON GENNARO:  But they don't serve them.

23  They don't serve-- the businesses don't serve them.

24      MR. M. BOOKMAN:  Right.  No.  They take their

25  video, they go home, and then they submit the

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    135

1

2    complaint form to DEP.  So we had one client who got

3    seven of these in a 20-day period, and didn't get

4    summons number one in the mail, until, you know,

5    until after turns out summons number seven was

6    issued.  So it's like there's a delay here.  So they

7    come issue 1-2-3-4-5-6-7.  And then, you know, 20

8    days later, 30 days later, you know, 60 days later

9    now in the mail, they get summons number one, then

10   the next day number two, 3-4-5-6-7.

11       So what legitimate purpose is this serving?  You

12   know, DEP talked about education.  There's no

13   legitimate purpose to this.

14       And lastly, the third, you know, aggressive

15   tactic that they're using is they're alleging

16   recidivism.  And this is so dishonest.  You know,

17   like many of your laws 24-244 B has higher penalties

18   for repeat offenders, which we call recidivists.  But

19   you're not a first-time offender until you've been

20   found guilty of something.  But it's not so with

21   these folks.  When they go on their summons spree,

22   where they're issuing the summonses day after day,

23   when they come to the on the second day, and every

24   day thereafter, they're alleging recidivist repeat

25   offender fines in their complaints to DEP, which DEP

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              136

1

2    then turns into a summons or DEP takes no action, and

3    the citizen gets to issue the summons.

4        So take my client who got the seven summonses in

5    20 days--

6        CHAIRPERSON GENNARO:  Mr. Bookman, if I could

7    just jump in here for a second.  I just wanted to see

8    who was remaining behind from the administration?

9    Who's-- Who's here from the administration to hear

10   their good testimony that we're--  Anybody here from

11   the administration?  Going once?  Going twice?

12       MR. RIGIE:  That's a law we should pass.  They've

13   got to stay until to the end of the hearing.

14       CHAIRPERSON GENNARO:  If I could-- Andrew, can

15   you call Robert Patello, and indicate that, you know,

16   it is my expectation that the administration has to

17   have somebody in this room to hear this good

18   testimony.  Just-- Just step outside and give him a

19   call.  You got his number?  Okay.  Like, somebody's

20   got to be here like really quick, or I'm going to get

21   upset.

22       Okay.  Please continue.

23       MR. M. BOOKMAN:  Thank you, sir.  So just to

24   finish the point.  So you take my client who got the

25   seven summonses in a 20-day period.  By the time that

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           137

1

2    second summons came in the mail, they're already

3    being told that they are a repeat offender, when the

4    first summons they just got yesterday, and it hasn't

5    even been adjudicated yet.  And this is particularly

6    insidious with these-- these citizen bounty hunters,

7    because the repeat offender fine, even just to

8    settle, even just to mail in a violation saying, "I

9    don't want to hire a lawyer.  I don't want to take a

10   day out to do OATH.  I'm just going to mail in the

11   fine."  Even the mail in fine is significantly higher

12   for these repeat offenders summonses.  So at minimum,

13   you know, I don't know why DEP is not policing that.

14   It's not in their form, you know?  "Are you saying

15   this is a repeat offender?  If so, state the date

16   that the summons was previously adjudicated, and, you

17   know, provide proof of that."  But, you know, we need

18   to, you know, it's just another example of these

19   aggressive and dishonest tactics that--

20       CHAIRPERSON GENNARO:  But- But-- But OATH is part

21   of this, because they are, you know, they're not

22   disseminating these appeals, and resolutions, and

23   they're, you know, levying fines for repeat offenders

24   when there has been no conviction or whatever you

25   call it, you know, no, no, substantiation.  So you

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 139 of 238

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1             RESILIENCY AND WATERFRONTS                      138

  2             haven't had-- So, you know, to the extent that, you

  3             know, you could give us-- or not like right now, but,

  4             you know, prepare something for us that our legal

  5             counsels can look at, and we would like to make an

  6             overture to OATH about your good testimony and about,

  7             like, what they're doing, and we want answers from

  8             them.

  9                MR. M. BOOKMAN:  Thank you for that.  Yeah.  I

 10             mean, there does need to be, I think, better

 11             education of the judges at OATH.  I mean, ultimately-

 12             -

 13                CHAIRPERSON GENNARO:  We're going to handshake,

 14             and then you're going to give me-- what you're--

 15             you're going to summarize what you're saying, right?

 16             Item one, item two, item three?

 17                MR. M. BOOKMAN:  Oh, yes.  And that's what I'm

 18             saying.  They ought to be-- they ought to be--

 19                CHAIRPERSON GENNARO:  That's the right move to go

 20             to OATH, right?  I mean...

 21                MR. M. BOOKMAN:  Well, I mean, yes and no.  I

 22             mean, yes, the right move is to go to OATH.

 23                CHAIRPERSON GENNARO:  Well, I mean, you know

 24             what?  I'll ask my own lawyers that question.

