# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------ x
DIETMAR DETERING, YOAV EREZ, DEBORAH FARLEY,
MITCHELL GRUBLER and FREDERIC HILLS,

         Petitioners,     Index No. 159847/2023

     - against –       **AMENDED
                  VERIFIED PETITION**

NEW YORK CITY ENVIRONMENTAL CONTROL
BOARD, OFFICE OF ADMINISTRATIVE TRIALS
AND HEARINGS, THE NEW YORK CITY COUNCIL
and ERIC ADAMS, in his official capacity as the Mayor of
the City of New York,

         Respondents.
------------------------------------------------------------------------ x

    Petitioners Dietmar Detering, Yoav Erez, Deborah Farley, Mitchell Grubler, Frederic

Hills, and Michael McFadden ("Petitioners") for their Amended Verified Petition pursuant to

CPLR Article 78 and 3001, allege as follows:

### INTRODUCTION

    1.  This Article 78 and declaratory judgment action challenges recent legislative and

administrative actions undertaken by the City of New York to unconstitutionally and unlawfully

nullify the citizen complaint provision of the New York City Noise Control Code ("Noise

Code") set forth in Title 24, Chapter 2 of the New York City Administrative Code.

    2.  First, The Environmental Control Board ("ECB"), by virtue of an unprecedented,

arbitrary, capricious and unconstitutional broad based and sweeping rule making resolution

promulgated and published in or about August 17, 2023 (see Resolution annexed hereto as

Exhibit "A" hereinafter referred to as the "Resolution"), along with related policy, practice and

administrative determinations, virtually nullified the Citizen Complaint provision of the Noise

Code, established by § 24-244(b) and the companion Citizen Complaint provision of § 24-261 of the Administrative Code (collectively, "Citizen Complaint provision").

3.      Second, on December 6, 2023, the City Council passed Intro 1194-A, which put the lid on the coffin of citizen complainant enforcement. The new legislation compounded the previously promulgated arbitrary administrative rules and practices by capping the compensation citizen complainants can receive when their complaints prompt proceedings under subdivision (b) of §244 of the Noise Code at $5 to $10, and dramatically reducing penalties for pending noise summonses.

4.      Previously, citizens were receiving, where penalties based on § 24-244(b) were collected from violators, between $110 and $2,625 for their complaint and/or prosecution efforts. The reduction in payment is on the order 95.5% to 99.6%, a near total diminishment. Intro 1194-A also reduces the penalties on pending § 24-244(b) summonses, but only if they are based on citizen complaints, from $440 - $5250 to only $50, a reduction of 88.6% to 99%.

5.      The newly enacted statute combined with unlawfully arbitrary and capricious administrative actions and the August 17, 2023 Resolution eviscerates New York City's longstanding policy to incentivize the citizenry to enforce the New York City Noise Code, thereby creating deterrence to unlawful behavior.

6.      As set forth herein, these legislative and administrative actions were undertaken in violation of legislative and rulemaking procedures set forth in the *New York City Charter* and the environmental laws set forth in the City Environmental Quality Review ("CEQR") statutes rules and regulations.

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 4 of 56

7.    Over five decades ago, the New York City Council did an in-depth investigation and issued findings determining that New York City executive branch agencies were unwilling or unable to effectively enforce noise regulations.

8.    The City Council found that despite abusive conduct by commercial establishments creating widespread noise related nuisances, very little enforcement was being undertaken by the agencies responsible for Noise Code enforcement. Therefore, the City Council established a mechanism to incentivize citizen enforcement. This mechanism was adopted in 1972 in Title 24, Chapter 2 of the New York City Administrative Code.

9.    Title 24, Chapter 2 of the New York City Administrative Code expressed the paramount importance of regulating unhealthy and dangerous noise pollution in its statement of legislative purpose by stating, *inter alia* in § 24-202:

> It is hereby declared to be the public policy of the city to reduce the ambient sound level in the city, so as to preserve, protect and promote the public health, safety and welfare, and the peace and quiet of the inhabitants of the city, prevent injury to human, plant and animal life and property, foster the convenience and comfort of its inhabitants, and facilitate the enjoyment of the natural attractions of the city. It is the public policy of the city that every person is entitled to ambient sound levels that are not detrimental to life, health and enjoyment of his or her property. It is hereby declared that the making, creation or maintenance of excessive and unreasonable noises within the city affects and is a menace to public health, comfort, convenience, safety, welfare and the prosperity of the people of the city. . . . This code shall be liberally construed so as to effectuate the purposes described in this section.

10.    By virtue of the perceived ineffectiveness of New York City agencies to enforce the Noise Code, §24-261 of the New York City Administrative Code empowers and incentivizes citizens to act as private attorneys general in maintaining a healthful environment by enforcing the Noise Code through private action, when the New York City Department of Environmental

3

Protection ("DEP") refuses or fails to take action in response to legitimate citizen complaints.

§24-261 states *inter-alia* as follows:

> (a)    Any person other than personnel of the department and employees of the city of New York authorized by law to serve summonses for violation of the code may serve upon the department a complaint in a form prescribed by the commissioner alleging that a person has violated a provision of this code set forth in table VI, below, or an order or regulation promulgated under such provision together with evidence of such violation.

> (d)    In any proceeding brought by the department after receiving a complaint pursuant to subdivision (a) of this section, the board shall award the complainant, out of the proceeds collected, fair and reasonable compensation, which shall not exceed twenty-five percent of the proceeds collected, for disclosure of information or evidence not in the possession of the department, which leads to the imposition of the civil penalty.

> (e)   In any proceeding brought by a complainant, the board shall award, out of the proceeds collected, fifty percent of any civil penalty as fair and reasonable compensation to such person.

11.    On December 6, 2023, as a result of intense lobbying and behind the scenes donations to City Council Environmental Chair, James Gennaro, the City Council rushed through Intro 1194-A by thwarting public comment, truncating public debate, prematurely cutting off or refusing to allow those in opposition to voice their opinion, violating multiple statutory safeguards, and violating environmental rules and safeguards by failing to weigh the impact of unrestrained noise.

12.    The newly enacted legislation challenged herein will arbitrarily cap all citizen complainant compensation at $5 for proceedings brought by DEP and $10 for proceedings brought by citizens. The new law states the following:

4

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 6 of 56

A local law to amend the administrative code of the city of New York, in relation to compensation awarded by the environmental control board to complainants for citizen noise complaints and to the maximum penalty authorized for violations of subdivision (b) of section 24-244 of such code for certain proceedings.

Be it enacted by the Council as follows:

Section 1. Subdivisions (d) and (e) of section 24-261 of the administrative code of the city of New York are amended to read as follows:

(d) In any proceeding brought by the department after receiving a complaint pursuant to subdivision (a) of this section, the board shall award the complainant, out of the proceeds collected, fair and reasonable compensation, which shall not exceed [twenty-five] 25 percent of the proceeds collected, for disclosure of information or evidence not in the possession of the department, which leads to the imposition of the civil penalty; provided that for any proceeding brought by the department after receiving a complaint pursuant to subdivision (a) of this section alleging a violation of subdivision (b) of section 24-244, the board shall award the complainant, out of the proceeds collected, compensation in the amount of $5.

(e) In any proceeding brought by a complainant, the board shall award, out of the proceeds collected, [fifty] 50 percent of any civil penalty as fair and reasonable compensation to such person; provided that for any proceeding brought by a complainant alleging a violation of subdivision (b) of section 24-244, the board shall award, out of the proceeds collected, compensation in the amount of $10 to such person.

§ 2. Notwithstanding the amount of the civil penalties described in table 1 of paragraph 5 of subdivision (b) of section 24-257 of the administrative code of the city of New York, the maximum amount of a civil penalty authorized to be imposed for a violation of subdivision (b) of section 24-244, in any proceeding commenced prior to the effective date of this local law pursuant to section 24-261 of such code for which a final decision and order has not been rendered prior to such date, shall be $50. § 3. This local law takes effect immediately.

5

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction to decide this Petition pursuant to §§3001 and 7803 of the New York Civil Procedure Law and Rules.

14.     The challenged actions result from the Resolution rendered by the ECB in or about August 17, 2023 at 66 John Street, New York, and the passage of Intro 1194-A ("new law") on December 6, 2023.

15.     This Petition challenges these actions because Respondents 1) acted contrary to Article 1, Section 19 of the New York State Bill of Rights that enshrines basic environmental protections into the legal fabric and framework of environmental protections afforded each citizen of the State of New York; 2) acted contrary to CEQR, an Executive Order intended to facilitate the implementation of SEQRA in the City of New York (62 RCNY Chapter 5); 3) acted contrary to the Rules of Procedure for City Environmental Quality Review supplementing CEQR by, among other matters, establishing procedures or determining lead agency and establishing scoping requirements where Environmental Impact Statements are required; 4) acted in excess of their jurisdiction; 5) acted in violation of lawful procedure set forth in the rule making process promulgated within the *New York City Charter,* Chapter 45, §1043, was affected by an error of law, and was arbitrary and capricious; 6) acted contrary to provisions of the *New York City Charter*, including §§ 28(a), 32, 33, and 36; 7) acting contrary to the provisions of Article 1 § 10 of the United States Constitution, the City retroactively impaired and interfered with the contractual rights of Petitioners; and 8) acting contrary to Article 1 § 7(a) of the New York State Constitution, the City has confiscated private property without a rational basis and without just compensation, abrogating basic concepts of fairness and justice.

6

16.     Venue is proper in New York County Supreme Court pursuant to §§506(b); 3001 and 7804(b) of the New York Civil Procedure Law and Rules.