 25
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 140 of 238

```
COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1    RESILIENCY AND WATERFRONTS                          139

 2        MR. RIGIE:  It's a combination of both.  But also

 3    understand--

 4        CHAIRPERSON GENNARO:  But I-- Just for my own

 5    edificatio--

 6        MR. RIGIE:  Yeah.

 7        CHAIRPERSON GENNARO:  -it would be--

 8        MR. RIGIE:  A lot of these small businesses,

 9    they, you know, they are overwhelmed with just

10    running their business and trying to make a profit,

11    you know?  They're their own HR department.  They're-

12    - Many of them are immigrants.

13        CHAIRPERSON GENNARO:  Just to follow this by the

14    rules, because there's going to be other witnesses,

15    and they're going to say that I gave you a lot time--

16        MR. RIGIE:  All right.  I'm just going to finish-

17    -

18        CHAIRPERSON GENNARO:  So what I'm going to say

19    is-- So in answer to my question, you were in the

20    middle of a thought that was of interest to me.

21        MR. RIGIE:  Let me just finish that thought.

22        CHAIRPERSON GENNARO:  What's that?

23        MR. RIGIE:  Let me just finish this thought,

24    right?

25
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 141 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                          140

 2       CHAIRPERSON GENNARO:  I'm just saying that I am--

 3   I am asking you to finish your statement.

 4       MR. RIGIE:  Yeah, so--

 5       CHAIRPERSON GENNARO:  So this is being--

 6   Everyone, this is being done in response to a

 7   question by me.  Go ahead.

 8       MR. RIGIE:  They get something from the

 9   government.  It has a fine that you could just mail

10   in.  A lot of them just think, "That's what I'm

11   supposed to do.  And I just mail in the fine."  Even

12   if it's a recidivist fine.  You know, they don't even

13   know this, sometimes that they can go down and defend

14   themselves.

15       And so OATH, you know, when these-- when these

16   people get these things in the mail, it has a mail in

17   fine amount, you know, right there on it.  And so for

18   a lot of people, it's a cost of doing business in New

19   York City, is paying a certain amount of money to

20   city government, when you-- when you get violations.

21   It's always wrong.  But it's especially wrong when

22   it's a citizen bounty hunter, and they're getting a

23   recidivist amount.

24       So, you know, it's not so easy just saying that

25   OATH should not institute the recidivist fine.  That
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          141

1  true if you went to a full hearing.  Then the OATH

2  judge looks and says, "Well, you've never been

3  convicted of anything before--

4      CHAIRPERSON GENNARO:  Oh, I see.

5      MR. RIGIE:  --so it's a first-time violation."

6  But a good portion of these-- 59% are defaults,

7  another percentage are settlements where the person

8  just sends in the fine.  Only a small percentage are

9  actually going to a hearing.

10      CHAIRPERSON GENNARO:  I see.  I see.  Okay.

11  That-- yeah, we-- I-- we had great collaboration 20

12  years ago.  And let's, you know-- I appreciate your

13  advocacy on behalf of thousands of small businesses

14  that are-- that are being set upon in a most unjust

15  way.  And it is, you know.  I as Chair on this

16  committee, and then the Council at large, you know,

17  stands for trying to do what we can as soon as

18  possible to right this wrong.  And I appreciate your-

19  - um...

20      MR. RIGIE:  Thank you.  Thank you again.  Thank

21  you for 20 years ago.  Thank you for now.  Thanks for

22  joining the battle, and Councilman Holden.  I think

23  together, the two of you each have half of the coin

24  here, with which we could solve this problem.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 143 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          142

1

2      MR. R. BOOKMAN:  And there's some business owners

3  here, I know, that had been victims of this that

4  would be good to hear from--

5      MR. RIGIE:  Who would love to come and testify.

6  Some have to get back to work.

7      CHAIRPERSON GENNARO:  You know what?  My col-- My

8  colleague, Bob Holden, has a question for the panel.

9  I recognize Councilmember Holden for questions.

10      COUNCILMEMBER HOLDEN:  Thank you Chair.  And--

11  and just-- I guess this is for Max, because you

12  mentioned that some businesses were targeted multiple

13  times, and they are repeat offenders.  What are we

14  talking about in the way of fines that they're--?

15  Like, what kind of nightmare stories do you have one

16  business absorbing thousands of dollars worth?

17      MR. M. BOOKMAN:  Yeah.  I've got one client right

18  now, who was here earlier, but had to go back to

19  their business who is facing right now, because of

20  the total number of these citizens issue summonses

21  they've gotten, over $12,000 in fines.  You know, 50%

22  of that goes to a citizen.  So that's just-- that's

23  the citizen.

24      COUNCILMEMBER HOLDEN:  Yeah.  And so this is

25  coming on top of the pandemic, where all these

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          143

1

2   especially-- I mean, I had a barber shop that was--

3   He didn't have like these little six feet markers on

4   the floor, and he got hit with thousands of dollars'

5   worth of fines.  He said, "I only had one customer at

6   a time.  I'd make an appointment.  And so I never had

7   more than one person in my store.  And I had to pay

8   $1000."  And we couldn't, you know, again, OATH, they

9   find him, and we couldn't do anything about it.

10      And this is-- so, this is egregious.  It's

11  particularly egregious, when, on top of the pandemic

12  and all the restrictions, we had to close, to shut

13  down, to only operate, you know, outside, whatever it

14  was that the business had to put up with, and then

15  they have this now.

16      And that's why I think we have to fix things that

17  are unfair.  God knows government's unfair,

18  bureaucracy is unfair many times, and this is why

19  things fall through the cracks.  So I thank you for

20  your-- for your testimony.  I'd like to see even fine

21  tuning this further, where we get the businesses an

22  even shake here.  And I'm not what-- you know, again,

23  I have businesses that cause problems in the

24  neighborhood.  So, we understand that, but they need

25  some kind of measurement.  And they need to know when

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                144

1

2    they're breaking the law.  And not some subjective

3    and arbitrary person.

4        MR. RIGIE:  Correct.  And the last thing I want

5    to say in response to you, I think most important

6    part of the DEP testimony, which was surprising to me

7    is they are saying that there is no court, there is--

8    that these places that are getting these-- bounty

9    hunters are not places that are getting 311

10    complaints for noise.  So this, you know, it's one

11    thing if these are, you know, are trouble locations

12    and problem locations in the neighborhood, you know,

13    where there's a hundred 311 complaints.  This is just

14    people, according to their map, they're walking

15    around just wherever they can hear a sound system

16    they're giving a violation, even though nobody's

17    complaining about it.  It's outrageous.

18        COUNCILMEMBER HOLDEN:  Thank you, Chair.

19        MR. RIGIE:  Thank you.

20        CHAIRPERSON GENNARO:  Thank you.  I want to thank

21    this panel for your advocacy on the part of the

22    business community, and your commitment to making a--

23    you know, to bring justice to the business community.

24    I appreciate it.

25

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1             RESILIENCY AND WATERFRONTS                           145

  2                 COUNSEL:  Next we have David Sheldon with the

  3             South Street Seaport coalition, Katelyn Mooney with

  4             The Independent, and Kathleen Reilly Irwin with the

  5             New York State Restaurant Association.

  6                 You may begin when ready.

  7                 CHAIRPERSON GENNARO:  Okay.  I'd just like to ask

  8             the witness and make sure they state their name for

  9             the record.  And I have the statement of the New York

 10             State Restaurant Association, but in whatever order

 11             you wish, just-- or you know, the-- the witness on my

 12             left started, so why don't you start?

 13                 MS. MOONEY:  Sure.  My name is Katelyn Mooney.

 14                 Why don't you bring the mic right in front of

 15             you, like I have it?

 16                 MS. MOONEY:  Sure.

 17                 CHAIRPERSON GENNARO:  Just move the whole thing.

 18                 Yeah, because it'll help other witnesses too.

 19                 MS. MOONEY:  My name is Katelyn Mooney.  I am the

 20             General Manager at The Independent in Time Square on

 21             40th Street between Seventh and Broadway.  We

 22             received two noise violations dated back from last

 23             September.  There's not any residential in our area.

 24             It's all commercial.  Also, we do not-- The tickets

 25             stated that we had speakers facing the sidewalks.  We
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                           146

2    do not.  We have French doors that have speakers

3    inside where we play music, but not-- not outside,

4    not facing the sidewalk.  So it's kind of just a

5    completely false statement.

6        CHAIRPERSON GENNARO:  And I'll come back for

7    questions.

8        MS. MOONEY:  Sure.

9        CHAIRPERSON GENNARO:  Is that the extent to your

10   statement.

11       MS. MOONEY:  Yeah.

12       CHAIRPERSON GENNARO:  Okay.  Brevity is a-- is a

13   blessing.  So I appreciate that.  Please.  Please

14   commence.

15       MS. REILLY IRWIN:  Good afternoon.  My name is

16   Kathleen Reilly Irwin, and I'm the New York City

17   Government Affairs Manager for the New York State

18   Restaurant Association.  We are also here to testify

19   in strong support of the interest under consideration

20   today to reform the noise ordinance and put an end to

21   the abuse of the civilian complaint system.

22       Under the current law, civilians are empowered

23   and incentivized to issue complaints regarding the

24   noise ordinance.  And with no limits in place, you

25   have these career complainants who have abused the

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 148 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1    RESILIENCY AND WATERFRONTS                          147

  2    system by reporting the same establishments over and

  3    over in quick succession and resulting in sometimes

  4    thousands of dollars in fines for restaurant

  5    operators.

  6        We've received frantic and frustrated calls

  7    throughout the summer into the fall.  I got one

  8    literally today right before this hearing.  He said,

  9    "I need to talk to you.  We just got a violation.  Is

 10    this one of these two people who's issuing all the

 11    fines?"  I said, "Yes.  You should fight it.  It's

 12    obviously bogus."  Same exact thing.  It said he had

 13    speakers facing the sidewalk, except we don't have

 14    those speakers.

 15        So the abuse of the system has been incentivized

 16    up until now by offering civilian complainants up to

 17    50% of the fines collected if they're the ones who

 18    actually bring the claim all the way through OATH,

 19    with no limits in place on total dollar amount,

 20    number of complaints that can be compensated or any

 21    other type of limits.  And that creates a situation

 22    where these notorious noise enforcers are bragging in

 23    the press about making a living off of frivolous

 24    complaints.

 25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                         148

1

2      We've already discussed at length the decision in

3   the appeals board, and it was also already read for

4   the record.  But I also would like to point out a

5   little note that was put in the decision, saying that

6   "the board further finds that whether there are

7   patrons or shoppers currently in a dining

8   establishment or store is not a material fact, as

9   such dining establishment or store is not expected to

10  turn on and off music being provided for ambiance as

11  customers enter and leave."  So that's one more of

12  the sort of factors that the OATH appeal appeals

13  board has already put in writing and should be used

14  as precedent.

15      So, while those findings are encouraging, and

16  we're glad to hear that the appeals board even

17  reversed several past decisions based on the

18  precedent, restaurants should not be dragged before

19  OATH and forced to adjudicate their ambiance setting,

20  however often these serial complainants would like.

21  The incentive system must be re-engineered so that

22  the noise ordinance is not able to be abused.

23      So, Intro 160 would add concrete decibel levels

24  into the definition of unreasonable noise, and

25  importantly it specifies that Section 24-244 of the

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                        149

1

2    Administrative Code which is the section being

3    abused, shall not apply to music originating from an

4    interior space in connection with the operation of

5    any commercial establishment or enterprise (quoted

6    from the language).

7         So, if this legislation is enacted, it would

8    strongly curtail the complaint activity that has been

9    so burdensome for restaurants.

10        1194 would work to revamp the incentives and cap

11   the dollar amount that a civilian can receive for

12   reporting the noise ordinance to either $5 or $10,

13   which is also a much needed reform to put an end to

14   this current system of abuse and frivolously

15   harassing businesses.

16        Thank you so much for considering our feedback

17   and for bringing these two very important pieces of

18   legislation.

19        CHAIRPERSON GENNARO:  Thank you for coming

20   forward with your good testimony.  I certainly wish

21   you well in fighting your thing about the speakers.

22   I urge you to do that.  And, Kathleen, I salute you

23   and your support of restauranteurs in your capacity

24   with the New York State Restaurant Association.

25   Thank you for your good testimony.

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 151 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              150

1

2    I just want to-- Sergeant?  Sergeant, can I see

3    for a second?  Okay, just call the next panel.

4    COUNSEL:  Our next panel will be Michael Jacobs

5    with Corner Table Restaurants, Vanessa Oré with

6    Romantic Depot Queens, and Brittney Mayorga with

7    Romantic Depot.

8    You may begin when ready.

9    CHAIRPERSON GENNARO:  You've got to put the

10   microphone on.

11   MS. ORÉ:  Okay, thank you.  Good afternoon,

12   everyone.  I'm Vanessa Oré, and I serve as the

13   General Manager of Romantic Depot, a distinctive

14   novelty and lingerie store located in the vibrant

15   neighborhood of Sunnyside, Queens.  Our store stands

16   alone at 4702 Queens Boulevard.  It's important to

17   understand that our location is unique.  We have no

18   neighboring buildings, no upstairs or next door

19   neighbors.  Our storefront faces an eight-lane

20   stretch of Queens Boulevard, bustling with traffic,

21   divided by the elevated M train.  The nature of our

22   surroundings naturally make it a noisy environment.

23   In 2022 and ordinary white envelopes arrived at our

24   store mysteriously delivered by the US Postal

25   Service.  To our surprise it contain what appeared to

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 152 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    151

1

2     be four or five counterfeit summonses.  These

3     documents were not issued by a police officer or any

4     authorized city inspector.  Rather, they bore the

5     signature of the individual residing a few blocks

6     away.  The summons incited alleged violations related

7     to music for business or commercial purposes.  It's

8     important to clarify that we've never utilized our

9     music for commercial advertising.  Our music has

10    always been intended for the enjoyment of our

11    customers and employees.

12       Devoid of promotional content or sales

13    announcements, we have consistently been

14    conscientious about keeping the volume at an

15    appropriate level and avoiding late-night

16    disturbances.

17       Initially we regarded these tickets as a prank or

18    novelty summons available for purchase online to

19    place on someone's car windshield.  We even conducted

20    online research to verify whether civilians could

21    indeed issue summonses for noise violations.

22       Surprisingly, there was a complete absence of

23    information confirming the legitimacy of these

24    tickets, especially before media coverage and the

25

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1      RESILIENCY AND WATERFRONTS                       152

 2      involvement of local politicians shed light to the

 3      issue.

 4          To make matters more baffling, these summons

 5      referred to violations from months earlier.  Since we

 6      believe the summonses were not genuine, we did not

 7      respond to them.  However, several months later, we

 8      see an official notice from the DEP, stating that we

 9      owed $1,000 due to the failure to address the initial

10      summonses.  Regrettably, by that point, we had

11      received at least 10 or 15 additional summonses, all

12      bearing the same charges and originating from the

13      same individual.  We haven't received physical

14      tickets.  It appeared that this individual Mr.

15      Detering, has been documenting instances of audible

16      music outside our store and stockpiling them before

17      delivering another wave of violations.

18          Consequently, quietly, we find ourselves facing

19      overwhelming sum of $30,000 in fines.  I humbly

20      request that you intervene and rectify this glaring

21      injustice.

22          CHAIRPERSON GENNARO:  Thank you.  Thank you.

23      I'll come back with comments after I get the next

24      witness.

25          MS. MAYORGA:  Hello, good afternoon.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                            153

1

2       CHAIRPERSON GENNARO:  Oh, you got to turn the

3   light on, the red light, and speak right into the

4   microphone.

5       MS. MAYORGA:  Gotcha.  Good afternoon ladies and

6   gentlemen.  My name is Brittany Mayorga, and I serve

7   as a supervisor at Romantic Depot, an establishment

8   conveniently located at the intersection of 47th

9   Street and Queens Boulevard.

10      As stated by my colleague, this section of Queens

11  Boulevard is exceptionally busy with vehicles and

12  trains passing by around the clock seven days a week.

13      Our business specializes in novelty items and

14  exquisite lingerie, and we are dedicated to creating

15  an enjoyable atmosphere are both our customers and

16  our dedicated staff.  Part of that ambiance involves

17  background music.  We have always been diligent in

18  ensuring that our music remains at an appropriate

19  volume.  It's also worth noting that the sound from

20  our stores is genuinely confined to the immediate

21  vicinity, since we are the only people taking up that

22  block.

23      Upon discovering that the tickets that were

24  initially believed to be fraudulent were indeed

25  legitimate, and that a program existed to monetize

Case 1:25-cv-02100-KPF     Document 16-2     Filed 07/01/25     Page 155 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1     RESILIENCY AND WATERFRONTS                          154

  2     them through reporting, I was truly astonished.  I

  3     was even more taken aback when I learned that these

  4     citations were not for excessively loud music, but

  5     simply for being audible outside our store.

  6         It seems improbable that the music we play

  7     intended for business and aesthetic purposes could be

  8     categorized as a violation of commercial noise

  9     regulations.

 10         What's most distressing is while this program may

 11     have been established with good intentions, it is

 12     evidently having the opposite effect.  When a

 13     business exceeds noise levels, common sense dictates

 14     that an appropriate authority should issue a warning

 15     and offer an opportunity for correction.  However,

 16     instead of this reasonable approach, it appears that

 17     individuals who benefit from issuing these tickets

 18     choose to accumulate them and serve multiple

 19     citations simultaneously, primarily driven by

 20     financial gain.  I genuinely appreciate my role and

 21     the excellent relationships I share with my coworkers

 22     who, like me, are all striving to make better lives

 23     for ourselves and our families.  We all work hard and

 24     is deeply unfortunate that a handful of individuals

 25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              155

1

2    can manipulate a well-intentioned but poorly executed

3    law for their personal gain.

4         I wish to express my gratitude to our local

5    politicians and the Sunnyside Business Improvement

6    District for recognizing this issue.  I implore the

7    entire City Council to rectify this abusive practice

8    and restore fairness and justice to our community.

9         CHAIRPERSON GENNARO:  Well, thank you both for

10   coming forward and bearing witness to the problem

11   that we've been talking about all day.  You know, the

12   more people that come and testify, you know, the more

13   it is--  You know, it's one thing to hear me say it.

14   It's another thing to hear people that are really

15   affected by it.  And so I appreciate you coming

16   forward today with regard to--  The witness to-- to

17   my right about me, you know, intervening:  Because

18   your fines are, you know, under adjudication I have

19   no-- I have no authority to do that.  But I would

20   urge you to fight them.  And-- And it would be--

21   throat lozenge.  I've been talking all day, scratchy

22   voice.  My view is to try-- and once we get the bills

23   passed into law, all those summonses that have not

24   been adjudicated-- you know, the ones that have been

25   adjudicated there is nothing anybody can do.  But,

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          156

2    but we do intend to move quickly.  And to the extent

3    that we can have the violations that have been

4    written but not yet adjudicated, you know, go away,

5    that's a legal question.  That would be my intention

6    to do that.

7        I want to thank you for coming forward.  And I

8    appreciate you-- your patience for being here this

9    time, this-- this whole hearing.  Thank you.

10       MS. ORÉ:  Thank you for your time.

11       CHAIRPERSON GENNARO:  Andrew, can I see you for a

12   second?

13       COUNSEL:  Should I call the next panel?

14       CHAIRPERSON GENNARO:  Yes, please.

15       COUNSEL:  Next panel will be Jouel Kuperman from

16   the Environmental Justice Initiative, John Conroy

17   from Mustang Harry's, and Theresa Sigler from Pig N

18   Whistle.

19       MS. SIGLER:  Hi there.  My name is Theresa Sigler

20   and I represent the Pig N Whistle Group.  I am the

21   manager over there.  This past February we received a

22   ticket in the mail, like all the others have said,

23   you know from a very dodgy-looking envelope, not a

24   city agency.  We immediately turned off our outdoor

25   speakers, which we did have on for the ambience of

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              157

2    our outdoor diners, because they were the only ones

3    that we had during COVID.  So the speakers were

4    turned on at that point for that.  Quite frankly, we

5    just forgot to turn them off.  Rockefeller Center is

6    a very noisy neighborhood.  You could barely hear our

7    speakers, but as soon as we did, we adhered to the

8    law.

9        A couple of weeks later, we got another seven

10   tickets all predated from the previous August,

11   Christmas, what have you.

12       We have had two OATH hearings.  The problem with

13   the OATH hearing for us is we had requested to appear

14   in person.  Like I wanted to look that person in the

15   eye who was writing these tickets.  But they're not

16   allowed.  It's by telephone only.  So that's one

17   issue we have.  It allows the bounty hunters to, you

18   know, call in from home, call in from their office,

19   call in from-- even if they're out of the country.

20       OATH have sent us tickets that we have never even

21   received.  The person from OATH, today said that it's

22   75 days.  It's not it's 30.  And there are businesses

23   who have not received either the ticket or the

24   hearing.  And this states right here, that the city

25   will get a legal judgment if a new hearing is not

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 159 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              158

1

2   requested, or the $1750 paid within 30 days.  So

3   that's also another issue that the businesses are

4   dealing with.

5       This gentleman here asked, well, you know, "What

6   would the defense be?"  Yes, the defense absolutely

7   is I was unaware, I did not know, I immediately

8   ceased operation.  The first DEP inspector that we

9   had on site was after we had received five tickets.

10  And I have been at that location for 10 years.  And

11  in 10 years, we have never received a single noise

12  violation.  So yes, that is-- would have been my

13  defense.

14      Okay, and those-- those are my comments.

15      CHAIRPERSON GENNARO:  Thank you.

16      MS. SIGLER:  Everything else, everybody has

17  already said.  So I would not like to waste the time.

18      CHAIRPERSON GENNARO:  Thank you.  And I also

19  understand we have about 40 witnesses on Zoom.  And

20  so, you know, brevity, as I said, is a blessing.  I

21  thank you for that.  And thank you for bearing

22  witness to the problem.

23      MS. SIGLER:  Sure.

24      CHAIRPERSON GENNARO:  Joel?

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              159

1

2      MR. KUPFERMAN:  Good afternoon, thank you.  I'm a

3   little upset that there's all this talk about

4   protection of the small business people and abuse of

5   environmental law.  I'm here partly to-- to defend

6   the citizen suit provision in general, and then here

7   in particular.  DEP has a bad record of enforcement.

8   They have a bad record of enforcement.  There's also-

9   - There's no coordination with Department of

10  Buildings and other city agencies.  As an

11  environmental lawyer that has been dealing with noise