17.     This Verified Petition amends the Verified Petition filed on October 6, 2023 as a result of the passage of Intro 1194-A ("new law") on December 6, 2023 by virtue of the fact that the new law implicates the legal and factual issues in the original Petition. Filing an amended Petition conserves judicial resources in avoiding duplicitous and cumulative litigation.

## PARTIES

18.     Petitioner, Dietmar Detering, PhD, is a longtime resident of New York City who is deeply concerned about the damage caused by both noise pollution and air pollution to his health and that of his community. Mr. Detering is not only concerned about noise and air pollution plaguing the New York City environment, Mr. Detering has suffered the ill effects of living in close proximity, and being regularly exposed to, noisy bars, restaurants, hotels and stores creating an unabated nuisance and infringing upon Mr. Detering's right to a safe, healthy and habitable environment.

19.     For many years, Petitioner has worked to reduce such pollution, primarily by advocating for sensible nuclear energy policy, by reporting idling violations throughout New York City, especially in Manhattan and Queens, and, most recently, starting in 2022, by reporting and prosecuting noise violations, again especially in Manhattan and Queens. Petitioner has also, on a volunteer basis, served on a Citizens' Advisory Committee to the DEP on the subject of improving anti-idling enforcement.

20.     Mr. Detering has observed many commercial establishments with large outdoor speakers and noise setups in violation of N.Y.C. Admin. Code § 24-244(b). For example, commercial establishments, in flagrant violation of the Noise Code, often broadcast loud music

7

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 9 of 56

facilitated by equipment solely designed for outdoor advertising purposes to reach large numbers of members of the public traversing public sidewalks. This creates an ongoing unabated public nuisance if left unaddressed.

21.    Mr. Detering has submitted many complaints to DEP pursuant to N.Y.C. Admin. Code § 24-261. DEP has reviewed the legal and factual sufficiency of these complaints, and, in many cases, has approved these complaints either for DEP to prosecute before ECB, or, much more frequently, for Petitioner to prosecute before ECB. ECB is a division of the Office of Administrative Trials and Hearings ("OATH"). Mr. Detering will be personally harmed by the reduction in payments to him and penalties to violating businesses due to the substantial time, energy, resource and monetary investments Mr. Detering has devoted to citizen noise control enforcement.

22.    Petitioner Yoav Erez has lived in New York City for nearly two decades, and currently resides on Gold Street in Brooklyn. He is regularly disturbed by commercial noise, including on his bicycle commutes back and forth between Brooklyn and Manhattan, increasing his anxiety. He also fears that the constant distraction from these sound sources may lead to an accident while he rides his bicycle.

23.    Petitioner Erez has had a recent experience with a neighboring business's sound reproduction device, serving what he understands to be this business's own commercial purposes, consistently creating noise that disturbs him in his home. Without meaningful enforcement mechanisms, he fears this disturbance in his home will, especially in conjunction with the many outdoor speakers he encounters during his commutes, cause lasting damage to his health and wellbeing.

INDEX NO. 159847/2023
RECEIVED NYSCEF: 03/06/2024

24.     Petitioner Erez has attempted to address these noise problems through 311 calls, but this has not fixed the problem. More recently he has begun making citizen complaints to DEP pursuant to N.Y.C. Admin. Code § 24-261. DEP has indicated he may proceed with many of his complaints, but he has not yet been afforded an opportunity to pick up forms from DEP. Petitioner Erez is concerned, in light of the passage of Intro 1194-A, that, despite his complaints being made some time ago, his ultimate prosecution efforts on them will only result in an award of at most $10, a far cry from the "reasonable" compensation City Council envisioned in 1972 for what may require him to both expend hours of time on prosecution and also incur expenses for printing, postage, travel to pick up forms and engage in mailings, and the like. He is fearful he will actually lose money pursuing these complaints,

25.     Petitioner Deborah Farley has lived in Sunnyside Gardens for 72 years. Her apartment building is adjacent to two restaurants, The Skillman and Claret Wine Bar. Both businesses have dining sheds and curbside dining. The Skillman restaurant also has backyard seating. All of her windows face the street or avenue sides of these dining establishments. Because of the proximity of the two restaurants to her building, she cannot escape the raucous noise outdoors. As a result, her apartment windows have remained permanently shut for the last three years.

26.     Ms. Farley's windows must remain closed to watch television, hold a simple conversation, or get a restful sleep. Her stress and anxiety levels have risen sharply due to interrupted sleep patterns. The excessive noise levels make falling and staying asleep impossible. Living with windows permanently sealed and no fresh air leads to a feeling of isolation and entrapment inside her apartment.

27.     Restaurants' outdoor noise sources expose Ms. Farley to noise every night of the week. In the warmer weather, The Skillman offers live entertainment on weekends, and performances are amplified with outdoor speakers and microphones. The Skillman amplifies music to the outside dining shed even when no customers are seated outside. Petitioner's only hope to alleviate noise is through citizen enforcement, which is now being nullified by Intro 1194-A. Petitioner has been advised that no environmental assessment was undertaken by the City Council prior to the passage of Intro 1194-A.

28.     Exposure to hours of continuous loud music and noise contributes to Petitioner's loss of a peaceful and habitable environment. Environmental noise severely interrupts daily activities, thoughts, and relaxation and, in particular, deprives Petitioner of sleep.

29.     Petitioner Mitchell Grubler lives on Bowery Street between Canal Street and Division Street.  Petitioner Grubler lives in close proximity to a bar called The Crown located on the rooftop of 50 Bowery Hotel. The Crown utilizes outdoor speakers in warmer months. The outdoor speakers cause an invasive nuisance to Mr. Grubler's home. In the absence of citizen enforcement, Mr. Grubler has little confidence or faith in City governmental enforcement of the Noise Code. Despite complaints to City officials, no enforcement action has occurred to date.

30.     Mr. Grubler testified at the October 16, 2023 hearing, on behalf of the Bowery Alliance of Neighbors. His testimony referred to this noise problem from the hotel, and how it forced him to shut his windows.

31.     Petitioner Frederic Hills has lived in Brooklyn since the late 1980s and has lived with his family in Cobble hills for 22 years. Petitioner's home is across the street from Bar Tabac at 128 Smith St., where, for the last 15 years music from the restaurant has become increasingly intolerable to him and his family. Bar Tabac's live music events are a nearly nightly occurrence,

10

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/16/25    Page 12 of 56

and feature extremely loud amplified music. During warm weather all doors and windows are intentionally left open to attract customers. Especially on weekends, Bar Tabac commissions bands to play outdoors, for example with amplified guitar, drums, steel drums, and keyboard, on the sidewalk in front of Bar Tabac.

32.     Even with Petitioner Hills' windows closed and installing soundproof windows at cost of $7500, Bar Tabac's music remains unbearable inside Mr. Hill's home.  Petitioner and his neighbors have called 311 hundreds of times, and Bar Tabac has repeatedly been asked to cease and desist, to no avail. Even reaching out to the local Community Board and the local police precinct has not caused the problem to stop.

33.     The noise has affected Petitioner Hills' mental health, raised his anxiety and stress, and has forced him to resort to taking anti-anxiety medications.

34.     In the absence of citizen enforcement of the noise code, Mr. Hills is fearful for his health and that of his family.

35.     Petitioner Michael McFadden is a retired NYPD Detective, who has become deeply concerned with health and quality of life issues in New York City, especially as it relates to vehicle idling and noise.

36.     Petitioner McFadden became concerned with the Introduction of Intro 1194 by James Gennaro, including because of the negative effect it would have on New Yorkers' health and quality of life, and also because it would create a chilling effect on reporting both noise and idling violations.

37.     Accordingly, Petitioner McFadden signed up to speak at the October 16, 2023 Environmental Committee hearing regarding Intro 1194.

11

38.     Despite waiting over four hours, Petitioner McFadden was never afforded an opportunity to speak his concerns regarding Intro 1194 before City Council.

39.     Petitioner McFadden wrote to City Council, during the evening after the October 16, 2023 hearing, indicating that he should have been heard by the Environmental Committee and he still would like to be heard by the Environmental Committee.

40.     City Council failed or refused to provide Petitioner McFadden with an opportunity to speak regarding Intro 1194 or its amended version Intro 1194-A at any time thereafter.

41.     Petitioner McFadden is fearful that the refusal of City Council to let concerned New Yorkers speak their concerns for the full three minutes promised by James Gennaro, or in his case to speak his concerns at all, has provided City Council with political cover to pass a bill, Intro 1194-A, that is deeply harmful to New Yorkers' health and quality of life.

42.     Respondent Office of Administrative Trials and Hearings (OATH) was established by the *New York City Charter* in Chapter 45a, §1048 which states:

> § 1048. Office. There shall be an office of administrative trials and hearings which shall conduct adjudicatory hearings for all agencies of the city unless otherwise provided for by executive order, rule, law or pursuant to collective bargaining agreements. The office shall be directed by the chief administrative law judge, who shall be an attorney admitted to practice for at least five years in the state of New York. The chief administrative law judge shall be appointed by the mayor.

43.     OATH is the City agency with the authority under N.Y.C. Admin. Code § 24-261 to carry on hearings on noise and air summonses, including those issued by members of the public and the DEP.

12

44.    OATH is also charged, relevant to this proceeding, pursuant to N.Y.C. Administrative Code § 24-261, with awarding prescribed fair and reasonable compensation to citizens.

45.    Upon information and belief, OATH's principal Office, upon which Petitioner notices noise summonses, is located at 66 John Street, New York, NY 10038.