12  complaints, air pollution complaints, environmental

13  complaints, City enforcement is basically

14  nonexistent.  Okay, that's the tenant that's out

15  there.  I'm here probably not to protect the

16  restaurant owners.  But all the other thousands and

17  hundreds of thousands of people that are suffering

18  from lack of air enforcement by DEP.  I'm here to

19  protect the DEP enforcement people who were sent out

20  to Brownfield sites.

21      CHAIRPERSON GENNARO:  We're not talking about

22  Brownfields or anything.  Just please limit it to

23  noise.  We're talking about noise.

24      MR. KUPFERMAN:  Okay.  I'm limiting it to noise.

25  With many, many construction sites, we've called up

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 161 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                        160

1

2    the DEP, we've asked them to send down inspectors,

3    they tell us they don't have the time to do it, and

4    the people in DEP have told us that it doesn't make

5    that much of a difference, because they're only going

6    to introduce a small fine, that doesn't get

7    collected.  So I think it's without the outside

8    goading, without these private or public citizens, we

9    wouldn't have been having this hearing in a way, and

10   non-enforcement would be continuing.  The City's owed

11   $2 billion in uncollected fines.

12       So without this outside pressure in different

13   ways, this-- we're not being protected.  The other

14   thing about noise protection.  What you're asking is

15   unequal enforcement.  When-- When NYCHA residents

16   call 311 to complain about noise, they're told they

17   have to go back to NYCHA.  So we have a definitely--

18   Mr. Gennaro, you should look at the unequal

19   enforcement to the city, especially in terms of noise

20   enforcement.  Okay?  But also you can't have a bill

21   of attainder-- you can't do a bill undoing past

22   complaints.  That's unconstitutional.  That's called

23   a bill of attainder, all right?  So I just want to--

24   I think it's-- it's a little stacked here that there

25   might be without going into the details.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 162 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          161

2        CHAIRPERSON GENNARO:  Please conclude.

3        MR. KUPFERMAN:  Excuse me?

4        CHAIRPERSON GENNARO:  Please conclude.

5        MR. KUPFERMAN:  Conclude?

6        CHAIRPERSON GENNARO:  Yeah.

7        MR. KUPFERMAN:  Well, I think one of the things

8    I'm going to ask, if you're so concerned about

9    restaurant owners and small businesses, which you're

10   expressing here, I think the City Council should look

11   at-- at commercial rent control is one way to--

12       CHAIRPERSON GENNARO:  That's another topic.

13   That's-- that's out of order for this hearing.

14       MR. KUPFERMAN:  Okay.  But in terms of noise,

15   that you have to look at-- that DEP does not have

16   injunctive relief when there's a serious noise

17   violation that's going on at a construction site.

18   They can't stop that construction going on.  We've

19   dealt with cases where there should be--

20       CHAIRPERSON GENNARO:  Joel, your testimony is not

21   relevant to the hearing.

22       MR. KUPFERMAN:  But just let me finish.  Okay.

23   You gave the other people more than two minutes, Mr.

24   Gennaro.

25       CHAIRPERSON GENNARO:  I'm just saying that--

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                      162

2      MR. KUPFERMAN:  A lot more than two minutes.  All

3    right.  And I think it's really unfair that you allow

4    three people to speak for like 10-12 minutes, and you

5    don't let--

6      CHAIRPERSON GENNARO:  That is the-- That is the

7    discretion of the Chair, and your off topic.

8      MR. KUPFERMAN:  Well, I'm asking--

9      CHAIRPERSON GENNARO:  You're not asking anything.

10    I get-- I'm just saying that you are-- you're off

11    topic.  We have 40 more witnesses.

12      MR. KUPFERMAN:  Well, I'm getting back on-- I'm--

13    I'm back on topic.

14      CHAIRPERSON GENNARO:  Next panel.  Next panel.

15    Your time-- Your time has expired.  Next panel.

16      MR. KUPFERMAN:  Okay, but the enforcement--

17      CHAIRPERSON GENNARO:  Next.  Panel.

18      MR. KUPFERMAN:  But let me just--

19      CHAIRPERSON GENNARO:  I'm calling the next panel.

20      MR. KUPFERMAN:  Okay.  I'm going to say--

21      CHAIRPERSON GENNARO:  Sergeant.  Turn off the

22    microphone.  Next panel.

23      COUNSEL:  The next panel will be Liam Malanachy

24    (I apologize if I mispronounce your name) with

25    Juniors, Mark Fox with Fox Lifestyle Hospitality

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              163

1

2    Group, and Clint Smeltzer with Manhattan Community

3    Board 3.

4        CHAIRPERSON GENNARO:  And while that panel gets

5    sell together, I have to take a two-minute break.

6    I'll be right back.

7        Okay, I'm back.  Thank you.  Yeah, please turn on

8    your microphone and speak right into it.

9        MR. MALANACHY:  Thank you.  Good afternoon,

10   Councilperson Gennaro and the rest of the Committee.

11   My name is Liam Malanachy.  You did a great job.  I

12   represent Junior's Cheesecake.  And they have been

13   subject to-- I would love to tell you how many

14   summonses they have.  What I can tell you is that

15   right now I'm representing them on a total of 13

16   summonses, which I beat out Mr. Bookman by a couple

17   of $1,000.  We now have somewhere around $16,000

18   worth of outstanding summonses that we hope to have

19   adjudicated in one fell swoop sometime next year.

20       I say I can't tell you because we have just

21   gotten to new ones that allege violations back in

22   October of last year.  So we have every reason to

23   believe that we're a very juicy target and that we

24   may be subject to more coming down the pipe.  I won't

25   reiterate--  I won't go over-- The work you've done

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                          164

 2   here is amazing.  I'm very impressed by today's

 3   hearing and by the testimony that's taken place so

 4   far.

 5        CHAIRPERSON GENNARO:  Thank you.

 6        MR. MALANACHY:  It is clear that this type of

 7   enforcement is not germane to quality-- to the

 8   quality of life in New York City.  Junior's

 9   Cheesecake has been here for 73 years, has been in

10   the Time Square area for 20 years, and they've

11   received a grand total of zero noise complaints aside

12   from these most recent summonses.  I can tell you

13   that I have represented a smaller business.  A friend

14   of mine has a bodega.  He would have never been able

15   to hire a lawyer.  And we had a hearing back in May.

16   So as a report from the trenches, it was a-- it

17   resembled a kangaroo court to the extent that the

18   administrative law judge in question felt as though

19   they had no discretion whatsoever to mitigate any

20   fine based on remediation.  We've heard that.

21        CHAIRPERSON GENNARO:  Right.

22        MR. MALANACHY:  He also felt as though once it

23   was audible from the street-- [bell rings]

24        CHAIRPERSON GENNARO:  Yeah, that's you.  But-- so

25   please conclude.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                           165

2        MR. MALANACHY:  Okay.  So once it was audible

3    from the street, it was completely irrelevant.  I'm a

4    former administrative law judge myself.  Discretion

5    was the stock and trade of our business.  I would

6    urge you to do one thing.  If you're going to pass--

7    if' you're successful, which I hope that you are, is

8    considering making it retroactive.  Contrary to what

9    Mr. Kupferman said, that would not be an ex post

10   facto law.  That would merely be applying the same

11   justice--

12       CHAIRPERSON GENNARO:  I know.

13       MR. MALANCHY:  Okay, thank you.

14       CHAIRPERSON GENNARO:  Thank you.

15       MR. MALANCHY:  Okay.

16       MR. SMELTZER:  Hi.  My name is Clint Smeltzer,

17   and I'm here representing Committee Board 3,

18   Manhattan.  I'm Chair of their State Liquor Authority

19   Licensing Committee.  Our board hasn't voted on this

20   legislation.  It's just been a discussion.

21       We're mainly concerned about Intro 160 and that

22   the changes would have a negative impact on our board

23   specifically.  We've had the highest number of

24   commercial noise complaints in Manhattan, and the

25   second in the city total.  Our complaints-- our noise

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           166

1

2    complaints have increased significantly since 2019.

3    I think it's a 74% increase in 2023 from 2019.  Our

4    area is densely residential, but there's also a lot

5    of non-conforming businesses on the side streets,

6    both nightlife businesses and other businesses.  Our

7    job is to make sure the businesses and residents can

8    peacefully coexist.  The protections that keep the

9    noise from businesses inside the business and not

10   spilling into the streets or nearby apartments and

11   allow people to sleep also allow different types of

12   businesses to coexist right next to each other.

13       Without these protections, we're putting the

14   residence-- reticent-- sorry, residences and

15   businesses unnecessarily in conflict with each other.

16   Many of our businesses are located in tenement

17   buildings which are almost impossible to soundproof.

18   So therefore, the sound emanating from there becomes

19   a huge problem for the residences above.

20       Basically, that's it.  We were just asking that

21   the protections that have been put in place years ago

22   must be maintained and enforced in order to have this

23   balance between residents and businesses, and that

24   you keep the existing legislation and the existing

25   language of legislation in regards to the decibel

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 168 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                            167

1

2  levels and readings of sound emanating from inside of

3  business.

4      CHAIRPERSON GENNARO:  Thank you.  And certainly

5  we are going to you know work with a host of

6  stakeholders both on Intro 160, mine, and Keith

7  Powers' bills and make sure you touch base with--

8  well, if you were notified of this hearing, then, you

9  know, you're in our orbit, and we'll make sure that

10  we stay in touch as these bills, all of them, roll

11  down the tracks.  Thank you very much for

12  participating today.

13      And as the next panel is called, I have to do-- I

14  have to take a special eye drop, and I just-- I'll

15  just take a second.

16      COUNSEL:  Call the next panel?

17      CHAIRPERSON GENNARO:  Yeah, call the panel.

18      COUNSEL:  The next panel will be will be Lisa

19  Lesa Rozmarek with Nederlander Organization, Robert

20  Camacho with Bushwick Alliance I think, and Yoav

21  Erez.

22      CHAIRPERSON GENNARO:  Okay, forgive me. I just

23  have to-- It's one of these things I've got to do it

24  every two hours.  It's just an eyedrop, but it's like

25  fancy.  I have to fill the little dropper.  It's got

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 169 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                          168

2  to be refrigerated.  It's like a whole thing you

3  know?

4      COUNSEL:  You may begin when ready.

5      CHAIRPERSON GENNARO:  That's it done.  Thank you

6  for your indulgence.

7      MS. ROZMAREK:  Good afternoon.  My name is Lesa

8  Rozmarek.  I'm the Director of Facilities for the

9  Nederlander Organization, a well-established and

10 respected business in Broadway theater and the

11 entertainment industry.

12     I'm here to share our experiences and concerns

13 regarding the enforcement of the ordinances under

14 review, and the impact they've had on our-- our

15 organization.

16     Since 1965, the family owned and operated

17 Nederlander Organization has been a proud contributor

18 to the vibrant cultural landscape of New York City.

19 We offer premier Broadway entertainment experiences

20 to our audiences and are strong supporters of our

21 local economy.  Recently, our business has been

22 negatively impacted by a series of sound-related

23 violations that we believe require a more balanced

24 and equitable approach to enforcement.

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                169

1

2        To date our organization has received (as of

3   yesterday or last week) a total of 28 violations

4   related to speakers mounted underneath our marquees

5   directly attached to our theatres, the majority of

6   which were issued during the summer and fall of 2022.

7        What is particularly troubling is that these

8   violations were issued without any prior warnings or

9   notifications.  It is our belief that a fair and just

10  system should provide businesses with the opportunity

11  to rectify violations through education and

12  corrective actions, rather than resorting to

13  immediate punitive measures.

14       In our 58 years of business in Times Square

15  theater district, we have never received a citizens

16  complaint regarding noise from our theaters until a

17  bounty was placed upon businesses with no

18  restrictions.  There's zero evidence to back up that

19  low level sound coming from theater marquees is

20  disruptive to Times Square.  Moreover, in commercial

21  areas, such as Times Square, there was no expectation

22  of quietness, and these citizens have chosen to

23  target the theaters as a source of revenue by

24  traveling to this area to issue violations.

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                               170

1

2      Additionally, to the clarifications proposed

3   accompanying the violations, citizens should be

4   required to also submit noise level readings.  This

5   has been common practice by the DEP to confirm if

6   there really is a violation.  The fact that these

7   citizens have found a loophole where they must only

8   show that there was an audible noise is against

9   public policy in the spirit of the law.  The videos

10  submitted are often in areas in Midtown where the

11  ambient noise levels are much higher than other areas

12  of the city and this is not considered when reviewing

13  the hearing.  Furthermore, there should be measures

14  taken to establish--

15      CHAIRPERSON GENNARO:  Please conclude.  I'm

16  sorry, you know.

17      MS. ROZMAREK:  We'd like to point out in our

18  experience that citizen complainers held on to a

19  stack of summonses for a significant amount of time

20  before mailing them via first class mail, and several

21  tickets were lost in the mail and never received.  We

22  were made aware of the violations after they went

23  into default.  So we do support the bills with the

24  additional-- additional clarifications and thank you.

25

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1              RESILIENCY AND WATERFRONTS                      171

 2                  CHAIRPERSON GENNARO:  Thank you very much for

 3              your views and your patience.  Yes, my friend.

 4                  MR. EREZ:  Hi.  My name is Yoav Erez, and I'm

 5              here because I'm a concerned citizen, sick of being

 6              the victim of illegal unregulated noise from

 7              businesses.  It has never before been easier to buy a

 8              powerful speaker which is causing a noise pandemic in

 9              the city.  I literally cannot walk one block without

10              someone trying to force their DJ skills on my

11              unwilling ears.  Restaurants should not be allowed to

12              pollute the public space with their music.  It cannot

13              be more clear to any reasonable person that the

14              intention of the law when referring to advertising is

15              any sound heard outside of a business.  Even if it's

16              just music, it doesn't matter how loud it is.

17                  Literally 100 feet from here, there are food

18              carts and street merchants who blast music out to

19              public most days and nights.  And even if there are

20              hundreds of 311 calls, they continue to make city

21              hall into an open air disco without any

22              interruptions.

23                  The reality is there is currently zero noise

24              regulation enforcement in the city.  Calls to 311 get

25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                                172

2    a visit from the police sometimes, and only up to

3    eight hours later when the problem is often gone.

4        Even in cases where the crime is obvious, and the

5    police are there on time, they will never issue a

6    fine or confiscate a speaker.  All they do is give a

7    meaningless warning and leave, and the issue

8    continues once they are gone.

9        Yes, there is a small number of people taking

10   advantage of the citizens complaint program right

11   now, because it is not advertised anywhere.  New

12   Yorkers aren't even aware it exists, and it takes

13   hours of work, months of waiting around and hoping

14   and praying that the DEP will sometimes reply to your

15   emails.  We are on a mission to protect New Yorkers

16   and their ears, and we should be compensated for it.

17       Because noise pollution is considered a smaller

18   crime that is easier for most people to ignore, who

19   you'll end up hearing from today are businesses who

20   instead of simply turning their music off, will

21   continue to advertise illegally with complete

22   disregard for peaceful, quiet, respectful New Yorkers

23   who live in their areas, because most New Yorkers are

24   nonconfrontational and don't even know that this

25   hearing is taking place or that they have this

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              173

2   option.  Even if they didn't know you wouldn't hear

3   from them because all you're here for is squeaky

4   wheels that are losing money.

5        Thank you.  Thank you for your time.

6        CHAIRPERSON GENNARO:  Thank you.

7        MR. CAMACHO:  Hi.  Hi, how are you?  My name is

8   Robert Camacho.  I live in the hood of Bushwick.

9   When nobody wanted to be there.  All of a sudden,

10  everybody wants to come there and be like Christopher

11  Columbus syndrome and throw the natives out.  I'm

12  talking about that Intro 160, the noise code.  Music

13  organizing from interior space-- space like

14  restaurants, bars, and now we got the weed shops.

15  Don't forget about that.  Intro 1194 would cap the

16  fines of noise violations from $5, which was

17  reported-- if you report it to DEP environment to

18  protection to $10 if you report it by a citizen who

19  was sick and tired of being assaulted by the noise

20  for profit coming from neighborhoods like mine, and

21  businesses like theirs.  The Sound Bar.  It sounds--

22  It gets worse.  The LU 00112-22 adopted by the

23  resolution 53, passed by City Council in 2020 allows

24  restaurants to keep their facility open at all times.

25  They are operating.  Local law 121 passed by City

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              174

2    Council in August mandates restaurants and bars must

3    be allowed to operate from 10am to 12pm, indoor and

4    Outdoor, even if it's a residential neighborhood.

5        Put it all together.  Under these combined four

6    laws, restaurants can keep their doors open 14 hours

7    a day, blast music in the streets, and in homes by

8    nearby residents with no fear of a fine that is the

9    cost of a sandwich, which is absolutely not true.

10   I'm going to change the sandwich routine, because we

11   had a community space that was given to community

12   because they don't have no more CBOs.  A private

13   entity got rid of the CBO and did a-- a supermarket.

14   Very well.  We need supermarkets.  So I went in

15   there.  And I went to buy a sandwich.  And do you

16   know I pay $14.50 for a sandwich only with cheese

17   lettuce and tomatoes.  More than that-- these people

18   would pay for fine.  Please.

19       CHAIRPERSON GENNARO:  Please conclude.

20       MR. CAMACHO:  You've got to stop this.  You gotta

21   listen to the community.  I know I have both of my

22   Councilpeople here.  Jennifer Gutiérrez and Sandy

23   Nurse, and we will be blasting it, because we're

24   dying.  Our seniors and our kids can't live on top of

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          175

1

2    these stores.  And the covert-- our kids got to study

3    seven days a week.

4        CHAIRPERSON GENNARO:  Your time has expired.  I

5    have a comment--

6        MR. CAMACHO:  Thank you, God bless you, and I

7    appreciate you.

8        CHAIRPERSON GENNARO:  No, so-- but I--

9        MR. CAMACHO:  Take care of yourself, because you

10   don't sound too good.

11       CHAIRPERSON GENNARO:  I've got-- No.  I've got

12   something to-- to add, is that-- You know, the

13   individual civilian, you know, sometimes feels a

14   little helpless.  They call 311 or whatever.  And

15   this is why, you know, you not only have your local

16   Councilmember, because you go to the Councilmember,

17   and you know, you go to he or she, and indicate, you

18   know, that you've got a problem.  There's also the

19   local Community Board.  You know, we do have these,

20   you know-- Councilmembers have the ability to get

21   local problems addressed.  And that's like a large

22   part of what we do.

23       And there's 311 and there's like members of the

24   Council.  And so, you know, most Councilmembers are

25   better than 311 at getting, you know, situations

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 177 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1     RESILIENCY AND WATERFRONTS                              176

 2     remedied.  And that's what I do.  And I think I speak

 3     on behalf of, you know, the other 50 Councilmembers

 4     here that when we hear specific situations, we do our

 5     best, you know, to try to, you know, give-- give

 6     people the, you know, peace and repose that they

 7     need, and to address whatever problem they have.

 8         And so we try to fill in where you know, 311

 9     leaves off.

10         MR. EREZ:  This is the opportunity.  So, I've

11     never felt more helpless then until I came and saw

12     how one-sided--

13         CHAIRPERSON GENNARO:  Okay.

14         MR. EREX:  [inaudible]

15         CHAIRPERSON GENNARO:  But I just had-- I just

16     wanted to have that as a-- as a parting comment.  And

17     I appreciate this panel being here with us today.

18     Thank you very much.

19         MR. CAMACHO:  And I thank you.  And that citizen

20     thing needs to be fixed too.  So, thank you.

21         CHAIRPERSON GENNARO:  Thank you sir.

22         COUNSEL:  The next panel will be Sandra

23     Telendrana (again, I apologize if I pronounce her

24     name wrong) with Flowers by Giorgie, Nikolay Gergov

25     with Pando 39, and Frank McCawley with Tito Murphys.
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 178 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                177

1

2    Okay.  Why don't we go from-- from my right to my

3    left?  How about that?  We'll start with you.

4    MS. TELENDRANA:  Good afternoon.  My name is

5    Sandra Telendrana.  I stand before you today as the

6    voice of Flowers By Giorgie, a small family-owned

7    flower shop nestled in the heart of Sunnyside,

8    Queens.

9    Our shop has been marred by an unpleasant

10   encounter with Mr. Dietmar Detering, who in

11   conjunction with a DEP, unjustly slapped us with

12   three unwanted tickets.  Two of these tickets found

13   themselves in the favor of Mr. Detering, each

14   carrying the weight of an $880 fine, adding up to a

15   staggering $1760.

16   Our luck ran out when the so-called bounty

17   hunters were instructed to document violations

18   themselves.  The second ticket handed out by the DEP

19   cited unreasonable noise on the sound reproduction

20   device for commercial business advertising purposes,

21   on November 28, 2022, at 8:12am.  This was despite

22   the fact that our doors remained open and the music

23   emanating from our shop was meant to create a

24   pleasant atmosphere inside, not to disturb our

25   neighbors.  However, the DEP argues that even if you

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 179 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                      178

1

2    stand at our front door with the doors open, and can

3    hear music from there, it qualifies as a violation.

4    This interpretation left us perplexed.  The third

5    ticket further deepened our confusion claiming that

6    speakers outside our store were playing music to

7    attract attention.  We probably removed those

8    speakers, which were remnants from the previous

9    tenant that were not even connected to our music

10   system.  During the hearing, when we explained this,

11   we were asked if we had evidence from a sound

12   technician proving those speakers' inactivity.  For a

13   small business like ours, it is financially

14   impractical to allocate funds for a sound technician,

15   especially when money is already in short supply.

16       Our flower shop is not just a business, it's our

17   livelihood and the legacy of our family.  It has

18   sustained us, put food on our table, provided

19   shelter, put my siblings and I through school, and

20   now my youngest sibling.

21       Witnessing individuals misuse their power to levy

22   hefty fines on hardworking families like ours is

23   disheartening.  My parents tirelessly dedicate 60 to

24   80 hours each week to make ends meet, pay monthly

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          179

1

2    rent, cover utility bills, and restock our store with

3    merchandise.

4        The pandemic left countless small businesses

5    reeling, and now we find ourselves under the

6    relentless scrutiny of city agencies.

7        So as you deliberate the purpose of bills to

8    curtail the exploitation of small businesses by

9    bounty hunters through unjust violations, we implore

10   you to contemplate the impact of these actions on

11   families like ours.  Your support could be the

12   lifeline that ensures businesses like Flowers By

13   Giorgie continue to flourish.  Thank you.

14       CHAIRPERSON GENNARO:  Thank you.  I'm just going

15   to jump in for a second, even though ordinarily I'd

16   wait until a panel is done.  But now, the person--

17   the entity that you're talking about, or the

18   individual who heard sound outside your-- your

19   business, what-- was this someone from DEP?

20       MS. TELENDRANA:  No.  The individual--

21       CHAIRPERSON GENNARO:  It was the bounty hunter

22   guy.

23       MS. TELENDRANA:  It's the bounty hunter guy.

24       CHAIRPERSON GENNARO:  Okay, fine.  Fine.  I just

25   wanted to make sure that-- because DEP would know in