46.    Respondent New York City Environmental Control Board ("ECB") is a division of OATH that handles and decides appeals of OATH hearing officers as defined in Chapter 45 A, § 1049-a of the *New York City Charter*.

47.    ECB holds meetings on a semi-regular basis to promulgate rules and set policies, including those which are being challenged in this proceeding.

48.    Respondent New York City Council is the legislative body of the City of New York responsible for the passage of Local Laws within the City of New York.

49.    Respondent Eric Adams is the Mayor of the City of New York, Chief Administrative Officer of the City of New York responsible for the execution and administration of Local Laws within the City of New York. Upon information and belief, his principal place of business is located at City Hall, New York, NY 10007.

50.    Respondent Office of the Mayor of the City of New York (the "Mayor's Office") is an "agency" within the meaning of Public Officers Law § 86(3).

## FACTUAL BACKGROUND

51.    New York City has a longstanding tradition of encouraging citizen complainants to prosecute quality of life cases in the absence of governmental action. New York City governmental action in the past few months represents a shocking departure from this tradition.

13

52.    In order to encourage and promote a healthful and safe environment minimizing the impacts of noise pollution, the City Council empowered citizens to enforce specific sections of the City's Noise Code, including §244(b), and to receive fair and reasonable compensation for their efforts.

53.    The City Council, from 1972 to the present, provided the citizens of New York with a procedure to prosecute in the public interest, violations of specified sections of the Noise Code pursuant to §24-261(a) which states *inter-alia*:

> (a)  Any person other than personnel of the department and employees of the city of New York authorized by law to serve summonses for violation of the code may serve upon the department a complaint in a form prescribed by the commissioner alleging that a person has violated a provision of this code set forth in table VI, below, or an order or regulation promulgated under such provision together with evidence of such violation.:

| Violation related to section or subdivision and order or regulation thereunder |
|---|
| 24-208 |
| 24-216 |
| 24-220 (b) |
| 24-224 |
| 24-232, except that the provisions of this section 24-261 shall apply only to violations by persons operating motor vehicles listed in subdivisions one and two of column I, and subdivisions one and two of column II of Table 1. 24-234 24-236 24-237, except that the provisions of this section 24-261 shall apply only to a violation by a person operating a circulation device with a rated capacity in excess of fifty thousand British thermal units per hour or its equivalent. |
| 24-238 |
| 24-240 |
| 24-241 |
| 24-244 |
| 24-245 |

14

54.    The City Council established procedures that a citizen complainant may follow. First, DEP may issue its own notice of violation based on a citizen complaint and pursue it before OATH.  In such case, "the board shall award the complainant, out of the proceeds collected, fair and reasonable compensation, which shall not exceed twenty-five percent of the proceeds collected."

55.    Second, if DEP refuses or neglects to act on a citizen complaint within 30 days and has not informed the citizen that the complaint is either "frivolous or duplicitous," (i.e., the third course of action) then the citizen may prosecute the specified noise code violations before OATH himself or herself, "at his or her own expense."  In such case, "the board shall award, out of the proceeds collected, fifty percent of any civil penalty as fair and reasonable compensation to such person."

56.    The expense and investment necessary for citizen prosecution, in terms of time and money, is considerable. Petitioner, in order to prosecute these noise complaints, has had to (i) obtain suitable video camera equipment, (ii) maintain his bicycle and travel between violating locations to document violations, (iii) obtain cloud storage for the serving of video content to the DEP and to OATH/ECB, (iv) travel to the DEP's main offices to pick up summons forms used to prosecute complaints, (v) maintain printing equipment to print on these summons forms, (vi) fill in, sign, and print these forms, (vii) purchase stationery and postage and set them up for mailing duplicate sets of summonses to the respondents and to OATH, (viii) track the status of summonses within OATH's systems, (ix) wait by the phone for most of his Mondays, Tuesdays, and Wednesdays for when the respondents decide to call in for scheduled hearings, or to see if the hearings are rescheduled, (x) attend a hearing for the summons, and possibly multiple

hearings in the event of adjournments and the improper late rescheduling, and (xi) review decisions and prepare written appeals for adverse ones.

57.     Petitioner Detering has invested extensive time and money to engage in the activities set forth above in relation to pending cases. In doing so, with respect to each and every noise summons issued, Petitioner has accepted an offer made by the City, specifically an offer from the City to award prescribed fair and reasonable compensation in exchange for Petitioner's environmentally helpful efforts. Petitioner has expended dozens of hours a week to pursue citizen enforcement since Summer of 2022 and continuing through the present. Intro 1194-A retroactively nullifies and eviscerates Petitioner Detering's substantial financial investment and interest in matters pending before OATH.

58.     The time Petitioner Detering has devoted to the fulfillment of the required time expenditure has substantially interfered with Petitioner's ability to engage in other forms of employment and other forms of financially remunerative engagement.

59.     As set forth in more detail below, Intro 1194-A retroactively nullifies and eviscerates Petitioner Detering's substantial financial and time investments, and financial interest, in matters pending before OATH and in matters where offending businesses have not paid fines already issued.

60.     Prior to the passage of Intro 1194-A, the City Council in implementing a monetary incentive for citizen enforcement understood that citizens could not be reasonably expected to initiate citizen enforcement of noise complaints due to the time and money involved, without a reasonable expectation that they would be entitled to a portion of civil penalties when they successfully enable a prosecution of a violation of the Noise Code under §24-244(b).

16

61.    The City Council, in passing the 1972 Noise Code explicitly relied on citizens being able to expect such compensation, so that they would be encouraged to participate and reduce the illegal noise that is so harmful to the health of New Yorkers. The legislative history contains, for example, statements such as the following:

> ". . . The citizen, too, both alone and in combination often fails to appreciate his responsibility for reducing noise pollution. And yet, it has been the individual New Yorker who has indicated that he will no longer tolerate the awful noises to which he has been subjected. It is his outcry and his support which have been responsible for the enactment of this legislation. His continued support for both enforcement and further development of this law must be sought and encouraged. [. . .] With cooperative effort on the part of all New Yorkers, this new law can help provide the peace and quiet which we believe to be essential for a healthy environment." - June 28, 1972 Report to the Council of Committee on Environmental Protection;

62.    The Citizen's Union of the City of New York encapsulated the intent of the Citizen Complaint provision of the Noise Code by stating the following in a memorandum presented to the New York City Council at the time of the legislative enactment:

> Citizen's complaint
> We applaud the provisions of §6.09, "Citizen's complaint." By this section, a citizen can bring a complaint to the Board and demand that the EPA act against the noise violator. If the EPA fails to act, the citizen may prosecute the complaint himself and obtain up to 50% of penalty fines as compensation for his efforts. He may be awarded up to 25% of fines for information or evidence resulting in impositions of penalties of which the EPA lacked knowledge. Given the fact that noise is often a local problem and that enforcement will be difficult by the EPA with its limited staff, the broad provisions facilitating citizen complaints will probably be crucial to the successful implementation of the Code.
>
> Since the Code relies upon citizen cooperation in its enforcement, it is sensible and proper to provide for some compensation for the time and tribulations citizens will incur with their complaints.

63.    Prior to the passage of Intro 1194-A, the penalty schedule for the Noise Code, replied upon the *New York City Charter's* rulemaking process established the penalties for §24-244(b) violations adjudicated at a hearing. Penalties implemented by DEP established

17

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 19 of 56

longstanding administrative precedent established through the rulemaking process dictated by the *New York City Charter*.

64.     Prior to the passage of Intro 1194-A, the penalty schedules in effect for decades are as follows: $440 for a first violation; $880 for a second violation; and $1320 for a third or subsequent violation. Higher amounts of $1750 to $5250 are authorized in the event of an uncorrected default on a summons. RCNY Title 15 § 4702 sets forth the rules for the issuance of penalties.

65.     Prior to the passage of Intro 1194-A and newly enacted administrative practices alongside the August 17, 2023 Resolution, the general longstanding practice experienced by Petitioner and other citizen complainants was the receipt of twenty-five or fifty percent of such penalty amounts, upon payment of the fine by the businesses.

66.     Prior to the August 17, 2023 Resolution, a zero-dollar mitigation penalty for a first violation, based on certain proofs, and admissions, was provided as to some sections of the Noise Code by the DEP's adopted penalty schedule. However, such provisions have never been applicable to any violation of §24-244(b).

67.     §24-244(b) violations can start and stop when a business turns on or off a speaker or moves a speaker outdoors or indoors.

68.     Thus, mitigation based on mere proof of temporary cessation makes little sense of the context of §24-244(b).

69.     However, in or about July 27, 2023, the Appeals Division of OATH decided two appeals where Petitioner was the citizen complainant/citizen petitioner, *Dietmar Detering, CC v. Matto Espresso, Appeal No. 2300419* and *Dietmar Detering, CC v. Electro USA, Appeal No.*

18

*2300509* (see Decisions annexed hereto as Exhibit "B" hereinafter referred to as $0 violation decisions).

70.    OATH did not publish these decisions until August 18, 2023, the day after the August 17, 2023 resolution.

71.    In the two above cited cases, Petitioner was found to have successfully demonstrated the respondent business violated §24-244(b) of the Noise Code. However, in both cases, OATH arbitrarily remitted the penalty in full.

72.    There was no factual determinations in the above cited cases regarding the reason the penalties were being remitted in full, as opposed to in part or not at all, in the $0 Violation Decisions. For example, there no discussion of whether no remission, or remission only in part, would be more appropriate. Notably, Electro USA Corp ("Electro") had been found in violation previously by Stipulation as to a Summons Petitioner had brought to the ECB's attention (000287326Z, committed on November 6, 2021 and stipulated no later than January 10, 2022, see Stipulation annexed hereto as Exhibit "C").