```
   COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1 RESILIENCY AND WATERFRONTS                          180
 2 that situation that they have to use a decibel meter.
 3 And so--
 4    MS. TELENDRANA:  They didn't.  On the second
 5 ticket that was issued, and I had the hearing with
 6 DEP, that's what-- I raised the-- all the flags
 7 during their--
 8    CHAIRPERSON GENNARO:  Right.  Okay.  No.  This
 9 is--  This is part of the whole bounty hunter
10 phenomenon, and why we're doing everything we can to
11 try to-- and we're moving on this.  But thank you.
12 Let me go to the next witness.
13    MS. TELENDRANA:  Thank you.
14    MR. GERGOV:  Good evening.  My name is Nikolay
15 Gergov, and I represent Pando 39.  We've received 16
16 summons from the same individual.  One of them was
17 from someone else, but 15 from the same individual.
18 We took the business as is, and there was a small
19 speaker right above the front door, which we took
20 down the moment we received the first one, by-- But
21 this time the summons kept coming.  And as you're
22 already aware, there's a huge disconnect somewhere,
23 because most of the summons were issued in the two
24 weeks of this February, and we received them sometime
25 in the beginning of May.  And then we received
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          181

1

2    summons that were from last November as well and

3    December.  If we are to pay the total final of those

4    16 sermons that's over $20,000.

5        CHAIRPERSON GENNARO:  You should fight those.

6        MR. GERGOV:  Yeah.

7        CHAIRPERSON GENNARO:  You should fight those.

8    Thank you.

9        MR. GERGOV:  Thank you.

10       MR. MCCAWLEY:  Hi, my name is Frank McCawley.

11   I'm a partner in Tito Murphys on 46th Street, right

12   on restaurant row.  Our business is rest-- primarily

13   a restaurant with a bar.  We have an area of about

14   300 square feet outside with two speakers that are

15   kept as background music.  They are not facing the

16   street, even though we have outside dining.  We were

17   summonsed 8 times by the same individual, by the same

18   bounty honor.  He just keeps coming back, and coming

19   back, and coming back.  Until we got our first

20   summons, we had no idea this was going on.  We got no

21   warning.  We just had no clue.  So I think it's very

22   unfair.  I think we're low hang-- low hanging fruit,

23   and we've been exploited.

24       CHAIRPERSON GENNARO:  Correct.  That's what's

25   going on.  And that's what we're here to fix.  And

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1     RESILIENCY AND WATERFRONTS                      182

 2     you know, Councilmember Holden, who, you know, is

 3     hanging in with us this late in the hearing, and you

 4     know, Bob and I--  well, Councilmember Holden and I

 5     are very committed to making sure that-- that people

 6     aren't abused by people who self-empower on a 50-

 7     year-old unknown law, and that's what we're here to

 8     fix.  And so bear with us as we get through this.  In

 9     the meantime, anything that comes your way you should

10     fight.

11         MR. MCCAWLEY:  Thank you.

12         CHAIRPERSON GENNARO:  I thank this panel.  I

13     direct Counsel to call the next panel.

14         COUNSEL:  The next panel will be A.M. Riccielli,

15     with the East 17th Street Loft Corporation Co Op,

16     Gregory Guarino with Acoustics Inc., and Norma Cote.

17         CHAIRPERSON GENNARO:  While we're here, I'm just

18     wondering if anyone from the administration has made

19     their way into the room?  Okay.  Thank you for being

20     here.  Please tell the City-- the City Legislative

21     Affairs that we need someone from the Administration

22     to hear every single word of testimony that these

23     good people have waited around hours to deliver.  And

24     they're not getting paid to be here.  So it's the

25     least that we can expect for-- someone from the
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1    RESILIENCY AND WATERFRONTS                          183

2    mayoralty, someone from the Administration to listen

3    to the citizens, and as further impetus to work with

4    the Council to get this fixed.  But I thank you for

5    being here.

6        Okay, please, commence when you're ready.  How

7    about you.  You have to turn on the microphone, red

8    light on?

9        MS. COTE:  Okay.  My name is Norma Cote.  I live

10   directly over a restaurant.  It's a residential

11   building.  It's a residential block.  It's a

12   residential street.  There are no other commercial

13   establishments on that block or at that intersection.

14   That restaurant plays its music in its dining room.

15   I don't hear it through the floor, because they have

16   sound protection equipment.  But there's no way you

17   can introduce sound protection out of doors.  And if

18   this restaurant should choose to play its music loud

19   enough that it penetrates into the outdoor space, it

20   will not only harm me, but it will harm everyone else

21   who lives around that neighborhood.

22       I think it is not fair to ask the residents to

23   endure the-- the destruction of their peace and quiet

24   in order to support a private profit-making

25   enterprise.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              184

1

2      Music is a kind of air pollution.  It's no answer

3   to say, "Well, we'll just we'll just regulate it at

4   night."  I am at home a lot.  I work at my computer a

5   lot.  It's just as destructive of my life in the

6   daytime as it is at night.

7      In order to have any enforcement at all, since

8   the city agencies will never be able to do it, you

9   have to preserve effective citizen complaints.  I say

10  whatever problems you have with people who are

11  abusing it, don't throw the baby out with the

12  bathwater.  Keep effective civilian complaints, which

13  has to be underlaid by effective penalties placed on-

14  - on violators.

15     Violators can't say, "Well, my music is just

16  background music."  If it was just background, it

17  wouldn't be out in the street.  And those people need

18  to be reined in.  Thank you for hearing me.

19     CHAIRPERSON GENNARO:  Thank you.  Thank you, and

20  I do agree with you.

21     MR. GUARINO:  My name is Greg Guarino.  I'm from

22  Acoustilog Incorporated.  We measure noise.  We agree

23  that 24-244 clearly should not be used to penalize

24  accidental sound leakage.  But Intro 160 will have

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,

1  RESILIENCY AND WATERFRONTS                         185

2  unintended consequences due to its use of the wrong

3  measurement technique, dBA.

4      The current noise code includes the phrase "shall

5  include but shall not be limited to before specifying

6  three very limited examples, B1, 2, and 3."  By

7  removing that phrase, Intro 160 will allow businesses

8  to disturb both businesses and residential neighbors

9  by only requiring them to conform to those three

10  limited examples.

11      I understand my Councilman's wish for an

12  objective standard.  But all three examples only use

13  dBA.  dBA ignores the bass.  And as everyone knows,

14  bass is the problem.  Bass is what comes through

15  floors, walls, windows, etc.  Right now, a business

16  can at least use 24-218 to complain about bass from

17  another business.  If the code has changed, that bass

18  leakage will no longer be a violation.  Right now the

19  commercial music section, 24-231 protects residents

20  from some bass frequencies, but not the subbass from

21  subwoofers.  The proposed change would allow

22  businesses that produce unlimited sub-bass,

23  disturbing everyone around them indoors and outdoors.

24      If you live near loud business, a gym club

25  restaurant or even a clothing store, you will not be

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          186

1

2  able to complain about sub-bass coming through the

3  wall or floor.  And if you work next to one, you

4  won't be able to complain at all, because dBA does

5  not properly measure the bass that you hear.

6      If you remember nothing else about what I'm

7  saying, remember that there are many ways to measure

8  it many different kinds of decibel measurements.  dBA

9  ignores the bass, and bass is the problem.

10      CHAIRPERSON GENNARO:  Thank you.  I'd be very

11  grateful if you could provide a copy of your written

12  statement to the Committee Council.

13      MR. GUARINO:  Our consultant, Alan Firestein, who

14  wouldn't be here if he wasn't 10,000 miles away, is

15  going to submit something more comprehensive.

16      CHAIRPERSON GENNARO:  Please do, because we want

17  to get all of the technical subtle nuances correct.

18      MR. GUARINO:  Exactly right.  That's what we're

19  asking.

20      CHAIRPERSON GENNARO:  Yup.

21      MR. GUARINO:  Thank you very much.

22      CHAIRPERSON GENNARO:  Yours is very compelling

23  testimony.  We really appreciate you coming forward.