73.    Electro continued to violate the Noise Code notwithstanding its previous guilty admission. Petitioner provided evidence to ECB of Electro's recidivism, yet ECB ignored this evidence in its $0 violation decision.

74.    Arbitrarily and contrary to the record, ECB makes no mention of Electro's recurring violations despite the receipt of evidence demonstrating that this business persistently violated the Noise Code even after it was made aware of the illegality of its actions.

75.    Petitioner was found to have successfully demonstrated the respondent business violated §24-244(b) of the Noise Code. However, OATH stated in relevant part:

> Nevertheless, Respondent's representative testified at the
> hearing that she removed the speakers after she received this

19

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 21 of 56

summons, which the Board credits. Consequently, as of the date of the hearing, Respondent was no longer in violation of Code § 24-244(b). Therefore, the Board remits the penalty in full per Code § 24-257(b)(5), which sets forth the civil penalty for a violation of Code § 24-244(b) but further provides that the Board "may remit, in whole or in part, such a civil penalty if, at the conclusion of the hearing or at the time of the board determination under section 24-266 of this code, the respondent is no longer in violation of a provision of this code. . . ." Accordingly, the Board affirms the hearing officer's decision sustaining a violation of Code § 24-244(b) but remits the penalty in full. (Matto Espresso);

and

Nevertheless, Respondent's representative testified at the hearing that she had since removed the speaker following receipt of the summonses, which the Board credits. Consequently, as of the date of the hearing, Respondent was no longer in violation of Code § 24-244(b). Therefore, the Board remits the penalty in full per Code § 24-257(b)(5), which sets forth the civil penalty for a violation of Code § 24-244(b) but further provides that the Board "may remit, in whole or in part, such a civil penalty if, at the conclusion of the hearing or at the time of the board determination under section 24-266 of this code, the respondent is no longer in violation of a provision of this code. . . ." **Accordingly, the Board affirms the hearing officer's decisions, sustaining three violations of Code § 24-244(b), but remits the penalty [in full] (Electro USA Corp)]**. (*emphasis added*)

## Treatment of Additional Civil Penalties

76.    In furtherance of arbitrary administrative practices, OATH has eliminated penalties for late payments in citizen-initiated noise code complaints.

77.    OATH's longstanding practice had been to assess an additional charge of 10% per month for late payment of an assessed violation of the noise code, as it does for violations of other provisions of law (see Exhibit "D" annexed hereto).

78.     These late charges are, with respect to the Noise Code, pursuant to NYC Admin. Code §24-257(b)(9), which in relevant part refers to "imposing an additional civil penalty in the amount of ten percent of the penalty originally imposed, for late payment of penalty for each month, or part thereof, that the penalty payment is in arrears."

79.     However, OATH, while it assesses such charges for DEP-brought noise summonses, has, without explanation or any rulemaking process, declined and will heretofore decline to assess such late payment charges for citizen-initiated noise complaints.

80.     As a result of the foregoing, there is little incentive for businesses to timely, if ever, pay their noise pollution penalties where the case is brought by a citizen. Because of nonpayment by businesses, Petitioner is being deprived of receiving his 50% legislatively determined share as "fair and reasonable compensation" under NYC Admin. Code§ 24-261.

81.     Additionally, Petitioner - who is damaged by delay in payment by violating businesses who he prosecutes or provides evidence to DEP with respect to  - is entitled under NYC Admin. Code §24-261 to a specified percentage of the proceeds including any late payment portion thereof.

**<u>Passage of the August 17, 2023 Resolution – Remittance of Civil Penalties</u>**

82.     On August 17, 2023, at a perfunctory five minute so-called "Public Hearing/Meeting", ECB unanimously voted on a sweeping rulemaking "Resolution Respecting the Environmental Control Board's Exercise Of Its Authority To Remit A Civil Penalty In Code §24-244(b) Matters." (See the Resolution annexed hereto as Exhibit "A", also referred to as the "$0 Violation Rule").

21

83.    Petitioner, as well as several other members of the public concerned about the $0 Violation Resolution's effect on noise pollution in New York City, attempted to speak against this rule at the August 17, 2023 "Public Hearing/Meeting."

84.    Petitioner and the other citizens virtually raised their hands when virtually logged on during the course of the meeting in an attempt to be called on to speak. However, the calling-on never occurred. One member of the public attempted to speak orally during the virtual meeting but was repeatedly muted by ECB's moderator each time he unmuted himself, preventing him from voicing his concerns. The virtual meeting was summarily ended when a second member of the public, also attending virtually, tried to speak. Petitioner recorded the meeting, which can be accessed with the following link:

https://www.youtube.com/watch?v=bh0Vkuxmozc . Compare this link with the ECB version which can be accessed with the following link:

https://www.youtube.com/watch?v=XNswbl4NVqg .

85.    ECB also arbitrarily edited its recording so as to avoid including the public's attempts to speak on its publicly posted version on YouTube and removed the ability to post comments on same.

86.    The August 17, 2023 Resolution and the administrative determinations relating thereto lack any rational basis, factual support or administrative precedent beyond a conclusory claim by OATH/ECB that they are allowed to remit in whole or in part, and a statement that they (and/or all Hearing Officers going forward) will remit in whole.

87.    The August 17, 2023 Resolution and the administrative determinations relating thereto will be unable to and have not considered, for example, the effect of such blanket removal of fines, based on after-the-violation claims by the businesses, on the incentives to

22

participate in reporting noise violations, or on noise pollution as a whole or its concomitant effect on New Yorkers' health.

### New Practice in Relation to Summonses

88. In a further arbitrary and capricious effort to thwart citizen complainants, Respondents have now instituted a new policy in relation to commencement of proceedings.

89. Petitioner has been swearing to or affirming his noise violation summonses sent to businesses, under penalty of perjury, and thus, per the *Charter*, they have been creating a *prima facie* case that may be, where appropriate, rebutted by businesses at a hearing before OATH.

90. However, OATH/ECB has, on information and belief, begun printing new, special, summons forms, for distributions only to citizens, and only via pick-up at the head offices of the DEP.

91. Upon information and belief, summons forms for citizens differ from those used by all enforcement agencies of New York City.

92. The summons forms provided to citizens state: "**THIS SUMMONS CANNOT BE SWORN TO OR AFFIRMED**" (emphasis in original).

93. Accordingly, such citizen summonses, unlike agency summonses, do not create a *prima facie* case, and if Petitioner fails to attend a hearing based on this new special summons form, for example because of OATH's own policies to schedule multiple citizen hearings for different respondents at the exact same time on occasion, Petitioner will lose the hearing.

94. Losing hearings means that Petitioner does not receive an award.

95. Being forced to attend all hearings means that Petitioner cannot use his time to attend to other matters.

23

96.     Petitioner first received these new special citizens summons forms when he visited the DEP offices to pick up summons forms on September 28, 2023.

97.     OATH/ECB failed to follow any rulemaking process, foreclosing mandatory notice to the public, public comment and hearings prior to printing these new special citizen summons forms.

**Schedule of Hearings – Failure of Proper Notice to Citizen Complainants**

98.     Petitioner Detering, pursuant to explicit written directions received from the DEP, which upon information and belief are in turn based on guidance from OATH/ECB, schedules the hearings on his summonses to occur at 9:00 AM on Mondays, Tuesdays, or Wednesdays. This information, including date and time of the hearing, appears on the summons forms Petitioner Detering prepares and sends to both the accused businesses and OATH.

99.     OATH's Hearing Rules of Practice, adopted after a notice and public comment period, provide that a "request by a Respondent to reschedule must be received by the Tribunal prior to the time of the scheduled hearing."

100.    OATH routinely ignores this Rule, and grants rescheduling requests submitted by respondent businesses well after the scheduled hearing time of 9:00AM. For example, on information and belief, OATH will grant rescheduling requests made at least as late as 12:37PM on the day of the hearing (see Exhibit "E" annexed hereto.)

101.    As a necessary result of OATH granting, contrary to its own rules, rescheduling requests after the hearing time, Petitioner Detering frequently receives no notice in advance of the hearing that a hearing has or will be rescheduled for a later date. Therefore, Petitioner Detering unnecessarily waits by the phone the entire morning and afternoon for a hearing that day that will never occur. Petitioner Detering is only able to learn of the grant of such untimely

24

rescheduling requests either late on the hearing day or on the following day, when the information is effectively useless to his planning of the original hearing day.

**Notice on Appeals**

102.     OATH's Hearing Rules of Practice, adopted after a notice and public comment period, provide that for "[t]he party seeking to appeal the decision of a Hearing Officer [...] the filing must contain proof that the appealing party served a copy of the appeal on the non-appealing party."

103.     OATH applies this rule to Petitioner and other citizen petitioners, but not to respondent businesses that receive Petitioner's summonses and have lost at a hearing. Indeed, OATH treats Petitioner as an enforcement agency, and states on its online appeal form that "Enforcement Agencies must attach proof of service on Respondent."

104.     However, OATH permits such businesses to submit such appeals via a web form, without any proof that the business served the citizen a copy of the appeal, and indeed without even identifying the specific citizen on the web form.

105.     OATH's current online appeal form, as of January 19, 2024, instead of requiring attachment of proof of service, merely makes noise polluting businesses promise to serve Petitioner with a confirmation page rather than the entirety of the appeal, at some unspecified point in the future.