24  Make sure we get that.

25      COUNCILMEMBER HOLDEN:  Uh, Chair could I...?

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 188 of 238

```
COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                        187
```

1

2     CHAIRPERSON GENNARO:  Oh, uh, I recognize

3     Councilmember Holden.

4     COUNCILMEMBER HOLDEN:  Again, I thank you for

5     that.  Because I don't know some of these things.

6     And we need the experts.  That's why we have

7     hearings.  So, I don't like the base either.  And I

8     think that's the most annoying.  So, I agree with

9     you.  So, this is very, very good information.  If we

10    could adjust it, we will.

11    MR. GUARINO:  Thank you very much.  We would be

12    more than to provide you with the information.  And

13    this is what we suspected: that we've been hearing a

14    lot of words like decibel go around.  And there's

15    different kinds of decibels.  And there's--  You talk

16    about objective measurements.  But there are

17    different kinds of objective measurements.  This just

18    isn't the right one for this problem.

19    COUNCILMEMBER HOLDEN:  So we could tweak the

20    bill, right?

21    MR. GUARINO:  Right.

22    COUNCILMEMBER HOLDEN:  With language that would

23    cover the bass.  I'd appreciate that.  Because I

24    don't want to create another problem by solving one

25    problem, we created another one.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                         188

2       MR GUARINO:  Okay.

3       COUNCILMEMBER HOLDEN:  Thank you so much for

4    this.

5       MR. GUARINO:  Thank you very much.  And if it

6    matters, I live in Glendale.

7       COUNCILMEMBER HOLDEN:  Thank you.  Thanks for

8    that.

9       CHAIRPERSON GENNARO:  Thank you.

10      COUNSEL:  The next panel will be Peter Gibson,

11   Robin Warren, and Murphy Fitzpatrick.

12      You may begin when ready.

13      CHAIRPERSON GENNARO:  If you could-- if you could

14   just hold on one second until I'm ready to listen.

15      Sorry about that.  I just want it to be focused

16   on your testimony.  Please commence.

17      MR. GIBSON:  Okay.  My name is Peter Gibson.  I

18   am a concerned citizen.  And I wanted to say that I

19   have concerns about the Bill 0160 that would

20   completely exempt any penalty for noise operating

21   from an interior space in a business.  It seems to me

22   that passing this law would mean any business can now

23   play music as loud as they want without any

24   deterrence.

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 190 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              189

1

2     Going forward, these laws would allow for a

3  business operator-- a business operator that was

4  previously-- previously considered a bad actor by

5  their Community Board to play music without

6  installing soundproofing or blast music directly into

7  the street, as long as the speakers were in an open

8  window inside.

9     These amendments would increase harmful noise in

10  the residential neighborhoods that were already

11  experiencing.  These laws might make it easier for a

12  business to operate, but would vastly and-- at a

13  vastly and proportionately higher cost to the

14  residents and the quality of life and health of those

15  residents.

16     As you know, 311 database indicates that noise is

17  the most common complaint in New York.  New York City

18  Department of Health Reports that 40% of New Yorkers

19  report disruptive noise at home in the past three

20  months.  About 30% of New Yorkers with serious

21  psychological distress report frequent noise

22  disruption.  The New York Department of Health also

23  reports that common effects of noise is hypertension,

24  diabetes, anxiety, increased risk of heart attacks.

25

```
                 COMMITTEE ON ENVIRONMENTAL PROTECTION,
    1            RESILIENCY AND WATERFRONTS                    190

    2                It seems that amending these laws would

    3            negatively impact the quality of life of many of your

    4            constituents.  To produce the overall-- To produce an

    5            overall greater good and balance for New York City,

    6            businesses and residents-- and for businesses and

    7            residents, that we urge you to change these

    8            amendments.

    9                So, the citizens--

   10            CHAIRPERSON GENNARO:  Please conclude.

   11            MR. GIBSON:  Okay.  The citizen initiated noise

   12            summons program should be improved.  I agree that

   13            meter evidence should be submitted, the business

   14            operator should be sent a copy of the proposed

   15            summons immediately.  If the citizen submitting a

   16            proposed summons does not live in the neighborhood--

   17            CHAIRPERSON GENNARO:  Please conclude.

   18            MR. GIBSON:  --he should have several residents

   19            that reside in the immediate neighborhood co-sponsor

   20            the summons, but keep the effective citizen complaint

   21            program in place.  Thank you.

   22            CHAIRPERSON GENNARO:  Thank you.

   23            MR. FITZPATRICK:  Hi, my name is Murphy

   24            Fitzpatrick.  I'm a manager at a restaurant called

   25            BarDough on Restaurant Row on West 46th Street.  And
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          191

1

2  I think I can one up everyone where I have 18

3  violations from the same person.  And I actually have

4  residential neighbors above and directly adjacent to

5  my establishment.  And I've never received a 311 call

6  from any of them.  And I'm friendly with many of

7  them, because when these violations started coming

8  in, I asked all of them, that they can always text me

9  let me know if they had issues.

10     And because I'm a smaller establishment as well,

11  and where I'm located close to Times Square, where my

12  rent is high, and my square footage is low, that my

13  violations total almost between three and four months

14  of my rent, which, if all of these hit my bank, would

15  probably put me out of business.

16     So this is something for me.  And I totally

17  understand everyone else's-- who are on the side as

18  well as people who are abusing the noise, that for

19  myself who is not one of them, that I would like for

20  there to be some sort of justification that we can

21  get through, and again, that people that do abuse it,

22  yes, there should be some penalty.  But for 18

23  violations from one person, for one location, that

24  really has no problems with any of their adjacent

25  neighbors doesn't really seem fair.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           192

1

2      CHAIRPERSON GENNARO:  Thank you.  And I will say

3  that before the-- before this section was uncovered,

4  that the bounty hunters were using, you know, life

5  went on and with the new noise code for 20 years, and

6  we were using the decimal standard.  So, any

7  declaration that any witness would make that they're

8  under no obligation whatsoever to limit their noise.

9      You know, there was a paradigm in place that was

10  just blown up and the bounty hunters got into

11  business.  And so I just-- I just felt it was

12  important to make that point that, you know, people

13  were getting decibel meter violations, this was

14  happening.  It's not like, you know, the bounty

15  hunters showed up and then, you know-- now and only--

16  and only since their arrival is there any kind of

17  noise enforcement.  That's just-- that's not the

18  case.  We need to do better.

19      We need to do better, you know civilian

20  enforcement, we needed to do better on all frontiers.

21  But what we don't need is, you know, profiteers

22  running around who do not have your best interests at

23  heart.  They just want to make a lot of money.  But--

24  And any problem that you're having--  And any problem

25  that you're having, I would urge you to engage with

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 194 of 238

```
         COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1      RESILIENCY AND WATERFRONTS                        193

  2      your Councilmember, your local Community Board and

  3      make yourself-- That's where you turn up the volume,

  4      to them.

  5         MR. FITZPATRICK: Yeah, we're doing that. And,

  6      you know, that's your speculation that this person's

  7      doing it on-- for profit. And that's, uh--

  8         CHAIRPERSON GENNARO: I don't think that's

  9      speculation, but we will agree to disagree and we're

 10      calling the next panel. Thank you.

 11         COUNSEL: The next panel will be Sharon Trennor

 12      and Cormac Flynn

 13         CHAIRPERSON GENNARO: Cormac. Cormac and I go

 14      back a long time.

 15         Is that the League of Conservation Voters days or

 16      something? Or something like that?

 17         MR. FLYNN: Yeah, I was there a long time.

 18      Before that--

 19         CHAIRPERSON GENNARO: Yeah, right. You've got to

 20      put on your microphone, you know.

 21         MR. FLYNN: Well, I was there a long time, but

 22      before that Former Speaker Vallone.

 23         CHAIRPERSON GENNARO: Oh, right. Right. Right.

 24      Yeah. Please.

 25
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 195 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              194

1

2      MS. TRENNOR:  Hi, my name is Sharon Trennor, and

3   I am representing eight bars and restaurants in

4   Manhattan, Jack Dempsey's, the Playwright Irish Pub,

5   the Playwright Tavern, McHale's, BarDough, Legends,

6   Tito Murphy's, and St. Pats.

7      I am testifying as how it is unfair that

8   civilians can write up their own noise violations and

9   get paid for it, creating bounty hunters, and I feel

10  like bars and restaurants are being targeted.

11     I am also testifying that the rules are unclear

12  as it states unreasonable noise from sound

13  reproduction device for commercial and business

14  advertising purposes.  Meanwhile, businesses are not

15  advertising, but simply creating a nice ambience for

16  their customers.

17     As I mentioned before, our eight locations have

18  received over 87 violations.  We started receiving

19  them in the mail of March 2023 for dates occurring as

20  far back as August 2022.  This was the first time we

21  had received any sort of noise violations.  And as

22  soon as we received the first one, we actually took

23  down our speakers.  The problem did not stop there.

24  We began to receive them week after week in the mail,

25  some days two days apart, some days a week apart, all

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 196 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    195

1
2   ranging from August 22 to March 23.  So these

3   violations were being held for over six months before

4   being sent out.  As a matter of fact, I'm still

5   receiving them from dates in October 22, 5th and 7th,

6   but they're only been mailed out September 27 of this

7   year, nearly a whole year later.

8       I believe this is an attempt to rack up as many

9   offenses as possible in order for maximum penalty

10  payouts.

11      Nobody has come to actually give us a violation

12  in person.  Some of these violations have gone into

13  default, 59% as we established, because we never

14  actually received them, and only find out about them

15  when we got a default letter.  Some of our managers

16  have even witnessed the bounty hunters going right up

17  to the speakers to video them.  May I add there's two

18  individuals in particular are responsible for 95% of

19  these--

20      CHAIRPERSON GENNARO:  Yeah, we know.  We know

21  that.

22      MS. TRENNOR:  Yeah.  Okay.  [Bell rings]  Can I

23  continue just--

24

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 197 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                    196

1

2      CHAIRPERSON GENNARO:  Very briefly, because--

3   very briefly.  Because there are scores of witnesses

4   still to testify.

5      MS. TRENOOR:  What is the point in paying for

6   outdoor seating permits and music royalties, if we

7   can even give our customers the same ambience as

8   inside?  They'd rather listen to music than honking

9   horns and sirens.

10      I feel the need to testify today, because I'm

11   genuinely worried about how we are supposed to pay

12   all these fines if they are sustained.  We also have

13   to pay legal representation.  Some businesses will

14   not survive this.  We're still recovering from the

15   repercussions of COVID, and we never got back to

16   where we were before then.  This is just creating

17   more stress for us.

18      May I suggest that civilians do not get paid for

19   reporting noise complaints.  And if they do file

20   complaints that they'd be filed within 30 days of it

21   actually occurring?  I'm also suggesting that all the

22   rest of the noise violations be dismissed.  We

23   weren't given the chance to cure them in the first

24   place.  Had we done that, we wouldn't have racked

25   them up.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 198 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1     RESILIENCY AND WATERFRONTS                          197

  2         CHAIRPERSON GENNARO:  This is--  Yeah.  I--  The

  3     ones that are already in the pipeline, we'll do what

  4     we can.  Anything that has been adjudicated, it's out

  5     of our hands.  But you know, we're trying to work as

  6     quickly as possible to get the best result as soon as

  7     possible, and to have those that have not yet been

  8     adjudicated thrown out.  Thank you.  I'm going to

  9     move on to Cormac now.

 10         MS. TRENNOR:  Thank you for your time.  I

 11     appreciate it.

 12         CHAIRPERSON GENNARO:  You bet.  Sure.  Cormac?

 13         MR. FLYNN:  Hello.  My name is Cormac Flynn and

 14     like Clint before from Community Board 3, I'm on

 15     Community Board 2.  We also haven't taken a position

 16     yet because our Community is really just learning

 17     about these bills in the last few days.

 18         However, for background, I'm a member of

 19     Committee Board 2 for 12 or 15 years.  I'm the SLA--

 20     former SLA Chair.  I'm also the former head of my

 21     Block Association on the residential side.  And I've

 22     been for over 10 years on the board of the Village

 23     Alliance Business Improvement District, working to

 24     fill empty storefronts and that sort of thing.