106.     Despite many appeals being filed against Petitioner, a noise polluting business has never timely sent Petitioner any portion of the appeal it filed before filing the appeal (as required by OATH's rules), or even on the same day as it filed the appeal.  It is clear that OATH chose to require citizen complainants to submit proof of service on businesses, but not businesses to

25

submit proof of service on citizen complaints, in order to prejudice citizen complainants by denying or delaying them access to appeal briefing.

107.    Rules governing the process and procedure regarding the conduct of hearings are established through the rulemaking process. However, applying different onerous and restrictive procedures upon citizen complainants has never been subjected to the *New York City Charter* mandated rulemaking process.

## Administrative Determinations in Violation of Precedent

108.    The precedent setting administrative determination established in the case of Dietmar Detering v. Jackson Hole, Appeal No. 2300403 annexed hereto as Exhibit "F", runs counter to administrative and judicial precedent. This administrative adjudication was arbitrary and capricious, and is now being followed in a line of adjudicatory administrative determinations being challenged herein. (See decisions annexed hereto as Exhibit "G".)

109.    Largely beginning with a decision in *Dietmar Detering v. Jackson Hole* in the Summer of 2023, and continuing regularly thereafter, ECB engaged in a series of arbitrary and capricious appeals decisions, contrary to prior appellate and state court decisions, intended to undermine the Citizen Complaint provision and make enforcement against hospitality businesses impossible or near-impossible.

110.    In essence, these post-Jackson Hole arbitrary administrative determinations protect every outdoor dining facility and other facilities where customers on occasion spend time outdoors from the strictures of § 24-244(b). The Jackson Hole decision and its progeny would encourage and allow broadcasting of noise from indoors through an open window or from outdoor sound reproduction devices. Arbitrary adjudicatory decisions of this nature would protect lawbreakers from the prohibitions of § 24-244(b), regardless of how obnoxious

26

or loud the music, how large the speakers, or the nature of the sound setups designed to be

heard by the passing public. The impact upon the surrounding community and passersby will

be severe and disturbing. The legislative intent of protecting citizens and community members

from the disturbances of noise intentionally and obviously directed to public spaces will be

torn asunder by unlawful and arbitrary administrative determinations that are now being

followed in virtually every administrative proceeding relating to § 24-244(b) in the wake of

the Detering v. Jackson Hole, Appeal No. 2300403 decision.

**The Purported Passage of Intro 1194-A on December 6, 2023**

111.    Respondent City Council is entrusted with holding legislative hearings and

committee and full votes in connection with proposed legislation. As set forth herein, the City

Council failed to conduct proper committee hearings in that opponents to Intro 1194-A were

interrupted, thwarted and generally barred from participating fully in the public hearing process.

112.    The failure to conduct proper City Council hearings was aggravated by the City's

failure to conduct any proper environmental review. This failure led to a drastic overhaul of the

City's Noise Code without weighing the environmental consequences of the City's actions.

113.    Upon information and belief, Councilmember Gennaro was the architect of this

arbitrarily truncated review process influenced by donations received from lobbyists on behalf of

the restaurant industry (see communications between Councilmember Gennaro and lobbyists

obtained through a Freedom of Information Act request annexed hereto as Exhibit "H".)

114.    James Gennaro is an influential member of the New York City Council serving as

Chairman of the Committee on Environmental Protection, Resiliency, and Waterfronts

("Environmental Committee").

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 29 of 56

115.    At the October 16, 2023 public hearing, each member of the public was provided

three minutes to speak. However, during the hearing, three lobbyists in favor of Intro 1194-A

were provided thirty minutes to speak and other supporters of the legislation were given their full

three minutes to speak. In contrast, many of those opposing the legislation were cut off after only

two minutes. Petitioner McFadden was not allowed to speak at all. Petitioner Farley and

Petitioner Detering were cut off at two minutes. An attorney, Joel Kupferman representing the

Environmental Justice Initiative in objecting to the unconstitutionally retroactive aspect of the

bill was repeatedly interrupted by Councilmember Gennaro. A concerned citizen was cut off at

less than two minutes because she attempted to play a recording of a noise sample she

experienced in her neighborhood. Several opponents seeking to voice their opposition were

forcibly removed from the hearing room.

116.    The general longstanding practice experienced by Petitioner and other citizen

complainants was the receipt of twenty-five or fifty percent of such penalty amounts, when the

Petitioner's or other citizen's evidence was used to successfully prove a violation of §24-244(b)

of the New York City Noise Code.

117.    Through this incentive structure for everyday citizens like Petitioner to assist in

enforcing New York City's noise code, by mid-2023, Petitioner and other citizen complainants

had reduced the amount of noise violations occurring by businesses, particularly in Manhattan

and Queens.

118.    Despite Councilmember Gennaro preventing at least some people from speaking

at the hearing, the majority of those who spoke and submitted written testimony at the October

16, 2023 hearing and thereafter expressed concern about weakening noise enforcement in New

York City and its significant negative effect on the environment.

28

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 30 of 56

119.    Despite the overwhelming public opposition to Intro 1194 and its weakening of noise enforcement, on November 30, 2023, Gennaro chose to introduce an amended version, Intro 1194-A, which even further weakened noise enforcement. Like Intro 1194, it limited incentives to citizens for filing and/or prosecuting noise complaints to a max of $5-$10, a shockingly low amount drastically insufficient to cover time and expenses. Unlike Intro 1194, Intro 1194-A also embraced a second topic for which no public hearing had been held: reduction of fines for already pending citizen-based commercial noise proceedings under 24-244(b) to a paltry $50.

120.    A vote on Intro 1194-A in Gennaro's Environmental Committee was scheduled less than seven days later, for December 6, 2023.

**Failure to Prepare, Distribute or Publish a Fiscal Impact Statement**

121.    Upon information and belief, the required Fiscal Impact Statement was not made available to all members of the Environmental Committee by the time they voted on Intro 1194-A in the morning of December 6, 2023.

122.    The Fiscal Impact Statement ultimately published in connection with Intro 1194-A contained clearly falsified information. Intro 1194-A is a bill designed not only to reduce activity generating revenue for New York City, (*i.e.* the number of noise summonses) but also to reduce the amount New York City is entitled to collect on each noise summons from noise polluters (a reduction from $440-$1320 or more per pending noise summons to $50 per pending summons). Nonetheless, the falsified Fiscal Impact Statement stated that the effect on both New York City's expenses and its revenues would be "$0".

123.    Additionally, Intro 1194-A is designed to reduce city expenditures. Payments by the City to citizen complainants will be reduced from $110-$2,625 to only $5-$10.

29

124.     Upon information and belief, if members of the Environmental Committee, including but not limited to Gennaro, had an opportunity to review an accurate Fiscal Impact Statement prior to their vote, the falsified nature of this document would have been clear to them.

125.     The City Council's Fiscal Impact Statement arbitrarily failed to specify the sources of the information relied upon in reaching its determination of zero fiscal impact.

126.     A vote was held by Gennaro's Environmental Committee on October 6, 2023, approving Intro 1194-A for full vote. Later that same day, and still less than seven days after Intro 1194-A was in its final form, Intro 1194-A passed a vote of the full Council, despite a number of negative votes, abstentions, and speeches by concerned Councilmembers as to the problems with this bill.

127.     This legislative conduct violates, *inter alia*, §§ 33 and 36 of the *New York City Charter*.

128.     In an arbitrary, capricious and unlawful manner, no environmental analysis of any kind was ever prepared by City Council as to Intro 1194 or Intro 1194-A, despite these bills being designed to reduce enforcement of the City's noise laws and to reduce the monetary deterrence to violating these noise laws. No negative declaration was ever issued as to Intro 1194 or Intro 1194-A.

129.     As a result of the foregoing, there is little incentive for businesses to comply with § 24-244(b) of the Noise Code, because enforcement is unlikely given that citizens were the only ones prosecuting noise complaints.

**Health Impacts of Noise Pollution**

130.     Scientific inquiry has reinforced the City Council's pre-Intro 1194-A views as to the horrific psychological and health effects of chronic noise exposure.

30

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 32 of 56

131.    Noise is unwanted and/or harmful sound, first recognized as a public health hazard in 1968. The Noise Control Act of 1972 declared that "it is the policy of the United States to promote an environment for all Americans free from noise that jeopardizes their health or welfare."

132.    "Besides traditionally known risks of hearing loss resulting from the prolonged exposure to loud noise, chronic exposure to lower volume noise also has disastrous effects on human health. Continual exposure to noise can cause stress, anxiety, depression, high blood pressure, heart disease, and many other health problems"[1].

133.    "Chronic noise, even at low levels, can cause annoyance, sleep disruption, and stress that contribute to cardiovascular disease, cerebrovascular disease, metabolic disturbances, exacerbation of psychological disorders, and premature mortality. Noise interferes with cognition and learning, contributes to behavior problems, and reduces achievement and productivity. The health of more than 100 million Americans is at risk, with children among the most vulnerable. Noise-related costs range in the hundreds of billions of dollars per year."[2]

134.    The New York Times summarized the metabolic effects of continued exposure to noise[3]:

*Unpleasant noise enters your body through your ears, but it is relayed to the stress detection center in your brain.*

---

[1] https://www.cdc.gov/vitalsigns/hearingloss/index.html Centers for Disease Control and Prevention: Too Loud! For Too Long!
[2]  https://apha.org/Policies-and-Advocacy/Public-Health-Policy-Statements/Policy-Database/2022/01/07/Noise-as-a-Public-Health-Hazard American Public Health Association Policy Statement: Noise as a Public Health Hazard
[3] https://www.nytimes.com/interactive/2023/06/09/health/noise-exposure-health-impacts.html Emily Baumgaertner, Jason Kao, Eleanor Lutz, Josephine Sedgwick, Rumsey Taylor, Noah Throop and Josh Williams: Noise Could Take Years Off Your Life. Here's How.