 25
```

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 199 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              198

2        So, I actually know the noise issues from every

3    which side on this thing.  Let me just say that I do

4    not, and no one I know has any objection to the main

5    legislative purpose that you seem to be pursuing

6    here, which is to stop the monetization abuse of-- of

7    a complaint mechanism for the noise code.

8        However, we have very large concerns about Intro

9    160.  And most of those concerns, it turns out, were

10   just addressed a few minutes ago by that gentleman

11   from-- what was it?  Acoustilog? -- who came up.

12   They are specifically about the bass.  So if you

13   strip out the language that says, you know,

14   "including but not limited to," and you just leave

15   these three 20-year-old examples, those examples are

16   all A weighted, right?, and not C weighted.  And so

17   you end up leaving out bass and sub bass from any

18   kind of mechanism.  And this is important, because as

19   you said, Mr. Chairman, 20 years ago, the noise

20   revisions were made.  And I remember because I

21   testified a few times on that.  In those 20 years,

22   technology around bass, around woofers and

23   subwoofers, have just changed dramatically.  And now

24   you can get that kind of sound when you weren't able

25   to.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 200 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              199

1

2     CHAIRPERSON GENNARO:  Thank you.  Thank you,

3   Cormac.  And certainly, you know, the points were

4   made about the bass, and we will duly consider it.

5   We don't want to go backwards, and we're trying to go

6   forwards.

7     MR. FLYNN:  Thank you.

8     CHAIRPERSON GENNARO:  Thank you very much.

9   Andrew, if I could just see it for a second?  And you

10  can call the next panel.

11    COUNSEL:  The next panel will be Jonathan Rinaldi

12  and Raul Rivera.

13    MR. RINALDI:  That's on Great.  Good morning

14  Chair.  I have some materials showing how you,

15  Gennaro, are taking significant bribes from Kathy--

16  Kathy or Kathleen, wife of registered lobbyist Robert

17  Bookman in exchange for you introducing 1194.

18  Kathleen is married to Robert.  I have email--

19    CHAIRPERSON GENNARO:  Your testimony is out of

20  order.

21    MR. RINALDI:  I've had emails between the both of

22  you, but Intro 1194 is something that has no

23  sponsors.  It's just your bill.  And which not-for-

24  profits do you actually support?  Do you--

25

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                           200

 2       CHAIRPERSON GENNARO:  We don't answer questions.

 3   You get to testify and don't get to ask questions.

 4       MR. RINALDI:  Right.  Well, I'm just letting you

 5   know that I've have evidence that you are taking

 6   bribes for your bills that you're introducing.  Plus

 7   you-- you really don't care about the community

 8   because you filled--

 9       CHAIRPERSON GENNARO:  Okay, you're out of--

10   Sergeant, shut off the microphone--

11       MR. RINALDI:  --our district with illegal aliens.

12       CHAIRPERSON GENNARO:  You're out of order.

13   You're off topic.  Thank you.

14       MR. RIVERA:  Can you hear me?  Good afternoon.

15   My name is Raul Rivera.  I'm a TLC driver and a TLC

16   driver advocate.  It's been brought to our attention-

17   - I mean, you want to censor people.  You don't want

18   to let people speak, not even for two minutes.  I

19   don't know how that works.  But we are here at your

20   committee, because we are New Yorkers and we are

21   concerned--

22       CHAIRPERSON GENNARO:  If you're going topics,

23   speak on topic.  If you're going to speak on-- if

24   you're going to go off-topic then you're not going to

25   be allowed to testify.
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                        201

2        MR. RIVERA:  We're not-- We're not going off

3    topic.  We're speaking about you and your committee--

4        CHAIRPERSON GENNARO:  I'm-- It's not--

5        MR. RIVERA:  Hold on a second.

6        CHAIRPERSON GENNARO:  I am not the topic.

7        MR. RIVERA:  I'm asking you to hold on a second.

8    We're speaking about these bills and you're--

9        CHAIRPERSON GENNARO:  No you're not.  You're not.

10       MR. RIVERA:  You're cutting-- You're cutting us

11   off.

12       CHAIRPERSON GENNARO:  You're not talking--

13       MR. RIVERA:  We have two minutes to speak, sir.

14       CHAIRPERSON GENNARO:  No.  You get-- You get two

15   minutes to speak on topic.

16       MR. RIVERA:  That is censorship.

17       CHAIRPERSON GENNARO:  On topic.

18       MR. RIVERA:  It's censorship.  You're cutting us

19   off.  We ask respectively--

20       CHAIRPERSON GENNARO:  GENNARO:  You're off topic.

21   Sergeant, turn off--

22       MR. RIVERA:  --that you stand down and let us

23   testify.

24       CHAIRPERSON GENNARO:  Sergeant's-- Call the next

25   panel.  Call the next panel.  Call the next panel

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 203 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              202

2       [BACKGROUND VOICES]

3       CHAIRPERSON GENNARO:  Call the next panel.  I ask

4   the sergeant to clear these individuals out of the

5   room.

6       [BACKGROUND VOICES]

7       COUNSEL:  We will now turn to zoom testimony.

8   For panelists who are testifying--

9       [BACKGROUND VOICES]

10      We will now turn to zoom testimony.  When your

11  name is called a member of our staff will unmute you

12  and the Sergeant at Arms will give you the go ahead

13  to begin.  Please wait for the Sergeant to announce

14  that you may begin before delivering your testimony.

15      We will return to ought to in-person testimony

16  after we finished the Zoom testimony.  Yes.  We will

17  be doing the in-person testimony and then the Zoom

18  testimony.  I would now like to welcome Eric

19  Eisenberg to testify.

20      MR. EISENBERG:  Hi.  First thank you to Keith

21  Powers for your strong bills.  Now on to the bad ones

22  which are Intros 1194 and 160.  In the early 1970s,

23  New Yorkers realized that city agencies namely the

24  NYPD and DEP were failing to enforce their noise

25  laws.  They knew that chronic noise is not a mere

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 204 of 238

```
         COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1       RESILIENCY AND WATERFRONTS                         203

 2       nuisance, but also harms our sleep, our health, our

 3       learning, and even our lifespans.  So, City Council

 4       in the 1970s noise code enabled and monetarily

 5       encouraged members of the public to also enforce our

 6       noise laws against businesses that purposely direct

 7       their advertising noise to the public sidewalk.

 8           Unfortunately, in 50 years the DEP never

 9       explained to the public how they could participate.

10       In 2022, the public sick and tired of the city's non-

11       enforcement read the noise code and again insisted

12       that yes, they did have a right to fight for a

13       healthy soundscape in New York City.

14           OATH has treated businesses more than fairly at

15       noise hearings.  80% of citizen-based noise summons

16       result in a violation finding, much higher than the

17       49% of the NYPD OATH summonses.  Nonetheless, OATH

18       has very generously issued $0 fines when the

19       businesses stopped their noise pollution by the time

20       of the hearing.  That's unprecedented.  And where the

21       businesses have an alternate explanation to the

22       music, like outdoor dining, OATH has been dismissing

23       the tickets.

24           Only persistent and entirely unnecessary noise

25       polluters have anything to fear from citizen
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 205 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              204

1

2    enforcement at presents.  For responsible businesses,

3    the only consequence of a ticket is free education as

4    to the noise laws.

5        The results of the past year of citizen

6    enforcement have been outstanding.  Numerous

7    businesses in Midtown, the Village and Corona have

8    stopped unnecessarily blasting their music and

9    advertising come-ons directly to the sidewalk.

10   Citywide, 311 complaints have dropped from 766,000 in

11   2021 by about 100,000 or 13%.  That's overall noise

12   complaints by 311 in New York City.  That's-- That's

13   insane.  That's an amazing improvement.  All that is

14   really needed.  And on top of our current citizen

15   enforcement lawsuits is better education, like the

16   DEP immediately telling businesses when they get a

17   complaint that they got a complaint.  It's not hard.

18   The DEP has just failed businesses in that regard.

19   [BELL RINGS]

20       SERGEANT AT ARMS:  Time expired.

21       MR. EISENBERG:  Can I have a little more time?

22       CHAIRPERSON GENNARO:  Time expired.

23       MR. EISENBERG:  Maps of quality of life

24   improvement--

25

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              205

2       CHAIRPERSON GENNARO:  Time expired.  Next

3   witness.

4       COUNSEL:  The next witness is Jeanine BATA.

5       SERGEANT AT ARMS:  Starting time.

6       MS. BATA:  I'm here to testify about noise camera

7   location selection.  My name is Jeanine Bata.  I live

8   in East Flatbush, and I began advocating for use of

9   noise cameras combined with an educational component

10  in 2016, attempting to engage with my elected leaders

11  which was unsuccessful.  I testified at the City

12  Council hearing on the Smart City on January 21,

13  2021, citing cities throughout the world that were

14  already piloting noise cameras.

15      I'm affiliated with organizations concerned with

16  acoustics and noise, but I'm not representing them at

17  this hearing.  I'm only speaking for myself and other

18  New Yorkers affected by vehicle noise who live in

19  areas of low 311 usage.  I'm here to request that the

20  city council and DEP look beyond NYC 311 data and

21  direct complaints to elected leaders when selecting

22  locations for noise camera placement.  A high volume

23  of 311 noise complaints might represent a prevalence

24  of high volume of noise, or it might represent

25  complaint behavior.  Low numbers of 311 noise

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                           206

1

2    complaints might represent a quiet area or might

3    represent a noisy area where residents are reluctant

4    or afraid to submit noise complaints.  There are

5    areas like mine where elected leaders don't have much

6    interest in or knowledge of noise pollution as a

7    health issue.  Most residents here don't use 311 or

8    complain directly to elected leaders, but they will

9    complain about noise in NYPD, Community Council, or

10   Build A Block sector meetings.

11       I suggest the following three ideas about using

12   broader methods of site selection and I ask the City

13   Council and DEP to consider the following:  Outreach

14   efforts that combine marketing and education as a

15   means of giving advanced warning to drivers,

16   educating about health risks of noise and marketing

17   use of reporting noise, and I'm going to send in my

18   updated testimony and October 24, 2011, TLC press

19   release that did this in such a super fantastic way.

20   [BELL RINGS]

21       SERGEANT AT ARMS:  Time expired.  Please wrap up.

22       MS. BATA:  Okay, comprehensive noise--

23       COUNSEL:  The next witness is Deitmar Detering.

24       MR. DETERING:  Thank you, Committee.  Thank you,

25   Chair Gennaro.  You have a packed agenda today, and I

Case 1:25-cv-02100-KPF   Document 16-2   Filed 07/01/25   Page 208 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
1       RESILIENCY AND WATERFRONTS                              207

2       regret that I can only speak to citizen noise

3       complaint matters.  The city kept this noise

4       complaint program a secret for over 50 years.  When I

5       inquired with the DEP in April of last year about how

6       to submit citizen noise complaints under Section 24-

7       261, the department had neither information, nor

8       forms, nor processes for this.

9           To this day, the DEP publishes no information

10      about citizen noise complaints.  It does not, and to

11      my knowledge, never did publish any information about

12      the city's rules against advertising noise pollution

13      either.  Why is that?  To fill the void and to

14      effectively answer all the requests that I received

15      about how to participate in the program, I've created

16      a how-to that I've shared as a Google Doc.  But soon

17      you can find it online at NYCquiet.org.  But it

18      really should be the DEP providing that information.

19      Please understand, Section 244 B is not about noise

20      coming from legitimate-- legitimate purposes.  If a

21      bar or restaurant is allowed in the course of the

22      business, then that is not advertising and the DEP

23      deems such complaints frivolous already.  Such

24      complaints will not become a summons, will not reach

25      the respondent and will not get to OATH.  However, if
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                                208

2    it can be shown that a business is purposefully

3    placing or using a speaker to be heard by the general

4    public, then such businesses must be held accountable

5    for such nuisance.  Then not with the noise, the

6    city's full of it, and the noise code.  But not just

7    protecting our hearing but also our attention must be

8    enforced.  Unlike noise from much of construction and

9    traffic, advertising noise only benefits the polluter

10    at the expense of its law-abiding competition in the

11    neighborhood, and all of us New York's denizens.

12    Making polluters stop has no effect on the industry

13    as a whole.  And all of us win some peace and quiet.

14    Intro 160 is pro-noise because it would give carte

15    blanche--

16        SERGEANT AT ARMS:  Time has expired.  Thank you.

17        MR. DETERING:  --seeking free advertising with

18    noise.  All they need to do is place the speaker--

19        COUNSEL:  The next witness is Leslie Clark.

20        SERGEANT AT ARMS:  Time starts.

21        MS. CLARK:  Hello, thank you.  I want to in--

22    investigate some of the words that are being used

23    here today.  They're talking about advertising and

24    just ambiance sound.  One of the representatives of a

25    restaurant even said that they-- why couldn't they

Case 1:25-cv-02100-KPF          Document 16-2          Filed 07/01/25          Page 210 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                    209

1
2    have their ambient sound outside when they were

3    having it inside?  There are two reasons for that.

4    One is that I live over those restaurants.  And I

5    don't want their ambient sound in my home.  The

6    second reason is that it's illegal.

7        The other thing is the use of the term

8    advertising in terms of noise.  All noise that comes

9    out of restaurants and bars is in fact advertising.

10   It is saying to the people walking by, "There's a

11   party in here come on in."  And the reason why these

12   things matter today, and the fact that they these

13   terms are not being used carefully at all in this

14   discussion today is that with the zoning text

15   amendment that passed a year and a half ago, the--

16   all restaurants will be allowed to keep their windows

17   and doors open at all times that they are in

18   operation.  And also with Local Law 121 that passed

19   in August, no restaurant can be restricted in its

20   hours to less than 14 hours.  So that-- put it all

21   together.  You've got you have people-- you have

22   restaurants who are going to be in business for 14

23   hours during which they will be allowed to keep their

24   windows and doors open at all times, basically

25   blasting their ambient music at me.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                            210

2       This is not something that we that we want as a

3   city.  The fact that people-- that there are citizen

4   enforcers out there is in fact a very good thing, and

5   the fact that in this committee hearing, they were--

6   it was said of citizen enforcers they are more

7   motivated by profit than by quality of life.  In

8   fact, that is an excellent description of many, many

9   restaurant and bar owners who are much more profit

10  motivated by profit than by the quality of life of

11  their neighbors, thank you.

12      SERGEANT AT ARMS:  Time has expired.  Thank you.

13      COUNSEL:  The next witness is Alfred Fuente.

14      SERGEANT AT ARMS:  Time starts.

15      Thank you, Chair for hearing me today.  And thank

16  you to the Committee for considering these bills.

17  I'm an attorney that represents restaurants and bars

18  before the State Liquor Authority, before Community

19  Boards, as well as before OATH.  And I'm-- I oppose

20  all the bills before the Committee.  We live in a

21  city right now that is not responding to the

22  disorderliness, the noise.  The police will not

23  respond to our calls.  We had somebody try to climb

24  up the scaffolding of our building the other day, and

25  we called the police, and they do not answer.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 212 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
   1   RESILIENCY AND WATERFRONTS                          211

   2       I'm also flabbergasted that two individuals have

   3   caused 90% of these problems, and that no one is

   4   considering taking action against them, whether it's

   5   the restaurant and bars that are affected, that can

   6   bring causative action against those two individuals,

   7   DEP, who's also profiting from the receipt of all of

   8   these of all the revenue generated-- generated by

   9   these tickets, that Mayor's Office of Special

  10   Enforcement can bring a proceeding against these

  11   individuals.  There needs to be enforcement--  Excuse

  12   me, there needs to be action taken by the restaurants

  13   themselves against the people that are causing all of

  14   these problems and all of these violations to be

  15   lodged against them.