*This area, called the amygdala, triggers a cascade of reactions in your body. If the amygdala is chronically overactivated by noise, the reactions begin to produce harmful effects.*

*The endocrine system can overreact, causing too much cortisol, adrenaline and other chemicals to course through the body.*

*The sympathetic nervous system can also become hyperactivated, quickening the heart rate, raising blood pressure, and triggering the production of inflammatory cells.*

*Over time, these changes can lead to inflammation, hypertension and plaque buildup in arteries, increasing the risk of heart disease, heart attacks and stroke.*

135.     Many sources of noise in the city are difficult to mitigate as they are essential for it to function, e.g. traffic and construction noise. Some sources of noise are unnecessary, but notoriously difficult to police: e.g. honking and vehicles with manipulated mufflers.

136.     Commercial noise, however, originating from businesses in order to attract the attention of the general public "within earshot", however, is not necessary for city life and can be easily mitigated by turning off the speaker(s) or bringing them inside, and doors and windows closed if noise is desired inside - which often it is not. Any commercial benefit of music, advertising messages or other noises, produced for advertising purposes, for the emitting business necessarily results in a loss of walk-in customers for other, quiet, neighborhood-friendly, and law-abiding businesses nearby.

137.     The value that polluters reap from the free advertising effect of playing audio to the general public on the street and sidewalk must not be underestimated. With monthly rents on busy streets being in the tens of thousands of dollars per month, lifting sales just by a few percentage points will pay for many tickets.

138.    Petitioner regularly observed passers-by stopping in their pace in response to music or audio advertising messages and look at polluting businesses, perhaps then studying a displayed menu or contemplating about whether any of the offered services or goods might satisfy a need they have at the moment. Without the auditory distractions they would most likely not even have noticed the respective businesses. Getting this amount of extra attention free of charge can become an essential driver of profits for a business. Such a benefit will not be lightly given up.

## STATUTORY FRAMEWORK

139.    New York has established a more than half century public policy to protect its citizens from environmental hazards.

140.    The State of New York passed a public referendum in 2022 codifying environmental justice into its Bill of Rights.

141.    For decades, the City of New York has established a regulatory structure to ensure that notwithstanding the density and congestion of the City of New York, that citizens be protected to the greatest extent practicable from the health and safety hazards of noise pollution. This regulatory scheme has been promulgated in CEQR, an Executive Order intended to facilitate the implementation of SEQRA in the City of New York (62 RCNY Chapter 5).

142.    By virtue of deficiencies, failures and omissions in the environmental review process and the City Council's adherence to basic *New York City Charter* and constitutional provisions, the City's actions as set forth herein must be nullified. The City's actions were arbitrary, capricious and an abuse of discretion.

33

a.    **Constitutional Law – The Green Amendment**

143.    Article 1, Section 19 of the New York State Bill of Rights enshrines basic environmental protections into the legal fabric and framework of environmental protections afforded each citizen of the State of New York.

144.    Article 1, Section 19 states "*each person shall have a right to clean air and water, and a **healthful environment***." ("The Constitutional Amendment.")

145.    The New York State Legislature defines environment to include noise. The Environmental Conservation Law ("ECL") §8-0105(6) defines environment as follows:

> 6. "Environment" means the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, **noise**, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character. (*emphasis added*)

146.    Article 1, Section 19 became the law in New York State in January 2022. The intent of the Constitutional Amendment is to afford every citizen of the State of New York the right to a healthy and safe environment so that they will not be compromised due to governmental inaction or negligence that may damage the environment and impair public health. Scientific studies have undeniably confirmed the deleterious impacts of noise pollution upon public health.

147.    Constitutional Amendments are implemented in New York State as a means to emphasize, redefine and expand upon existing rights. During the legislative debates to implement the Constitutional Amendment, Assemblymember Englebright stated:

> This is a proposed Constitutional Amendment to enable something that everyone believes, in many cases is already a right, but has never previously been formalized. And that right is to a clean environment, clean air, clean water, and a healthful environment. It's in the largest sense, a proposed Constitutional Amendment that

34

is an expression of optimism. **It is intended to assure our citizens that they will not be betrayed circumstantially by environmental degradation, and that the health and wellbeing of they and their families will not be compromised due to governmental inactions or negligence that may otherwise damage our air, land or water**.

148.   The specific provisions of the New York State Constitution reflect amendments adopted over the years by the New York State Legislature and ratified by public referendum to implement and accommodate governmental actions in relation to major policy concerns.

149.   New York State has adopted constitutional rights in relation to major areas of policy concerns. For example, wrongful death recoveries set forth in Article 1, Section 16, labor rights set forth in Article 1, Section 17 and Workers' Compensation set forth in Article 1, Section 18.

150.   The Constitutional Amendment set forth in Article 1, Section 19 enshrines, through legislative amendment and public ratification, the right to a healthful environment enhancing and clarifying existing statutory rights.

151.   New York State voters amended the New York State Bill of Rights in January 2022, and have declared that it is a public purpose to assure that every citizen breathes clean air, consumes clean water, and enjoys the right to a healthful environment.

152.   The Constitutional Amendment has raised environmental rights to the level of other rights enshrined in the New York State Constitution including trial by jury set forth in Article 1, Section 2, freedom of worship and religious liberty set forth in Article 1, Section 3, due process set forth in Article 1, Section 6, compensation for taking prior property set forth in Article 1, Section 7, and free speech set forth in Article 7, Section 8.

153.   The Constitutional Amendment removes any doubt that it is the responsibility of the government to protect the citizens of the State of New York from environmental harm. This

35

is particularly the case where citizens lack basic environmental protections from the ongoing activities or inactivity of government.

### b. CEQR

154.    To assure that certain types of government action do not take place until a proposed action has undergone environmental review, the New York State legislature adopted SEQRA, Article 8 of the Environmental Conservation Law ("ECL"), §8-101 *et seq*. The State regulations implementing SEQRA are codified. (6 New York Code of Rules and Regulations ("NYSCRR") Part 617). The City regulations implanting CEQR are set forth in RCNY Title 62, Chapter 5. The City Environmental Quality Review ("CEQR") applies to City Council legislation, particularly legislation impacting a critical component of the environment, namely noise.

155.    The relevant portions of CEQR define its applicability and the scope of the rule's application to noise. Title 62, Chapter 5, § 5-02(d) states *inter-alia*:

> **(d) APPLICABILITY. These rules and Executive Order 91 shall apply to environmental review by the city that is required by the State Environmental Quality Review Act (Environmental Conservation Law, Article 8) and regulations of the State Department of Environmental Conservation thereunder**...(***emphasis added***)

156.    Environment is defined in Title 62 of the RCNY § 6-02 as follows:

> **Environment. "Environment" means the physical conditions which will be affected by a proposed action, including land, air, water, minerals, flora, fauna, *noise*, objects of historic or aesthetic significance, existing patterns of population concentration, distribution or growth, and existing community or neighborhood character. (emphasis added)**

157.    The goal of SEQRA and its implementing rules pursuant to CEQR is to guarantee that state and local agencies incorporate environmental considerations, into certain planning and

decision-making processes, and act in a manner "consistent with social, economic and other essential considerations [and] to the maximum extent practicable, minimize or avoid adverse environmental effects…." (ECL § 8-109).

158.    To initiate the environmental review process, SEQRA and CEQR require that, as early as possible, the lead agency must determine whether an "action may have a significant effect on the environment." (6 NYCRR §§ 617.11).  If such a finding is established, the agency will issue a "Positive Declaration," and an EIS must be completed. (6 NYCRR § 617.2 (ad) and 617(a) and (a) (1)).

159.    CEQR is an Executive Order intended to facilitate the implementation of SEQRA in the City of New York (Title 62 RCNY Chapter 5). The Rules of Procedure for City Environmental Quality Review supplemented CEQR by, among other matters, establishing procedures or determining lead agency and establishing scoping requirements where Environmental Impact Statements are required. CEQR is only applicable to situations where an environmental review is otherwise required by law.

160.    The heart of the State Environmental Quality Review Act and the City Environmental Quality Review is the Environmental Impact Statement ("EIS") process.

161.    SEQRA mandates that the preparation of an EIS when a proposed development project "may have a significant effect on the environment." (ECL § 8-0109(2)).

162.    SEQRA and CEQR mandate that agencies make an initial determination as early as possible as to whether an EIS needs to be prepared for a proposed action. (ECL §8-0109(4)). To require an EIS for a proposed action, the lead agency must determine that the action may include the potential for at least one significant environmental "effect." (6 NYCRR §§ 617.7 and §617.11). Noise is defined as a significant environmental factor within the CEQR definition.

163. The City is required under CEQR to undertake an initial determination in a scoping document which sets forth the areas of significant environmental concern that must be reviewed prior to discretionary decision making. Thereafter, the City must perform an environmental assessment to determine if a Negative Declaration or Environmental Impact Statement must be issued. In an arbitrary and unlawful manner, the City failed to perform any environmental review as they set about to eliminate, eviscerate and/or nullify the citizen complaint provision of the Noise Code.