  16       I understand and appreciate how unfair it is to

  17   them.  But nevertheless, it's also unfair to New

  18   Yorkers who are already living in a city littered

  19   with homeless people, marijuana use rampant

  20   everywhere, as well as open containers.  And we do

  21   not have any kind of authorities that are responding

  22   to our needs.  Because when you call the police, they

  23   don't-- they don't show up.  And when you call the

  24   precinct, you're told to call the police.  So we're

  25   living-- we're living in a place where the city
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 213 of 238

|   | COMMITTEE ON ENVIRONMENTAL PROTECTION, |
|---|---|

```
      COMMITTEE ON ENVIRONMENTAL PROTECTION,
  1   RESILIENCY AND WATERFRONTS                      212

  2   government is not answering the-- the neglect that is

  3   continuing to grow throughout the city, and instead

  4   we're going to be rewarded with-- with more noise and

  5   more chaos throughout the streets.  Thank you for

  6   your time and thank you for considering my testimony.

  7        COUNSEL:  The next witness is Deborah Farley.

  8        SERGEANT AT ARMS:  Time starts.

  9        MS. FARLEY:  Thank you.  My name is Debbie Farley

 10   and I have resided in Sunnyside for 72 years.  My

 11   perspective on noise violations, and who was most

 12   negatively impacted by it is diametrically opposed to

 13   those of businesses that gave testimony today.  My

 14   apartment building is adjacent to two restaurants.

 15   Both have dining sheds, both have curbside dining,

 16   and one restaurant has backyard seating.  All of my

 17   windows face either the street or avenue sides of

 18   these dining establishments.

 19        Because of the proximity of the two restaurants

 20   to my building, I cannot escape the raucous noise

 21   outdoors.  In an attempt to deafen the noise my

 22   apartment windows have been remained permanently shut

 23   for the last three years.  To watch television, hold

 24   a simple conversation, or get a restful night's

 25   sleep, my windows must remain closed.  My stress and
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 214 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                        213

2  anxiety levels have risen sharply due to the

3  interrupted sleep patterns.  The excessive noise

4  level makes falling and staying asleep impossible.

5      Living with windows that are permanently sealed,

6  never feeling fresh air gives me a feeling of

7  entrapment inside of my apartment.  Both restaurants,

8  dining sheds, and curbside dining areas are packed

9  with large noisy crowds every night of the week.

10 Live entertainment is often on weekends and

11 performances are amplified with outdoor speakers and

12 microphones.  When there is no live entertainment,

13 the music being played inside the restaurant is

14 played to outdoor speakers mounted onto the sheds.

15 Even during the days and nights when there are no

16 customers seated outside, music is blasting through

17 speakers mounted onto the shed.  Sunnyside is a

18 residential, family-oriented community.  Living 20

19 feet away from these restaurants demands that

20 measures need to be adopted to address the chronic

21 noise violations and lack of enforcement.  Exposure

22 to hours of continuous loud noise contributes to

23 sleep disturbances, sleep deprivation, high blood

24 pressure, heart disease, anxiety, and stress.

25      SERGEANT AT ARMS:  Time has expired.  Thank you.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 215 of 238

```
        COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1      RESILIENCY AND WATERFRONTS                          214

 2          COUNSEL:  The next witness is Ernest Welde.

 3          SERGEANT AT ARMS:  Time starts.

 4          MR. WELDE:  My name is Ernest Welde, and I'm

 5      speaking in opposition to Intro 1194.  Removing the

 6      only productive thing about the noise code

 7      incentivizing citizen enforcement is an awful idea.

 8      I live in New York City.  Although I have not filed

 9      any noise complaints myself, I fully support the

10      citizen reporting component and I participate in the

11      citizen component of the idling law.  At my day job,

12      I'm an attorney and a legislative director at an

13      environmental health-based nonprofit.  I studied

14      legislation and work with legislators to enact

15      protect-- protective laws.

16          I believe that the noise law should be omitted

17      for clarity but you all should be extremely skeptical

18      of what Intro 1194 will actually do.  It will destroy

19      the citizen component of the noise complaint system,

20      the only thing that it's actually working to protect

21      residents from excessive and unlawful noise.  New

22      York City citizen program is the best legislation in

23      America that I know of to deal with daily micro-

24      violations such as excessive unlawful noise.

25
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 216 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              215

1

2       Giving citizens the power to record these

3   violations and receive a percentage of the proceeds

4   is pure genius and the model to emulate.

5   Councilmember Powers is absolutely correct:  Noise

6   creates a lot of health issues.  Excessive noise can

7   be a major environmental problem impacting the health

8   and well-being of residents of New York, and this

9   creates a broad range of issues including general

10  annoyance, sleep disturbance, negative effects on the

11  cardiovascular and metabolic system, as well as

12  cognitive impairment in children.  Excessive noise

13  can take years off one's life.  Intro 1194-- if Intro

14  1194 passes, it will regulate the noise reduction

15  program to the Silent Night Program of Bloomberg's,

16  the same dark and lonely, and place zero enforcement.

17  A minuscule number of tickets were issued before

18  this, and after-- if 1194 passes, a miniscule number

19  will pass.  There seems to be a focus on what

20  citizens are making on this program and accusing them

21  of abusing the system, but the real focus should be

22  on how much benefit the citizens have brought to

23  these communities by making them more peaceful and

24  quiet places to live.  Excessive unlawfully loud

25  noise is a huge environmental problem, and there was

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                                216

2   no enforcement.  This year there is enforcement, and

3   we are seeing huge changes.  Chair Gennaro, I saw

4   that you identified the citizens enforcers as the fly

5   in the ointment.  Unfortunately, I believe you got it

6   wrong.  Excessive noise from commercial

7   establishments is the actual fly in the ointment.

8   The ointment is the peaceful enjoyment of our

9   environment.

10       We New Yorkers have a lot to deal with.

11  Excessive noise is one of those, and this is a

12  program that is stopping that excessive noise.

13       SERGEANT AT ARMS:  Time has expired.  Thank you.

14       COUNSEL:  The next witness is Diana Mauer.

15       SERGEANT AT ARMS:  Time starts.

16       COUNSEL:  Diana Mauer.

17       SERGEANT AT ARMS:  Time starts.

18       COUNSEL:  The next witness is Hunter Severini.

19       SERGEANT AT ARMS:  Time starts.

20       MR. SEVERINI:  Hello, my name is Hunter Severini.

21  I'm a resident of downtown Manhattan.  And I would

22  like to testify against any and all bills weakening

23  citizen noise enforcement, particularly the two bills

24  that were mentioned earlier, those being 1194 and

25  160.  I live in the Central Business District.  And

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          217

1

2     like Debbie, who just testified, I literally cannot

3     open my window.  It's a nightmare.  I live on a high

4     floor.  And yet I don't ever get to have fresh air

5     because anytime I do, it's just a constant barrage of

6     noise.  So my suggestion to the Council is that they

7     should look into using technology to enforce noise,

8     such as unnecessary honking, which is like a virus in

9     the city, or like a cancer pretty much because it's

10    like we don't know how to get rid of it.

11        You know, there are other things.  Even dog

12    barking.  I mean, DEP is in charge with enforcing

13    stuff, but they basically-- they're under resourced

14    as well.  But they also don't really go out of their

15    way to help.  I've made numerous complaints about

16    things that have, you know, and at most gotten a

17    letter in response, not any kind of like in-person

18    visit, which is, you know, them kind of saying, "We

19    don't really believe you."

20        And then looking at all these businesses that

21    testified most of them seem to have been notified but

22    not done anything.  Like they all seem to have 10 or

23    20 violations, and like I really don't think-- maybe

24    if they got a few at once, I really don't think they

25    all came on the same day.  So I don't really buy

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                                  218

1

2       this.  I think that these people are some-- are, you

3       know, acting surprised.

4           But we live in a country of laws.  Ignorance does

5       not excuse guilt.  I think there are plenty of people

6       who would have common sense after receiving one of

7       the summons say, "What it is for?"  Go to the

8       hearing.  Was found in violation, and corrected the

9       problem.

10          And besides that, I really disagree with the tone

11      of this hearing.  I think it's been conducted in a

12      one-sided manner.  You know, Councilmember Gennaro, I

13      would appreciate much more impartiality from your

14      end.  I don't think the way that you've presented

15      this is respectful to the citizens who have taken

16      opposing positions.  Whatever, you know, the outcome

17      of all these hearings and bills is, there are points

18      to be heard on all sides.  And if I, openly saying

19      that one side is right does not encourage people to

20      come forward and testify against bills.

21          SERGEANT AT ARMS:  Time has expired.  Thank you.

22          COUNSEL:  The next witness is Hayden Brocket.

23          SERGEANT AT ARMS:  Time starts.

24          MR. BROCKETT:  Good afternoon.  My name is Hayden

25      Brockett.  I'm a lawyer.  My family and I live in

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                         219

 2   Manhattan.  I've never filed a commercial noise

 3   complaint, so unlike the businesses and lobbyists who

 4   testified today, I don't have a financial

 5   disincentive here, or a conflict of interest, but I

 6   urge the Committee to oppose Intros 160 and 1194

 7   because they will both harm-- they will both New

 8   Yorkers' health and undermine citizen enforcement

 9   laws that are already on the books and working.

10       Noise hurts our health, just plain and simple.

11   And as Chair Gennaro and Mr. Holden said at the

12   outset of the Committee hearing, in the last 20

13   years, New York has gotten noisier.  And that's

14   because right now, for the most part of our noise

15   code, the so-called objective standard actually means

16   no enforcement.  That's how businesses like it.

17       Almost no noise enforcement takes place because

18   only the DEP or the NYPD can issue a ticket.  And

19   they don't show up for 7 to 10 days and they don't

20   write summonses.  You need boots on the ground.

21   Citizen enforcement works.  Complaints are down 13%.

22   And if you want to tweak around the edges, fine, but

23   you don't need to change the law.  Councilman Holden,

24   you asked for feedback.  And as written Intro 160

25   will make it impossible for ordinary New Yorkers to
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 221 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                        220

 2   make commercial noise complaints.  If it passes, in

 3   effect, you'll have that same system that you were

 4   talking about that you don't like where it's only the

 5   DEP or the NYPD, that'll be everywhere.  And there'll

 6   be no effective enforcement.  Only if the DEP shows

 7   up at the right time with the right equipment, and it

 8   can get the offending business when they're still

 9   doing it will there ever be a violation issued. That

10   is not an objective standard that is an unenforceable

11   standard.

12       This system doesn't work for other parts of our

13   noise code.  It does work for commercial noise

14   pollution.  Commercial noise pollution is about

15   money.  The businesses who pump speakers onto our

16   streets for every passerby to be assaulted are in it

17   for the money.  We-- Jobs make money when people walk

18   in the door.  And so do bars and restaurants.  They

19   actually-- the bars and restaurants that break the

20   law are hurting the bars--

21       SERGEANT AT ARMS:  Time has expired.  Thank you.

22       MR. BROCKETT:  Thank you.

23       COUNSEL:  The next witness is Michael Streeter.

24       SERGEANT AT ARMS:  Time starts.

25
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                        221

2      MR. STREETER:  Hi, I wanted to-- to express my

3  support for most of the Introductions being discussed

4  today.  I think they're mostly solid and necessary.

5  And I want to thank Mr. Powers for introducing them.

6  But I wanted to use my time to speak out against

7  Intro 160 and Intro 1194, even though I've never

8  filed such a complaint myself.

9      311 has been completely useless in addressing

10  noise complaints for years, nothing happens and if

11  someone does get sent over to inspect, it's a

12  Michigan J. Frog situation where you'd have to luck

13  out that they show up at a time where the-- where the

14  noise issue isn't temporarily off or long gone.  Or

15  you get an officer who tells you, "Hey, this is New

16  York.  Go move to Ohio."  It's a joke.  We all know

17  this.  We need video and audio evidence from

18  citizens.  I disagree with Chair Gennaro's statement

19  that there was that-- there was enforcement before

20  the bounty hunters came along.  There-- There has

21  been a huge difference since citizens have been

22  submitting complaints.  Even just six of them.

23  Gutting this citizens' program would take away the

24  most valuable tool that we have in addressing illegal

25  noise pollution from food shops, restaurants, weed

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                              222

2   shops, the cell phone stores, and the like.  We

3   shouldn't have to put up with this.

4       You know, these lawyers got to go on earlier for

5   like 20 minutes.  And it really seems like they're--

6   they're running the show here.  The fact remains that

7   commercial noise is a huge problem.

8       One thing I wanted to bring up that hasn't been

9   really been discussed is that this this music when

10  you pass a food place, or a weed shop, or whatever,

11  it's overstimulation.  And that's something that a

12  lot of people struggle with, or they're struggling

13  with this with their children or loved ones.  There's

14  enough noise from traffic, but music of varying

15  levels of volume and annoyance to divert our

16  attention, which is advertising, that's illegal and

17  we-- we didn't opt into that.  I think people are--

18      SERGEANT AT ARMS:  Time expired.  Thank you.

19      CHAIRPERSON GENNARO:  Thank you.

20      COUNSEL:  The next witness is Michelle Compo.

21      SERGEANT AT ARMS:  Time starts.

22      MS. CAMPO:  Hello.  Do you hear me?

23      SERGEANT AT ARMS:  We can hear you.

24      MS. CAMPO:  Good.  Okay.  I represent most of

25  Little Italy in Manhattan as well as the Bowery Block

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 224 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1   RESILIENCY AND WATERFRONTS                          223

2   Association.  The idea of weakening these Intro bills

3   that has been long accepted-- the bills have been

4   long accepted, hard won with restrictions that-- and

5   wanted restrictions because what-- what is

6   recommended is an assault on myself, my family, and

7   the residents of New York City.  Restaurant noise is

8   already at ear damaging levels with little to no

9   compliance to existing restrict, no adherence.

10  Calling 311 is kind of a joke.  A rough joke.

11      Community residents are, or should be as

12  important as the restaurants.  Unbelievable to even

13  propose 14 hours a day.  Noise pollution is well

14  documented as having adverse health outcomes.  Are

15  individuals to be considered more important than our-

16  - Excuse me.  Are restaurants to be considered more

17  important than residential well-being?  I think

18  that's what you're trying to say.

19      Residents also work from home and we need our

20  sleep.

21      Also, legally speaking, as was mentioned before,

22  ignorance of the law is not an excuse.  And I agree

23  that this has been a very unbalanced hearing.  Very.

24  We're all very frustrated and very annoyed.  And we

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 225 of 238

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                      224

 2   live here, and we've lived here all our lives, and

 3   you should have some respect for that.  Thank you.

 4      CHAIRPERSON GENNARO:  Thank you.

 5      COUNSEL:  The next witness is Laura Sewell.

 6      SERGEANT AT ARMS:  Time starts.

 7      COUNSEL:  Laura Sewell?

 8      SERGEANT AT ARMS:  Time starts.

 9      MS. SEWELL:  I apologize.  I'm having trouble

10   with my laptop.  I'm Laura Sewell.  I'm the Director

11   of the East Village Community Coalition, which has

12   long worked to support the local individual

13   businesses that make our neighborhood unique, and to

14   support local residents in seeking a balanced quality

15   of life in an area well known to be oversaturated

16   with nightlife establishments.  And I want to thank

17   everyone contributing to productive conversation on

18   this today, because we definitely need additional

19   help.

20      One thing:  Outdoor speakers have always been and

21   should continue to be prohibited in outdoor dining in

22   New York City.  The burden is on residents as always

23   to support-- report them and work with the Community

24   Board, Council Office, and precinct to educate

25   businesses and work to get them removed.  But we have
```

```
     COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1   RESILIENCY AND WATERFRONTS                      225

 2   had some success with that in our area.  I know it's

 3   not citywide, and it should be.