**c. New York City Noise Code**

164. In addition to Title 24, Chapter 2 of the New York City Administrative Code, New York City's public policy is expressed in §10-108(a) which states:

> **§ 10-108 Regulation of sound devices or apparatus.**
> a.  Legislative declaration. It is hereby declared that the use or operation of any radio device or apparatus or any device or apparatus for the amplification of sounds from any radio, phonograph or other sound-making or sound-producing device, or any device or apparatus for the reproduction or amplification of the human voice or other sounds, in front of or outside of any building, place or premises, or in or through any window, doorway or opening of such building, place or premises, abutting or adjacent to a public street, park or place, or in or upon any vehicle operated, standing or being in or upon any public street, park or place, where the sounds therefrom may be heard upon any public street, park or place, or from any stand, platform or other structure, or from any airplane or other device used for flying, flying over the city, or on a boat or on the waters within the jurisdiction of the city, or anywhere on or in the public streets, parks or places, is detrimental to the health, welfare and safety of the inhabitants of the city, in that such use or operation diverts the attention of pedestrians and vehicle operators in the public streets, parks and places, thus increasing traffic hazards and causing injury to life and limb. It is hereby further declared that such use or operation disturbs the public peace and comfort and the peaceful enjoyment by the people of their rights to use the public streets, parks and places for street, park and other public purposes and disturbs the peace,

38

quiet and comfort of the neighboring inhabitants. Therefore, it is hereby declared as a matter of legislative determination that the prohibition of such use or operation for commercial or business advertising purposes and the proper regulation of such use and operation for all other purposes is essential to protect the health, welfare and safety of the inhabitants of the city, to secure the health, safety, comfort, convenience, and peaceful enjoyment by the people of their rights to use the public streets, parks and places for street, park and other public purposes and to secure the peace, quiet and comfort of the city's inhabitants. It is hereby further declared as a matter of legislative determination that the expense of supervising and regulating the use and operation of such sound devices and apparatus for purposes other than commercial and business advertising purposes should be borne by the persons using or operating such devices and apparatus and that the requirement of a nominal fee for the issuance of a permit for such use and operation as hereinafter prescribed is intended to defray the expenses of regulating such use or operation for the health, welfare and safety of all the people.

165.    Section 244(b) of the Administrative Code is closely intertwined with §10-108's

policy accordingly specifies:

No person shall operate or use or cause to be operated or used any sound reproduction device, for commercial or business advertising purposes or for the purpose of attracting attention to any performance, show, sale or display of merchandise, in connection with any commercial or business enterprise (including those engaged in the sale of radios, television sets, compact discs or tapes), **(i) outside or in front of any building, place or premises or in or through any aperture of such building, place or premises, abutting on or adjacent to a public street, park or place;** (ii) in or upon any vehicle operated, standing or being in or on any public street, park or place; [. . .]; or (vi) anywhere on the public streets, public sidewalks, parks or places where sound from such sound reproduction device may be heard upon any public street, sidewalk, park or place. Nothing in this section is intended to prohibit incidental sounds emanating from a sporting or an entertainment or a public event for which a permit under section 10-108 of the code has been issued.

39

Case 1:25-cv-02100-KPF    Document 24-2    Filed 10/10/25    Page 41 of 56

166.    Essentially, §244(b) of the New York City Administrative Code protects New York citizen's health by prohibiting businesses from utilizing sound reproduction devices, such as speakers or musical instruments, to reach out into public spaces, such as sidewalks, thereby creating an environmental nuisance and distract and divert the attention of members of the general public trying to go about their day. In the event every business in New York City were to violate this provision with impunity, the result would be a cacophony of noise rendering our City a stressful and health-impairing place to live.

167.    In order to encourage and promote a healthful and safe environment minimizing the impacts of noise pollution, the City Council empowered citizens to enforce specific sections of the City's Noise Code, including §244(b), and to receive fair and reasonable compensation for their efforts.

168.    The City Council from 1972 until December 6, 2023, provided the citizens of New York with a procedure to prosecute in the public interest. Intro 1194-A has significantly and detrimentally altered the landscape of Noise Code enforcement in the City of New York.

**c. Rulemaking Authority**

169.    By virtue of the broad based general and sweeping nature of the challenged August 17, 2023 ECB Resolution, and various practices and procedures implemented by ECB, New York City's rulemaking process set forth in the *New York City Charter* is mandated.

170.    The rulemaking process in New York City is required when an agency establishes precepts that remove its discretion by dictating specific results in particular circumstances. A fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation that must be formally adopted pursuant to the City Administrative Procedure

40

Act ("CAPA") and *New York City Charter* §1043[b],[e], (*see CBS Outdoor, Inc. v. City of New York*, 50 Misc. 3d 283, 308 (N.Y. Sup. Ct. 2015)).

171.    Rules are not required for *ad hoc* decisions based upon individual facts and circumstances. However, where discretionary determinations unmoored from specific facts are mandated by administrative fiat, the public must receive due notice and an opportunity to be heard regarding matters of manifest public interest established through broad based resolutions.

172.    The City Administrative Procedures Act ("CAPA"), §1041, defines "rule" according to, inter alia, the following language:

> [...] "Rule" means the whole or part of any statement or communication of general applicability that (i) implements or applies law or policy, or (ii) prescribes the procedural requirements of an agency including an amendment, suspension, or repeal of any such statement or communication.
>
> a. "Rule" shall include, but not be limited to, any statement or communication which prescribes (i) standards which, if violated, may result in a sanction or penalty; (ii) a fee to be charged by or required to be paid to an agency; [...]

173.    The August 17, 2023 ECB Resolution has eliminated case-by-case factual inquiries and determinations. The challenged Resolution has virtually eradicated any semblance of an impartial hearing process initiated by citizens. Moreover, associated practices have infringed upon citizen complaint prosecutions.

174.    For example, a key component of the citizen complaint enforcement process is filing notices of violations. The *New York City Charter* establishes the correct form to be utilized providing notice of violations. A sworn statement is utilized by the DEP to establish *prima facie* evidence of alleged facts. This form is purposely denied to citizen complainants through

41

administrative fiat divorced from the rulemaking process. This administrative action has burdened and impeded citizen enforcement of Noise Code violations.

175.     The commencement of citizen complaints through the preparation of a summons is a vital and integral element of the citizen complaint procedure. The procedural basis for commencing a proceeding is so critical to the process that it is defined in the *New York City Charter*.

176.     Chapter 45-A of the *New York City Charter* titled "OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS," states at 1049-a (d)(1)(b) that "The notice of violation or copy thereof [i.e., the summons form] when filled in and served shall constitute notice of the violation charged, and, if sworn to or affirmed, shall be *prima facie* evidence of the facts contained therein." ECB is planning to prevent citizens from filing sworn affidavits, thus further burdening, impeding and thwarting citizen complaints in a manner not applied to agency personnel. This unfair and disparate treatment is part of ECB's overall pattern and practice of nullifying the citizen complaint statute.

**e. Fiscal Impact Statement**

177.     Section 33 of the New York City Charter states, inter alia, that:

> "a. No proposed local law or budget modification shall be voted on by a council committee or the council unless it is accompanied by a fiscal impact statement containing the information set forth in subdivision b of this section. b. A fiscal impact statement shall indicate the fiscal year in which the proposed law or modification would first become effective and the first fiscal year in which the full fiscal impact of the law or modification is expected to occur; and contain an estimate of the fiscal impact of the law or modification on the revenues and expenditures of the city during the fiscal year in which the law or modification is to first become effective, during the succeeding fiscal year, and during the first fiscal year in which the full fiscal impact of the law or modification is expected to occur. [. . .] d. Each fiscal impact statement shall identify the sources of information used in its preparation. [. . .]"

178. The failure and refusal of the New York City Council to assess the fiscal impact of eliminating revenue derived from citizen complaints was an arbitrary and capricious abuse of discretion.

**f. Unconstitutional Retroactive Effect of Intro 1194-A**

179. In failing to adhere to the provisions of Article 1 § 10 of the United States Constitution, the City retroactively impaired and interfered with the contractual rights of Petitioner Detering.

180. Contractual rights were created by Petitioner Detering accepting an offer of the City to provide information to the City and engage in prosecution activities for the benefit of the City in exchange for specified monetary recompense.

181. In failing to adhere to Article 1 § 7(a) of the New York State Constitution, and the Fifth and Fourteenth Amendments of the Unites States Constitution, the City has confiscated private property without a rational basis and without just compensation, abrogating basic concepts of fairness and justice.

182. In all respects, Intro 1194-A has the effect of retroactively applying a new statute to previously established statutory obligations undertaken by Petitioner Detering. This retroactivity has the effect of upsetting reasonable reliance triggering fundamental concerns about fairness. *See Landgraf v. USI Film Products,* 511 US 244 (1994); *see also American Economy INS. Co. v. State of New York*, 30 NY3d 136, 149 (2017), cert denied, 138 S. Ct. 2601 (2018). In *Landgraf v USI Film Prods*., the Supreme Court articulated a contemporary framework for analyzing retroactivity — adopted by the New York State Court of Appeals, in *Regina Metropolitan Co. v. New York State Division of Housing and Community Renewal*, 35 NY 3d 332 (2020). The New York State Court of Appeals in *Regina* "recognized that application

43

of a new statute to conduct that has already occurred may, but does not necessarily, have 'retroactive' effect upsetting reliance interests and triggering fundamental concerns about fairness" *Regina* at 365. A statute has retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." See *Landgraf,* 511 U.S. at 280; *see also American Economy*, 30 NY 3d at 149.

183. Intro 1194-A impairs Petitioner's rights that he possessed when he entered into contractual arrangements to prosecute citizen complaints. Basic contractual rights have thereby been retroactively impaired. In short, new statutory and contractual obligations are being imposed upon past conduct.