 4       But we do want to clarify that we are only

 5   talking about sound emanating from within a business

 6   here.  To my understanding, I guess that's a question

 7   you can tell me if I'm wrong when I'm done.  Our main

 8   comment on Intro 160 is that if the Council is

 9   considering a change, rather than completely

10   exempting what's commonly known as background level

11   music from within an establishment, why not define a

12   reasonable cap on the volume of music in decibels

13   (not dBA; thank you to the gentleman from

14   Acoustilog).  We don't have the expertise to state

15   what that level would be, but in layman's terms, if I

16   have to shout to be heard by my companion passing by,

17   or if the person on the other end of the phone wants

18   to know what the heck is that, it's too loud.

19       For Intro 1194, you know, the city has

20   increasingly turned to citizen enforcers for help

21   with handling standing violations such as idling, and

22   we find no reason why citizen enforcers could not be

23   continued to be helpful in enforcing DEP violations,

24   given appropriate parameters.  I've heard some

25   horrible things here today.
```

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 227 of 238

```
       COMMITTEE ON ENVIRONMENTAL PROTECTION,
   1   RESILIENCY AND WATERFRONTS                     226

   2       SERGEANT AT ARMS:  Time expired.  Thank you.

   3       CHAIRPERSON GENNARO:  Thank you.

   4       COUNSEL:  The next witness is Lisa Ann Chapman.

   5       SERGEANT AT ARMS:  Time starts.

   6       MS. CHAPMAN:  Hello?

   7       SERGEANT AT ARMS:  We can hear you.

   8       MS. CHAPMAN:  Hi.  Yeah, my name is Lisa Chapman.

   9   I'm a resident living in a mixed-use neighborhood,

  10   with a hotel, with a nightclub and restaurants that

  11   operate sometimes until two or four o'clock in the

  12   morning, and I've tried all means, 311.  They also

  13   have a smog hog.  And you know, I've been to DEP and

  14   311.  I just-- The noise codes or-- or the-- what's

  15   available to me as a resident who can't sleep is-- is

  16   limited and I just-- I just want to say that I can't-

  17   - I just would urge-- I understand the issues, but I

  18   would urge that we not be further restricted from our

  19   ability to live peacefully and-- and get sleep

  20   especially at two o'clock in the morning.  Anything

  21   after midnight, and I agree with-- with what's said

  22   about-- there should be a way to measure it.  There

  23   should be a decibel level that's livable for the

  24   residents, that also-- you know, in this situation,

  25   the-- the venues that the-- that the hotel has have
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                            227

1

2    glass walls and rooms that open up.  So when the

3    nightclub is in full swing, in the middle of the

4    night, the noise that's emanating from them is not

5    one that a person can live with or sleep with.  And

6    you know, I have young children and I have elders

7    here at home.

8        And so I just think that there needs to be a

9    recognition of the that there has to be a level

10   that's-- that's livable.  And it just-- that's it.

11   Thank you.

12       CHAIRPERSON GENNARO:  Thank you.

13       COUNSEL:  Next is Micki McGee.

14       SERGEANT AT ARMS:  Time starts.

15       MS. MCGEE:  Thank you very much for having this

16   hearing.  I want to express my gratitude to

17   Councilmember Holden for still being here.  It is my

18   understanding, although I can't see it on my own

19   screen, that the Chair has left the meeting.  And I

20   hope--

21       CHAIRPERSON GENNARO:  I'm here.  I'm here.  I'm

22   Jim Gennaro.  I'm the Chair.  I'm here.

23       MS. MCGEE:  Okay.  Fantastic.  Thank you.

24   Earlier in today's testimony, Robert Bookman, the

25   chief lobbyist for the Hospitality Alliance, and the

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1  RESILIENCY AND WATERFRONTS                              228

2  prime architect of the open restaurants program,

3  testified that ever since Bloomberg moved to move us

4  to an objective noise standard, we have lived happily

5  ever after, until recently with the emergence of the

6  citizen noise complaints, the rediscovery of this

7  law.

8     I am here to testify that Mr. Bookman's Happily-

9  Ever-After is my neighborhood's living hell.  I live

10  in the South Village.  I live in the community

11  district where we have 1000 outdoor dining sites.  We

12  have so many per square mile, it is unbearable.

13     So what Mr. Bookman has wrought, Mr. Bookman is

14  seeing the return of.

15     I want to share with you the sound from MacDougal

16  street, which is around the corner.  And I have

17  elderly neighbors living there in rent stabilized

18  units who have reached out to our neighborhood group

19  to ask what they can do.  This is what it sounds

20  like.  I'm only going to play you 30 seconds of it.

21     CHAIRPERSON GENNARO:  The purpose of this hearing

22  is to get testimony not to put on a display.  And so

23  I'm not inclined to grant this.  I know what noise

24  sounds like.  I'm sure it's going to be noisy.  Next

25  witness please.  This is not testimony.

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 230 of 238

```
         COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1       RESILIENCY AND WATERFRONTS                        229

 2           COUNSEL:  Next is Mitchell Grubler.

 3           SERGEANT AT ARMS:  Time starts.

 4           COUNSEL:  Mitchell Grubler?

 5           MR. GRUBLER:  Yes, I'm here.  I'm with the Bowery

 6       Alliance of Neighbors.  I'm a senior living in

 7       Mitchell Lama housing.  And it's not enough to

 8       restrict noise when it's just in the interior.  The

 9       interior noise permeates to the outside.  Doors open

10       and close by the waitstaff and by patrons.  I live

11       across the street from a hotel with a bar on the

12       roof.  I can't-- I cannot keep my windows open

13       because of the noise that comes from that bar.  And

14       it's not just a matter of what sound can reach the

15       sidewalk.  The sound comes up from that bar into my

16       windows.  We would like to have fresh air in our

17       apartment when the weather is nice.  And I am

18       deprived of that right of that fresh air as a result

19       of the noise that permeates from that bar on the

20       roof.  Thank you.

21           CHAIRPERSON GENNARO:  Thank you, sir.

22           COUNSEL:  The next witness is Susan Ginsburg.

23           SERGEANT AT ARMS:  Time starts.

24           MS. GINSBURG:  Yes, hello.  I live in the West

25       Village and I agree with all of the people that are
```

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                            230

1

2    very articulate about why we stand against these two

3    new laws.  We have been suffering, especially living

4    near NYU's dorms, with noise.  And we complain.  I

5    didn't even know that there was this thing of these

6    bounties.  But we call 311.  We can call the

7    precinct.  And the restaurants-- I have a bar on the

8    corner, that they are not supposed to open their

9    windows on my block, for the noise to come in that

10   they are playing their music inside.  And, of course

11   they do.  I live about three doors from them.  And

12   it's excruciating.  I have to go one o'clock in the

13   morning, two o'clock in the morning, go into the bar

14   and say, turn your music down, please.  Do I report

15   it?  Sometimes.  Sometimes not.  I call the owner.

16       We just-- it's just not going to change.  It's

17   not going to stop until somebody says that you're

18   going to be punished for this.  Or when you get your

19   liquor license, that you have to abide by a certain

20   kind of decibel level, and if you don't, we're going

21   to fine you.  I mean, I just think that-- I just

22   think that that's the reasonable way to operate in

23   New York City.  We live here.  And somehow to the

24   restaurant industry, that doesn't seem to matter.

25   And we think that this is just an excuse for them to

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 232 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                              231

2    want with the new law that they can have outdoor

3    dining with music, which we will-- We're just going

4    to have to leave.  We're-- I'm a senior.  And it's--

5    it just makes you want to cry, half of our lives.

6    That's it.  I don't have any of the things.

7        CHAIRPERSON GENNARO:  Thank you.

8        COUNSEL:  Next is Victoria Hillstom.

9        SERGEANT AT ARMS:  Time starts.

10       Hello, can you hear me?

11       CHAIRPERSON GENNARO:  Yes, we can do it.

12       MS. HILLSTOM:  Yes.  Thank you.  Thank you very

13   much for having me.  I would first like to say that

14   Intro at 160, and I believe it's 1194, your other

15   bills are absolutely beyond the pale.  I am a

16   resident of Tribeca, 385 Greenwich, aka 71 North

17   Moore, since 1982.  Many of our neighbors left during

18   the pandemic over the absolute chaos on our streets

19   from-- from the outdoor dining.  The noise is

20   absolutely untenable.

21       And I would just like to say, a quite famous

22   restauranteur is above me, Carlos Omada.  We've

23   designed nightclubs around the world.  Our work has

24   been published.  We've worked with Ian Schrager,

25   Andre Blahs.  Really all the best and brightest.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                              232

1

2    We've designed the most relevant nightclubs in the

3    world.  And I would just like to say that these bills

4    are really just beyond the pale.  New York City has

5    become a laughingstock.  We don't open our doors and

6    windows and advertise.  There isn't a credible

7    nightclub operator in the world-- they don't do this

8    in Paris or London.  And so I would also like to

9    share in the sentiment that Mr. Bookman can certainly

10   bring suit against these two bounty hunters, which

11   really nobody has ever heard of.  And I am the last

12   person in the world to be speaking out against

13   restauranteurs.  I would not do it.

14       SERGEANT AT ARMS:  Time expired.  Thank you.

15       COUNSEL:  Next is Zack Weinstein.

16       SERGEANT AT ARMS:  Time starts

17       MR. WINESTINE:  Sorry, I'm having trouble with my

18   computer.  Yeah, Hi.  My name is Zach Winestine with

19   St. Gansevoort.  St. Gansevoort is an organization

20   that deals with quality of life, landmarking, and

21   land use issues in the Meat Market and far West

22   Village area.

23       As you folks know, noise is a huge problem

24   citywide.  This has been mentioned in almost city--

25

Case 1:25-cv-02100-KPF    Document 16-2    Filed 07/01/25    Page 234 of 238

COMMITTEE ON ENVIRONMENTAL PROTECTION,
RESILIENCY AND WATERFRONTS                          233

1
2   every citywide survey.  It's mentioned in the number

3   of 311 calls.

4       What I'm puzzled by at this hearing is it appears

5   that the bad-faith actions have to citizen enforcers

6   who are intentionally incorrectly interpreting the

7   law is being used as an excuse to significantly

8   weaken the citywide noise code.  The solution isn't

9   to change the code the solution is to correctly

10  enforce it the existing code.  The specific concern

11  that I have is the same that that was brought up by

12  the representative of Acoustilog.  They shortchanged

13  themselves.  Acoustilog is one of the most highly

14  respected noise consulting businesses in the city.

15      As they said, removing the unreasonable noise

16  language from Subdivision B of Section 24-218 leaves

17  only the specified decibel levels as a constraint

18  upon noise.  And the problem is that those decibel

19  levels are specified as A-weighted decibel levels,

20  dBa.  DBA does not, contrary to what was said earlier

21  in this hearing, mimic human hearing.  At normal

22  listening music listening volume levels dBA filters

23  out the deep bass frequencies.  And as we all know,

24  it's the deep bass that creates the noise problems

25  when establishments are playing loud music.  It's the

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                        234

2    deep bass that travels distances, that travels

3    through the walls, that travels through ceilings, and

4    creates the profound disturbances that community

5    residents feel.

6        It is essential that if the council wishes to

7    rely upon specific decibel levels, they've got to be

8    defined as C weighted.  It's the alternate way of

9    measuring sound, of measuring decibels.  It

10   incorporates the deep bass and the bass levels and

11   more authentically replicates the disturbing sounds

12   that you hear.

13       SERGEANT AT ARMS:  Time expired here.  Thank you.

14       CHAIRPERSON GENNARO:  Thank you very much.  That

15   was very compelling testimony.  I appreciate that,

16   the bass stuff.

17       COUNSEL:  If we have inadvertently missed anyone

18   that has registered to testify and has yet to have

19   been called, please use the Zoom hand function if you

20   are testifying remotely and you will be called in the

21   order that your hand has been raised.

22       Seeing none, we will return to the in-person

23   testimony.  The next panel is Alex Stein.

24       MR. STEIN:  Are the mics hot?  All right.

25   Finally, it took forever for me to be able to speak.

COMMITTEE ON ENVIRONMENTAL PROTECTION,
1    RESILIENCY AND WATERFRONTS                          235

2    Alright guys, I am primetime Alex Stein.  I have a

3    little mom-and-pop adult bookstore and we get fined

4    like crazy on gloryhole night.  We play the music

5    loud.  We're getting fines.  They're coming there.

6    People are complaining.  The bounty hunters they're

7    on us, partially because my wife's boyfriend is--

8    well, her ex-boyfriend is a bounty hunter.  But

9    that's neither here nor there.  Now what is my

10   biggest complaint, is on 45th Street at the Roosevelt

11   Hotel.  You have every illegal Venezuelan out there

12   hooting and hollering.

13       CHAIRPERSON GENNARO:  That's off topic.

14       MR. STEIN:  No, no, no.  I'm saying--

15       CHAIRPERSON GENNARO:  That's off topic.

16       MR. STEIN:  But I tried to report them, right?

17       CHAIRPERSON GENNARO:  That's off topic.

18       MR. STEIN:  Gennaro, no, no , no.  I tried to

19   report them for their sound.

20       CHAIRPERSON GENNARO:  Thank you.

21       MR. STEIN:  They're out there.  No, no, I'm

22   saying they're hooting and hollering.  They're just

23   going, ay-yi-yi-yi-yi.  And then the Haitians--

24       CHAIRPERSON GENNARO:  Sergeant, turn off the

25   microphone.

```
                COMMITTEE ON ENVIRONMENTAL PROTECTION,
 1              RESILIENCY AND WATERFRONTS                      236

 2                  MR. STEIN:  And I try to report the Haitians, and

 3              then the Haitians-- and they're having a turf war--

 4                  CHAIRPERSON GENNARO:  Turn off the microphone.

 5                  MR. STEIN:  --and I'm just trying to get their

 6              attention, and I'm trying to call the bounty hunter.

 7                  CHAIRPERSON GENNARO:  Can I have the microphone

 8              turned off please?

 9                  MR. STEIN:  But you guys aren't doing anything.

10              I mean, it sounds like a little-- like a fiesta.

11              They're just out there dancing.  This is what it

12              sounds like.  This is what it sounds like.  Their

13              Bluetooth speakers.  Gennaro, and I'm just I'm just

14              sick of it.  I'm trying to complain, and I'm trying

15              to live in this city.

16                  CHAIRPERSON GENNARO:  This is off topic.

17                  MR. STEIN:  I'm a pimp on a blimp and I'm trying

18              to complain, and you don't do anything.

19                  CHAIRPERSON GENNARO:  Turn off the microphone

20              please.  This hearing is adjourned.

21                  [GAVEL]

22

23

24

25
```

C E R T I F I C A T E

World Wide Dictation certifies that the

foregoing transcript is a true and accurate

record of the proceedings.  We further certify

that there is no relation to any of the parties

to this action by blood or marriage, and that

there is interest in the outcome of this matter.



Date _____ 11/13/2023 _____