## AS AND FOR A FIRST CAUSE OF ACTION

### Violation of the Green Amendment

184. Petitioners repeat and reallege each and every allegation contained in paragraphs 1-183 as if fully set forth herein.

185. The failure of the Environmental Control Board and the New York City Council to comply with the Constitutional Amendment in implementing the August 17, 2023 Resolution and associated practices and procedures alongside Intro 1194-A respectively, is a violation of the constitutional rights of Petitioners.

186. Petitioners are injured and damaged by such failure to comply with their constitutional rights in that they and other citizens of New York will be subjected to adverse noise related environmental impacts not heretofore identified or considered by the Environmental Control Board in the evisceration and nullification of the citizen complaint provision of the New York City Noise Control Code.

44

## AS AND FOR A SECOND CAUSE OF ACTION

### Violation of *The New York City Charter*

187.    Petitioners repeat and reallege each and every allegation contained in paragraphs 1-186 as if fully set forth herein.

188.    The ECB's failure to follow the rulemaking provisions and procedures set forth in the *New York City Charter* in the passage of the August 17, 2023 Resolution constitutes an arbitrary and capricious violation of law.

## AS AND FOR A THIRD CAUSE OF ACTION

### Violation of Administrative Law

189.    Petitioners repeat and reallege each and every allegation contained in paragraphs 1-188 as if fully set forth herein.

190.    Under an Article 78 review, the Court must consider whether the agency determination was procedurally deficient, whether it was affected by an error of law, or whether it was arbitrary and capricious.  *See* CPLR §7809(3).

191.    ECB/OATH acted and continues to act *ultra vires,* unlawfully, arbitrarily and capriciously in failing to adhere to its statutory mandate to comply with the citizen complaint provision of the New York City Noise Control Code.

192.    The failure to comply with applicable law and procedure, defines arbitrary and capricious behavior.

193.    As a result of the foregoing, ECB's Resolution of August 17, 2023 must be annulled and vacated.

Case 1:25-cv-02100-KPF     Document 24-2     Filed 10/10/25     Page 47 of 56

**AS AND FOR A FOURTH CAUSE OF ACTION**

**Failure to Provide a Factual Basis for the August 17, 2023 Resolution and/or
Administrative Determinations Rendered in the Aftermath of the Resolution**

194.     Petitioners repeat and reallege each and every allegation contained in paragraphs
1-193 as if fully set forth herein.

195.     ECB/OATH acted arbitrarily and capriciously and in violation of law and
continues to do so in its ongoing pattern and practice of enforcement by failing to provide a
factual or rational basis for the Resolution of August 17, 2023.

196.     ECB/OATH has acted arbitrarily, capriciously, irrationally and in violation of law
by enforcing the Resolution without any factual investigation or factual basis in the record to
support its decision-making.

**AS AND FOR A FIFTH CAUSE OF ACTION**

197.     Petitioners repeat and reallege each and every allegation contained in paragraphs
1-196 as if fully set forth herein.

198.     Respondents, in failing to follow administrative precedent in a pattern and
practice of actions related to citizen enforcement of §24-244(b) of the New York City Noise
Code, has acted and continues to act arbitrarily, capriciously, without a rational basis, and in
violation of New York City's statutory Noise Code.

**AS AND FOR A SIXTH CAUSE OF ACTION**

**(Passage of Intro 1194-A)**

199.     Petitioners repeat and reallege each and every allegation contained in paragraphs
1-198 as if fully set forth herein.

200.     Respondent City Council acted unlawfully, arbitrarily and capriciously in the
passage of Intro 1194-A by failing to conduct and publish a proper fiscal impact statement.

46

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Limiting Public Debate in the Passage of Intro 1194-A)

201.    Petitioners repeat and reallege each and every allegation contained in paragraphs
1-200 as if fully set forth herein.

202.    Respondent City Council acted unlawfully, arbitrarily and capriciously in the
passage of Intro 1194-A by thwarting, impeding and preventing public speakers from voicing
opposition during the public review and hearing process.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Timing Violation in the Passage of Intro 1194-A)

203.    Petitioners repeat and reallege each and every allegation contained in paragraphs
1-202 as if fully set forth herein.

204.    Respondent City Council acted unlawfully, arbitrarily and capriciously in the
passage of Intro 1194-A by failing to wait seven days, exclusive of Sundays, prior to a final vote
before City Council on Intro 1194-A.

## AS AND FOR A NINTH CAUSE OF ACTION

### (Breach of SEQRA and CEQR)

205.    Petitioners repeat and reallege each and every allegation contained in paragraphs
1-204 as if fully set forth herein.

206.    In failing to conduct any environmental assessment in relation to the significant
negative environmental impacts of noise, the City Council violated SEQRA and CEQR. The City
Council, in approving Intro 1194-A, acted unlawfully and in a manner that was arbitrary and
capricious.

47

## AS AND FOR A NINTH CAUSE OF ACTION

### (Unconstitutional Retroactive Application of Intro 1194-A)

207.    Petitioners repeat and reallege each and every allegation contained in paragraphs 1-206 as if fully set forth herein.

208.    In failing to adhere to the provisions of Article 1 § 10 of the United States Constitution, the City retroactively impaired and interfered with the contractual rights of Petitioner Detering.

**WHEREFORE,** Petitioners respectfully request that this Court grant judgment:

a)    Declaring that Respondents have acted unlawfully in failing to adhere to the Green Amendment;

b)    Declaring that Respondents have acted unlawfully in failing to adhere to SEQRA and CEQR;

c)    Declaring that Respondents have acted unlawfully in failing to adhere to the New York City Charter;

d)    Declaring that Respondents have acted unlawfully in failing to adhere to CAPA;

e)    Declaring that Respondent City Council acted in violation of Article 1 § 10 of the United States Constitution in retroactively impairing the contractual rights established by Petitioner Detering;

f)    Compelling Respondents to comply with the citizen complaint provision of the New York City Noise Code;

g)    Annulling the Resolution of August 17, 2023;

h) Annulling administrative determinations rendered by ECB/OATH in furtherance of the Resolution of August 17, 2023;

i) Annulling and declaring unconstitutional, Intro 1194-A;

j) Enjoining ECB/OATH from enforcing the August 17, 2023 Resolution;

k) Enjoining Respondents from unlawfully interfering, impeding or thwarting enforcement of the citizen complaint provision of the New York City Noise Code;

l) Awarding Petitioner and citizen complainants similarly situated their lawful share of civil penalties mandated by ECB compliance with the citizen complaint provision of the New York City Noise Code

m) Granting Petitioner legal fees, costs, disbursements and expenses in this proceeding; and

n) Granting such other and further relief as the Court deems just and proper.

Dated: East Hampton, New York
   January 22, 2024

           _____
           Jack L. Lester, Esq.
           *Attorney for Petitioners*
           41 Squaw Road
           East Hampton, NY 11937
           631.604.2228
           jllcomlaw@aol.com

49

## VERIFICATION

STATE OF NEW YORK     )

                                ) ss.:

COUNTY OF QUEENS      )

        **DIETMAR DETERING**, hereby affirms the following under penalties of perjury pursuant to CPLR 2106:

1.      I am one of the Petitioners in the above-captioned action.

2.      I have read the foregoing Amended Verified Petition and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.

        I affirm, this 22nd day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

        Dated: January 22, 2024

                                    _____

                                    **DIETMAR DETERING**

**FILORA B. SIMONIAN**
Notary Public, State of New York
No. 01SI4934450
Qualified in Queens County
Certificate Filed in New York County
Commission Expires June 13, 2026

47

# VERIFICATION

**YOAV EREZ**, hereby affirms the following under penalties of perjury pursuant to CPLR 2106:

1.    I am one of the Petitioners in the above-captioned action.

2.    I have read the foregoing Amended Verified Petition and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.

I affirm, this 22nd day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: January 22, 2024

**YOAV EREZ**

## VERIFICATION

**DEBORAH FARLEY**, hereby affirms the following under penalties of perjury pursuant to CPLR 2106:

1.      I am one of the Petitioners in the above-captioned action.

2.      I have read the foregoing Amended Verified Petition and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.


I affirm, this 22nd day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: January 22, 2024


*Deborah Farley*
_____
**DEBORAH FARLEY**

## VERIFICATION

STATE OF NEW YORK       )
                                  ) ss.:

COUNTY OF QUEENS        )

       **MITCHELL GRUBLER**, hereby affirms the following under penalties of perjury pursuant to CPLR 2106:

1.     I am one of the Petitioners in the above-captioned action.

2.     I have read the foregoing Amended Verified Petition and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.

       I affirm, this 22nd day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

       Dated: January 22, 2024


                                         *Mitchell Grubler*
                                    **MITCHELL GRUBLER**

50

## VERIFICATION

**FREDERIC HILLS,** hereby affirms the following under penalties of perjury pursuant to CPLR 2106:

1.      I am one of the Petitioners in the above-captioned action.

2.      I have read the foregoing Amended Verified Petition and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.


I affirm, this 22nd day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: January 22, 2024

**FREDERIC HILLS**

## VERIFICATION

**MICHAEL MCFADDEN**, hereby affirms the following under penalties of perjury pursuant to CPLR 2106:

1.    I am one of the Petitioners in the above-captioned action.

2.    I have read the foregoing Amended Verified Petition and know the contents thereof; and the same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.

I affirm, this 22nd day of January, 2024, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

Dated: January 22, 2024

**MICHAEL MCFADDEN**